## Exhibit F

**The Originators' and Sponsors' Pervasive
Breaches of Representations and Warranties**

A.    Alliance Bancorp ........................................................................................ 1

B.    American Home Mortgage Corporation ................................................... 2

C.    Countrywide Home Loans, Inc.,
       Countrywide Bank FSB, and Bank of America, N.A. ............................ 9

D.    Decision One Mortgage Company LLC .................................................. 21

E.    Encore Credit Corporation,
       ECC Capital Corporation, and EMC Mortgage Corporation .............. 23

F.    First Horizon Home Loan Corporation .................................................. 28

G.    Fremont Investment & Loan .................................................................... 36

H.    GreenPoint Mortgage Funding Inc. ....................................................... 41

I.    Impac Funding Corporation ..................................................................... 45

J.    JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC ............. 48

K.    Long Beach Mortgage Company ............................................................. 56

L.    MortgageIT, Inc. ....................................................................................... 61

M.    Nationstar Mortgage LLC ....................................................................... 65

N.    New Century Mortgage Corporation ..................................................... 68

O.    NovaStar Mortgage, Inc. ......................................................................... 75

P.    SouthStar Funding, LLC .......................................................................... 77

Q.    Wells Fargo Bank, N.A. ........................................................................... 78

A.    **Alliance Bancorp**

1.      Alliance Bancorp was a residential mortgage lender based in Brisbane, California.  Alliance Bancorp originated mortgage loans included in the CWALT 2007-AL1 Trust.

2.      Alliance Bancorp's abandonment of its underwriting guidelines was revealed, for example, in a lawsuit brought by the Federal Home Loan Bank of Boston ("FHLB Boston"), an RMBS investor.  The FHLB Boston conducted a review of the loan files for nine mortgage loans underwritten by Alliance Bancorp and each loan deviated from the underwriting guidelines.  *See* Compl. ¶¶ 567-574, *Fed. Home Loan of Boston v. Ally Fin. Inc.*, No. 11-1533 (Sup. Ct. Mass. Apr. 20, 2011).

3.      The types of deviations from the guidelines uncovered include:

- A loan file with no credit documentation whatsoever, making it impossible to evaluate the borrower's ability to repay the loan.  *Id*. ¶ 573.

- A cash-out refinance loan for a property with an unrealistic appraisal value of $2.8 million.  Less than 16 months before the appraisal, the home had sold for just $1.55 million.  *Id. ¶* 572.

- A loan made using an improper appraisal value.  For refinance loans that had been purchased within the prior year, the underwriting guidelines required that the sale price of the property be used to calculate the LTV ratio.  If the sale price had been used, the loan could not have been made because the CLTV exceeded 100%.  Because an appraised value was used instead of the sale price, the CLTV dropped below 100% and the loan was made.  *Id*. app. VIII at 1–2.

- A loan to a janitor, for whom the 75th percentile income was $3,317 per month.  The borrower's monthly obligations alone – including the subject transaction – were $5,587, far exceeding what could have been a reasonable repayment amount.  *Id*. app. VIII at 6.

B.    **American Home Mortgage Corporation**

4.    American Home Investment Corporation and its affiliates, including American Home Mortgage Corporation are collectively referred to as "American Home." American Home Mortgage Corporation originated mortgage loans included in the CWALT 2006-OC2 Trust.

5.    An October 2005 American Home "Credit Update" outlined the company's conscious decision to promote increasingly lax underwriting standards. Under the heading "Guideline Interpretation," the presentation set forth 30 pages of revised credit factors that made clear that American Home's underwriting guidelines were to be relaxed substantially or rendered essentially meaningless in order to allow the company to make loans to high-risk borrowers.  Specifically, on each page American Home set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What We Observed in [Our] Prior History" alongside the new "interpretation" under a heading entitled "Where We Are Now."  These new interpretations included:  (i) not requiring verification of income sources on stated income loans; (ii) reducing the required documentation for self-employed borrowers; and (iii) broadening the acceptable use of second and third loans to cover the full property value.

6.    That same document also set forth American Home's "Quality Control Philosophy" regarding its lending practices.  As that document made clear, underwriters and loan officers were to adhere to a philosophy that "Very few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

7.    Edmund Andrews, an economics reporter for *The New York Times*, recounted his own experience using American Home as a lender.  Edmund L. Andrews,

2

*My Personal Credit Crisis*, N.Y. Times, May 17, 2009, at MM46.  According to

Andrews, he was looking to purchase a home in 2004, and his real estate agent referred

him to a loan officer at American Home.  *Id.*  The American Home loan officer began the

ordeal by asking Andrews how large of a loan he needed.  *Id.*  Andrews, who had a

monthly take home pay of $2,777, advised the loan officer that he had hefty child support

and alimony payments to an ex-wife.  *Id.*  Andrews would be relying on his then-

unemployed fiancée to earn enough money to meet his monthly obligations—including

the mortgage.  Andrews reported:

> As I quickly found out, American Home Mortgage had become one of the fastest-growing mortgage lenders in the country.  One of its specialties was serving people just like me:  borrowers with good credit scores who wanted to stretch their finances far beyond what our incomes could justify.  In industry jargon, we were "Alt-A" customers, and we usually paid slightly higher rates for the privilege of concealing our financial weaknesses.

> I thought I knew a lot about go-go mortgages.  I had already written several articles about the explosive growth of liar's loans, no-money-down loans, interest-only loans and other even more exotic mortgages.  I had interviewed people with very modest incomes who had taken out big loans.  Yet for all that, I was stunned at how much money people were willing to throw at me.

> [The American Home loan officer] called back the next morning.  "Your credit scores are almost perfect," he said happily.  "Based on your income, you can qualify for a mortgage of about $500,000."

> What about my alimony and child-support obligations?  No need to mention them.  What would happen when they saw the automatic withholdings in my paycheck?  No need to show them.  If I wanted to buy a house, [the American Home loan officer] figured, it was my job to decide whether I could afford it.  His job was to make it happen.

> "I am here to enable dreams," he explained to me long afterward.  [The American Home loan officer]'s view was

> that if I'd been unemployed for seven years and didn't have a dime to my name but I wanted a house, he wouldn't question my prudence. "Who am I to tell you that you shouldn't do what you want to do? I am here to sell money and to help you do what you want to do. At the end of the day, it's your signature on the mortgage—not mine."

*Id.*

8. The American Home loan officer steered Andrews to a stated-income loan so that he would not have to produce paychecks or tax returns that would reveal his alimony and child support obligations. *Id.* The loan officer wanted to limit disclosure of Andrews' alimony and child support payments when an existing mortgage showed up under Andrews' name. *Id.* Although his ex-wife was solely responsible for that mortgage under the terms of the couple's separation agreement, the only way Andrews could explain that fact would be to produce the agreement, which would also reveal his alimony and child support obligations. *Id.* According to Andrews:

> [The American Home loan officer] didn't get flustered. If Plan A didn't work, he would simply move down another step on the ladder of credibility. Instead of "stating" my income without documenting it, I would take out a "no ratio" mortgage and not state my income at all. For the price of a slightly higher interest rate, American Home would verify my assets, but that was it. Because I wasn't stating my income, I couldn't have a debt-to-income ratio, and therefore, I couldn't have too much debt. I could have had four other mortgages, and it wouldn't have mattered. American Home was practically begging me to take the money.

*Id.*

9. American Home ultimately approved Andrews' application. *Id.* Not surprisingly, Andrews was unable to afford his monthly mortgage payments. *Id.*

10. American Home's poor lending practices resulted in numerous civil lawsuits. These lawsuits contained firsthand accounts from former employees and re-

4

analysis of the loans themselves.  When re-underwritten, a significant portion of American Home originated loans were found to have breached the associated representations and warranties.  Some of these complaints include the *Royal Park Invs. SA/NV v. Goldman Sachs Grp.*, No. 13-cv-652454 (N.Y. Sup. Ct. July 12, 2013)("Royal Park Complaint") and *N.J. Carpenters Health Fund v. Structured Asset Mortgage Investments II*, No. 08-cv-08093 (S.D.N.Y. May 15, 2009).

11.     American Home's lack of adherence to underwriting guidelines was set forth in detail in a 165-page amended class action complaint filed on June 4, 2008.  Am. Compl., *In re American Home Mortg. Sec. Litig.*, No. 07-md-1898 (TCP) (E.D.N.Y. June 4, 2008).  Investors in American Home common/preferred stock alleged that the company misrepresented itself as a conservative lender, when, based on statements from more than 33 confidential witnesses and internal company documents, American Home in reality was a high risk lender, promoting quantity of loans over quality by targeting borrowers with poor credit, violating company underwriting guidelines, and providing incentives for employees to sell risky loans, regardless of the borrowers' creditworthiness.  *See id*.

12.     Former American Home employees recounted that underwriters were consistently bullied by sales staff when underwriters challenged questionable loans, while exceptions to American Home's underwriting guidelines were routinely applied.  *See id*. ¶¶ 120–21.

13.     Former American Home employees also reported that American Home management told underwriters not to decline a loan, regardless of whether the loan application included fraud.  *See id*.

14.     Another former American Home employee stated that American Home routinely made exceptions to its underwriting guidelines to be able to close loans.  When American Home mortgage underwriters raised concerns to the sales department about the pervasive use of exceptions to American Home's mortgage underwriting practices, the sales department contacted American Home headquarters to get approval for the use of exceptions.  Indeed, it was commonplace to overrule mortgage underwriters' objections to approving a loan to facilitate loan approval.  *See id.* ¶ 123.

15.     A former American Home auditor confirmed this account that American Home mortgage underwriters were regularly overruled when they objected to loan originations.  *See id.* ¶ 124.

16.     The parties settled the litigation on January 14, 2010, for $37.25 million.

17.     In addition, according to a complaint filed by the SEC on April 28, 2009, senior executives of American Home made false and misleading disclosures designed to conceal American Home's financial condition from investors and violated various anti-fraud provisions of the federal securities laws.  *SEC v. Strauss*, No. 09-cv-4150 (S.D.N.Y. Apr. 28, 2009).

18.     Significantly, the SEC complaint alleged that American Home issued public statements misleadingly omitting the fact that American Home originated a large portion of mortgage loans without verifying the borrowers' incomes.  *Id.*

19.     Further, as set forth in the complaint filed in *Massachusetts Mutual Life Insurance Company v. Goldman Sachs*, No. 11-cv-30126 (D. Mass. May 5, 2011) ("Mass. Mutual Complaint"), American Home regularly disregarded its underwriting standards to grow its market share.  American Home's underwriters were put under

intense pressure by senior management to approve mortgage loans, while American Home's incentive commission structure emphasized a high volume of closed loans rather than prudent underwriting and loan quality.  Mass. Mutual Complaint ¶ 113.  "For example, an internal presentation called 'Incentive Compensation' discussed new compensation features to be implemented in 2005.  Per the company's new rules, underwriters were required to approve a certain minimum number of loans – five per day and 100 per month – in order to qualify for incentive compensation.  Loan 'Validators' and 'Closers' were similarly paid by volume, with a minimum of closed loans (18 and 80, respectively) required in order to qualify for bonuses."  *See id.* ¶ 113.

20.    A former American Home Executive Vice President stated that American Home's "underwriting practices became increasingly lax during the 2005 to 2007 time frame [and American Home] grant[ed] an ever-increasing number of loans to people unlikely to repay them.  According to this former employee, 'American Home followed Countrywide' . . . in offering 'fast and sleazy products' that had very questionable underwriting requirements and were of low quality."  *Id.* ¶ 114.

21.    As set forth in the Mass. Mutual Complaint, "[a] former American Home Wholesale Account Executive who worked at AHM from January 2005 through July 2007 stated that at American Home 'anybody could buy a house with zero percent down and no proof of ability to pay it [the loan] back.'"  *Id.*

22.    Ultimately, American Home's loan origination and underwriting practices were so suspect that in a 2010 report, the Office of the Comptroller of the Currency ("OCC"), identified American Home as the 10th worst subprime lender in the entire nation.  *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the

7

Worst Ten (Mar. 31, 2010), http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf ("2009 Worst Ten Report").

C.    **Countrywide Home Loans, Inc.,**
      **Countrywide Bank FSB, and Bank of America, N.A.**

23.    Bank of America, N.A. is an affiliate of Bank of America Corporation ("BAC"). In 2008, BAC acquired Countrywide Financial Corporation, including Countrywide Home Loans, Inc. and Countrywide Bank, FSB (collectively, "Countrywide").  Countrywide served as the sponsor for and originated mortgage loans included in sixty-three of the Countrywide Trusts. Countrywide also originated mortgage loans included in the SAMI 2006-AR3 and SAMI 2005-AR4 Trusts. Bank of America, N.A. originated mortgage loans included in the SAMI 2006-AR3 Trust.

24.    From 2000 to 2003, Countrywide rose to prominence as a mortgage lender originating hundreds of billions of dollars' of loans annually and securitizing them for sale.  Business expanded so rapidly that Countrywide's founder and CEO, Angelo Mozilo, stated publicly that, by 2006, Countrywide would be the Nation's "dominant" home-mortgage lender.  By 2004, however, Countrywide recognized that it would be unable to reach its lofty goals if it limited itself to lending to borrowers who qualified under prudent loan underwriting standards.

25.    In order to fuel Countrywide's growth, Countrywide resolved to approve any loan that could be securitized for sale to third parties, without regard to whether the loan complied with Countrywide's already lax underwriting standards. As Countrywide's CFO, David Sambol, stated in a February 13, 2005 email (which was not made public until years later):  "We should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."  Amanda Bransford, *MassMutual Brings New RMBS Suit Against Countrywide Execs*, Law360 (Apr. 24, 2012),

9

http://www.law360.com/articles/333621/massmutual-brings-new-rmbs-suit-against-countrywide-execs.

26.    Additionally, the SEC has released documents showing that Countrywide adopted a "matching" strategy whereby it would provide any mortgage product feature offered by a competitor.  This "matching" strategy could only be implemented through abandonment of Countrywide's supposed credit-risk-reducing underwriting guidelines. To get around its own requirements, Countrywide set up a system whereby any loan could be approved by way of underwriting "exceptions" and coached borrowers on how to apply for loan products that required little or no income or asset verification.

27.    Internal documents show that "exceptions" were involved in upwards of one-third of all loans, and were based purely on the desire to increase loan volume (and profits) and not on "compensating factors" as represented.  Countrywide deliberately offloaded the worst of these loans to securitizations sold to investors such as Commerzbank.

28.    In 2006, Countrywide internal reviews concluded that one-third of all Countrywide loans violated its underwriting guidelines.  As set forth in the complaint in *American Fiduciary Assurance Company v. Countrywide Financial Corporation*, "Frank Aguilera, a Countrywide Managing Director responsible for risk management, reported the 'particularly alarming' result . . . that 23% of the subprime loans," which were often included as prime or Alt-A loans in Countrywide's securitizations,

> were generated as exceptions, even taking into account "all guidelines, published and not published, approved and not yet approved."  The exception rate for "80/20" products (which [were] particularly risky because they required 100% financing) was even higher.  Aguilera wrote at the time:

10

"[t]he results speak towards our inability to adequately impose and monitor controls on production operations."

Compl. ¶ 124, *Am. Fid. Assurance Co. v. Countrywide Fin. Corp.*, No. 11-361D (W.D. Okla. Apr. 1, 2011). Another internal review conducted around the same time concluded that "approximately 40% of the Bank's reduced documentation loans . . . could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more." *See id.* ¶ 116 (omitted text in original).

29.    In a television special titled, "*If You Had a Pulse, We Gave You a Loan,*" Dateline NBC reported on March 27, 2009:

- To highlight just how simple it could be to borrow money, Countrywide marketed one of its stated-income products as the "Fast and Easy loan."

- As manager of Countrywide's office in Alaska, Kourosh Partow pushed Fast and Easy loans and became one of the company's top producers.

- He said the loans were "an invitation to lie" because there was so little scrutiny of lenders. "We told them the income that you are giving us will not be verified. The asset that you are stating will not be verified."

- He said they joked about it: "If you had a pulse, we gave you a loan. If you fog the mirror, give you a loan."

- Partow said that the practice of pushing through loans with false information was common and was known by top company officials. "It's impossible they didn't know."

- He lamented the decline of what he saw as a great place to work, suggesting a push to be number one in the business led Countrywide astray. He blamed Angelo Mozilo, a man he long admired, for taking the company down the wrong path. According to former senior

11

> account executive Bob Feinberg, Countrywide's problem was not limited to stated income loans. Countrywide also became a purveyor of loans that many consumer experts contend were a bad deal for borrowers, with low introductory interest rates that later could skyrocket.
>
> • In many instances, Feinberg said, that meant borrowers were getting loans that were "guaranteed to fail."

*If You Had a Pulse, We Gave You a Loan* (Chris Hansen, NBC Dateline Mar. 22, 2009), available at http://www.msnbc.msn.com/id/29827248/ns/dateline_nbc-the_hansen_files _with_chris_hansen.

30.     On June 4, 2009, the SEC sued Angelo Mozilo and other Countrywide executives, alleging securities fraud.  Specifically, the SEC alleged that Mozilo and the others misled investors about the credit risks that Countrywide created with its mortgage origination business, telling investors that Countrywide was primarily involved in prime mortgage lending, when it was actually heavily involved in risky sub-prime loans with expanded underwriting guidelines.  *See* Compl., *SEC v. Mozilo*, No. 09-cv-3994-JFW (C.D. Cal. June 4, 2009).  Mozilo and the other executives settled the charges with the SEC for $73 million on October 15, 2010.  *See* Walter Hamilton, E. Scott Reckard & Angelo Mozilo, *Other Former Countrywide Execs Settle Fraud Charges*, L.A. Times, Oct. 16, 2010, at A1.

31.     Internal Countrywide emails that the SEC released in connection with its lawsuit demonstrate the extent that Countrywide systematically deviated from its underwriting guidelines.  For example, in an April 13, 2006 email from Mozilo to other top Countrywide executives, Mozilo stated that Countrywide was originating home mortgage loans with "serious disregard for process, compliance with guidelines and

12

irresponsible behavior relative to meeting timelines." Email from Angelo Mozilo, CEO, Countrywide Financial, to Eric Sieracki, Stan Kuland, Dave Sambol, David Spector & John Murray, Managing Directors, Countrywide Financial (Apr. 23, 2006 7:42 PM PST), available at http://www.paperlessarchives.com/FreeTitles/FinancialCrisis Email.pdf. Mozilo also wrote that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan[s]." *Id.*

32. Indeed, in September 2004, Mozilo had voiced his concern over the "clear deterioration in the credit quality of loans being originated," observing that "the trend is getting worse" because of competition in the non-conforming loans market. With this in mind, Mozilo argued that Countrywide should "seriously consider securitizing and selling ([Net Interest Margin Securities]) a substantial portion of [Countrywide's] current and future sub prime [sic] residuals." Email from Angelo Mozilo, CEO, Countrywide to Stan Kurland & Keith McLaughlin, Managing Directors, Countrywide Financial (Sept. 1, 2004 8:17 PM PST), *available at* www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

33. Countrywide sold a product called the "Pay Option ARM." This loan was a 30-year adjustable rate mortgage that allowed the borrower to choose between various monthly payment options, including a set minimum payment. In a June 1, 2006 email, Mozilo noted that most of Countrywide's Pay Option ARMs were based on stated income and admitted that "[t]here is also some evidence that the information that the borrower is providing us relative to their income does not match up with IRS records." Email from Angelo Mozilo to Carlos Garcia, former CFO, Countrywide Financial, Jim

13

Furash, former President, Countrywide Bank, Stan Kurland & Dave Sambol, Managing

Directors, Countrywide Financial (June 1, 2006 10:38 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

34.     An internal quality control report emailed on June 2, 2006, showed that for

stated income loans, 50.3 percent of loans indicated a variance of 10 percent or more

from the stated income in the loan application.  *See* Email from Clifford Rossi, Chief

Risk Officer, Countrywide, to Jim Furash, Executive, CEO, Countrywide Bank, N.A.,

among others (June 2, 2006 12:28 PM PST), *available at*

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

35.     Countrywide, apparently, was "flying blind" on how one of its popular

loan products, the Pay Option ARM loan, would perform, and admittedly, had "no way,

with any reasonable certainty, to assess the real risk of holding these loans on [its]

balance sheet."  Email from Angelo Mozilo to David Sambol, Managing Director,

Countrywide Financial (Sept. 26, 2006 10:15 AM PST), available at

http://www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  Yet such loans

were securitized and passed on to unsuspecting investors such as the Commerzbank.

36.     With growing concern over the performance of Pay Option ARM loans in

the waning months of 2007, Mozilo advised that he "d[id]n't want any more Pay Options

originated for the Bank."  Email from Angelo Mozilo to Carlos Garcia, former Managing

Director, Countrywide Financial (Nov. 3, 2007 5:33 PM PST), available at

www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.  In other words, if

Countrywide was to continue to originate Pay Option ARM loans, it was not to hold onto

the loans.  Mozilo's concerns about Pay Option ARM loans were rooted in

14

"[Countrywide's] inability to underwrite [Pay Option ARM loans] combined with the fact that these loans [we]re inherently unsound unless they are full doc, no more than 75% LTV and no piggys." *Id.*

37.    In a March 27, 2006 email, Mozilo reaffirmed the need to "oversee all of the corrective processes that will be put into effect to permanently avoid the errors of both judgement [sic] and protocol that have led to the issues that we face today" and that "the people responsible for the origination process understand the necessity for adhering to the guidelines for 100% LTV sub-prime product.  This is the most dangerous product in existence and there can be nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances."  Email from Angelo Mozilo to the former Countrywide Managing Directors (Mar. 27, 2006 8:53 PM PST), available at www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

38.    Yet Countrywide routinely found exceptions to its underwriting guidelines without sufficient compensating factors.  In an April 14, 2005 email, Frank Aguilera, a Countrywide managing director, explained that the "spirit" of Countrywide's exception policy was not being followed.  He noted a "significant concentration of similar exceptions" that "denote[d] a divisional or branch exception policy that is out side [sic] the spirit of the policy." Email from Frank Aguilera, Managing Director, Countrywide, to John McMurray, Managing Director, Countrywide (Apr. 14, 2005 12:14 PM PDT), available at http://www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf. Aguilera further stated, "The continued concentration in these same categories indicates either a) inadequate controls in place to mange [sic] rogue production units or b) general

disregard for corporate program policies and guidelines." *Id.* Aguilera observed that pervasive use of the exceptions policy was an industry-wide practice.

39. "It appears that [Countrywide Home Loans]' loan exception policy is more loosely interpreted at [Specialty Lending Group] than at the other divisions. I understand that [Correspondent Lending Division] has decided to proceed with a similar strategy to appease their complaint customers. . . . [Specialty Lending Group] has clearly made a market in this unauthorized product by employing a strategy that Blackwell has suggested is prevalent in the industry. . . ." *Id.*

40. Internal reports created months after an initial push to rein in the excessive use of exceptions with a "zero tolerance" policy showed the use of exceptions remained excessive. Email from Frank Aguilera, Managing Director, Countrywide, to Brian Kuelbs, Managing Director, Countrywide, among others (June 12, 2006 10:13 AM PST), available at www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

41. Still, in February 2007, nearly a year after pressing for a reduction in the overuse of exceptions and as Countrywide claimed to be tightening lending standards, Countrywide executives found that exceptions continued to be used at an unacceptably high rate. Frank Aguilera stated that any "[g]uideline tightening should be considered purely optics with little change in overall execution unless these exceptions can be contained." Email from Frank Aguilera, Managing Director, Countrywide, to Mark Elbuam, Managing Director, Countrywide, among others (Feb. 21, 2007 4:58 PM PST), available at http://www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

42. John McMurray, a former Countrywide managing director, expressed his opinion in a September 2007 email that "the exception process has never worked

16

properly." Email from John McMurray, Managing Director, to Jess Lederman, Managing Director, Countrywide (Sept. 7, 2007 10:12 AM PST), *available at* http://www.paperlessarchives.com/FreeTitles/FinancialCrisisEmail.pdf.

43.     Countrywide conceded that the poor performance of loans it originated was, in many cases, due to poor underwriting.  In April 2007, Countrywide noticed that its high CLTV ratio stated income loans were performing worse than those of its competitors.  After reviewing many of the loans that went bad, a Countrywide executive stated that "in most cases [poor performance was] due to poor underwriting related to reserves and verification of assets to support reasonable income."  Email from Russ Smith, Countrywide to Andrew Gissinger, Managing Director, Countrywide (Apr. 11, 2007 7:58 AM PST), *available at* http://www. paperless*archives.com/FreeTitles/FinancialCrisisEmail.pdf.*

44.     Not surprisingly, Countrywide and BAC's complete disregard for proper loan underwriting has spawned numerous lawsuits.  As part of these lawsuits, plaintiffs have performed forensic analyses and re-underwritten entire loan files.  The staggering number of loans breaching the associated representations and warranties discovered in these cases would have alerted even the most casual of observers that Countrywide and Bank of America loans breached the associated representations and warranties.  *See, e.g.*, Compl., *Mass. Mutual Life Ins. Co. v. Countrywide Fin. Corp.*, No. 11-cv-10414 (D. Mass. Sept. 1, 2011); Compl., *Allstate Ins. Co. v. Countrywide Fin. Corp.*, No. 10-cv-9591 (S.D.N.Y. Dec. 27, 2010); Compl., *AIG v. Bank of Am.*, No. 11-cv-652199 (N.Y. Sup. Ct. Aug. 8, 2011).

17

45.     This is evident from an SEC Quarterly Report filed by BAC for the period ending March 31, 2011, which disclosed over $13.5 billion in outstanding repurchase requests based on breach of representation and warranty claims.  These repurchase claims were unquestionably meritorious as evidenced by the sums BAC was paying to resolve them.  For example, as reported in the SEC Quarterly Report, BAC paid $577 million during the three months ending March 31, 2011 and $1.1 billion for the three months ending March 31, 2010, in order to resolve $723 million and $1.2 billion of repurchase claims on both BAC and legacy Countrywide originations.  These repurchase claims resulted in a loss on the related loans totaling $346 million and $707 million respectively. Bank of Am. Corp., Quarterly Report (Form 10-Q) (May 5, 2011).

46.     Further, in August 2014, BAC reached a $16.65 billion settlement with the United States Department of Justice ("DOJ") to resolve federal and state claims against BAC and its former and current subsidiaries, including Countrywide.  The resolution required BAC to provide much needed relief to underwater homeowners and potential homebuyers.   In connection with the settlement, Defendants "made admissions concerning their conduct, including that they were aware that many of the residential mortgage loans they had made to borrowers were defective, that many of the representations and warranties they made to the GSEs about the quality of the loans were inaccurate, and that they did not self-report to the GSAs mortgage loans they had internally identified as defective." *Bank of America to Pay $16.65 Billion in Historic Justice Department Settlement for Financial Fraud Leading up to and During the Financial Crisis*, Department of Justice Office of Public affairs (Aug. 21, 2014),

18

http://www.justice.gov/opa/pr/ bank-america-pay-1665-billion-historic-justice-

department-settlement-financial-fraud-leading.

47.    Specifically, BAC admitted, among other things, the following statements

concerning Countrywide's conduct:

- "[F]rom 2005 to 2007, Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides.  At the same time, employees of Countrywide received information indicating that there was an increased risk of poor performance for certain mortgage programs and products that were being included in RMBS.  Despite having access to this information, Countrywide's RMBS offering documents generally did not disclose the extent to which underlying loans were originated as exceptions to its Loan Program Guides.  Nor did Countrywide disclose in its RMBS offering documents the results of certain reviews and internal reports related to loan performance." *Id.* at 6.

- "Countrywide originated an increasing number of loans as exceptions to its Loan Program Guides. . . .an internal Countrywide email indicated that during May 2006, for prime loans, exceptions constituted by dollar amount approximately 30% of funding for certain fixed loans, 40% for Pay-Option ARMs, and 50% for expanded criteria hybrid loans." *Id.* at 10.

- "During the period from August 2005 to 2007, Countrywide received information regarding the performance and characteristics of loans that it originated under various products and programs and securitized into RMBS. That information suggested that certain products had the potential to perform poorly, particularly in a challenging economic environment." *Id.* at 11.

- "On February 3, 2006, an article in Inside Mortgage Finance Publications reported on a study that Countrywide presented at the American Securitization Forum Conference.  The article reported that a Countrywide executive had stated that 'Pay Option Arms were found to be the riskiest product on the market. . . . Throughout 2006 and 2007, Countrywide continued to originate Pay-Option ARMs, including as exceptions to its Loan Program Guides, and to securitize these Pay-Option ARMs into RMBS.  As disclosed in Offering Documents, in certain RMBS backed by Pay-Option ARMs, as many as 90% of the loans that backed the certificates were originated under reduced documentation programs." *Id.* at 13-14.

19

- "Countrywide also received information indicating that some borrowers who applied for loans in which they stated their incomes without providing verification may have been overstating their incomes on their loan applications." *Id.* at 14.

- In May 26, 2006, a report found "that approximately 40% of [Countrywide's] reduced documentation loans in the portfolio could potentially have income overstated by more than 10% and a significant percent of those loans would have income overstated by 50% or more." *Id.*

- "Although Countrywide originated an increasing number of mortgage loans as exceptions to its Loan Program Guides from 2005 to 2007, Countrywide generally did not disclose in its RMBS Offering Documents the scope of the exceptions to its Loan program Guides. Throughout this time period, Countrywide received information on risks associated with certain mortgage products and programs. Countrywide did not disclose in its RMBS Offering Documents the results of certain reviews and internal reports that analyzed this information." *Id.* at 15.

- "A significant percentage of loans that Countrywide sold to [government-sponsored entities ("GSEs")] during 2004 to 2008 were originated by Countrywide's prime retail division, known as the Consumer Markets Division ("CMD").  During this time, Countrywide was aware that many of the residential mortgage loans originated through CMD were defective and/or otherwise ineligible for sale to the GSEs." *Id.* at 28.

20

### D.    Decision One Mortgage Company LLC

48.    In 2006, Decision One Mortgage Company LLC ("Decision One") was the 14th largest subprime lender in the nation.  It specialized in mortgage loans known as Alt-A lending options, and non-conforming or sub-prime loans.  Decision One originated mortgage loans included in the CWALT 2006-OC2, CWALT 2006-OC4, and CWL 2004-BC4 Trusts.

49.    According to testimony and documents submitted to the Financial Crisis Inquiry Commission ("FCIC") by a Clayton Holdings, Inc. ("Clayton") executive, during 2006 and the first half of 2007, Clayton reviewed 911,039 loans issued by originators, including Decision One, for securitization.  Clayton determined that over 10 percent of Decision One's loans did not comply with its underwriting guidelines and had no compensating factors.  *See* Clayton All Trending Report, 10 (2006–2007), *available at* http://fcic-static.law.stanford.edu/cdn_media/fcic-testimony/2010-0923-Clayton-All-Trending-Report.pdf.

50.    Indeed, Decision One's reckless lending practices earned it a spot on the OCC's 2008 "Worst Ten in the Worst Ten" report, a report which identified the ten originators with the largest number of non-prime mortgage foreclosures for 2005–2007 originations in each of the ten metropolitan areas with the highest rates of foreclosure in the first half of 2008.  *See* Press Release, Office of the Comptroller of the Currency, Worst Ten in the Worst Ten (Nov. 13, 2008), *available at* http://www.occ.gov/news-issuances/news-releases/2010/nr-occ-2010-39d.pdf (the "2008 Worst Ten Report").  Additionally, a complaint filed by Allstate Insurance Company contains confidential witness statements in which former Decision One employees "described Decision One's

21

lax attitude towards its own origination and underwriting standards and explained that

Decision One had been approving loans that should have never been issued." Compl.

¶ 95, *Allstate Ins. Co. v. Morgan Stanley*, No. 11-cv-651840 (N.Y. Sup. Ct. July 5, 2011).

E.    **Encore Credit Corporation, ECC Capital
      Corporation, and EMC Mortgage Corporation**

51.    Encore Credit Corporation ("Encore"), founded in 2002, was a subprime lender specializing in "nonconforming" borrowers and focused on Alt-A and subprime loans, including "interest-only" loans and ARMs. Bear Stearns Residential Mortgage Corporation ("BSRMC"), an RMBS originator, was formerly known as EMC Residential Mortgage Corporation, which is an affiliate of EMC Mortgage Corporation (collectively, "Bear Stearns"). Encore (later known as Performance Credit Corporation) and ECC Capital Corporation ("ECC") were acquired by BSRMC in February 2007, to act as another channel for the origination of subprime loans. Encore originated mortgage loans included in the CWL 2004-CB4 and ECR 2005-2 Trusts. ECC served as the sponsor for the ECR 2005-2 Trust. EMC Mortgage Corporation served as sponsor for the EMC Trusts.

52.    Encore has faced a number of TILA lawsuits alleging a host of deceptive loan origination practices. Allegations against Encore include predatory lending, failing to disclose material terms of the loan, improperly inflating appraisals, forcing homebuyers to sign blank loan documents and altering documents without borrowers' consent. *See* Compl., *Lindsay v. Encore Credit Corp.*, No. 10-cv-2464 (N.D. Ga. Aug. 6, 2010); Compl., *Pieleanu v. Mortg. Elec. Reg. Sys.*, No. 08-cv-07404 (N.D. Ill. Dec. 29, 2008); Compl., *Smith v. Encore Credit Corp.*, No. 08-cv-01462 (N.D. Ohio June 17, 2008); Compl., *Welch v. Countrywide Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009); Compl., *Martinez v. Encore Credit Corp.*, No. 09-cv-05490 (C.D. Cal. July 27, 2009).

53.    In 2007, Encore reported that:

23

> ECC Capital experienced an increase in repurchase claims related to early payment defaults (EPD) on mortgage loans for which the borrower has missed the first payment due to the purchaser of the loan or investor.  This increase in repurchase claims led to the need to increase ECC Capital's reserve for losses that are incurred in connection with the repurchase and disposition of repurchased loans or the costs incurred in directly settling any repurchase obligation with an investor.  During the third and fourth quarters of 2006, ECC Capital entered into settlement agreements with 11 purchasers of its loans paying or accruing a total of $35.4 million to extinguish various EPD and representation and warranty repurchase claims.  Loans sold to these 11 purchasers during 2006 represented the majority of ECC Capital's sales volume for the year.

News Release, ECC Capital Corp., ECC Capital Corporation Reports Results for Three Months Ended March 31, 2007 (2007), *available at* http://www.prnewswire.com/news-releases/ecc-capital-corporation-reports-results-for-three-months-ended-march-31-2007-58267032.html.

54.    Further, in January 2009, a lawsuit was filed in the Eastern District of California against Encore and several other defendants alleging that Encore engaged in a scheme to coerce low-income borrowers into loans that they could not afford.  Compl., *Welch v. Countrywide Home Loans*, No. 09-cv-00168 (E.D. Cal. Jan. 20, 2009).  The complaint alleged that defendants did not assess borrowers' credit risk, debt-to-income ("DTI") ratios, or any other objective factors designed to assess repayment ability.  *Id*. Moreover, the plaintiffs claimed that Encore encouraged appraisers to overstate and did overstate appraisal values in order to push more loans through the system.  *Id*.  In July 2009, a similar complaint was filed in the Central District of California against Encore, among others, alleging that Encore was involved in originating loans based upon false

and inflated appraisal values. Compl., *Martinez v. Encore Credit Corp.*, No. 09-cv-05490 (C.D. Cal. July 27, 2009).

55. Media reports also exposed Encore's practice of ignoring its stated underwriting guidelines and failing to evaluate its borrowers' true repayment ability. As illustrated in a news article published in *The Oregonian* on February 5, 2008, Encore ignored its stated underwriting guidelines, falsified incomes, did not determine whether the borrowers could afford to repay their loans, forged documents, and put borrowers into loans they obviously could not afford to repay. *Bill Would Help Declaw Mortgage Predators*, Oregonian, http://satellite.tmcnet.com/ news/2008/02/05/3251503.htm (last updated Feb. 5, 2008). *The Oregonian* recounted the story of borrower Paul Hoffhine Jr., a mentally disabled man who subsisted on Social Security payments of $624 per month. *Id.* Hoffhine had inherited a house from his parents in the 1980s that was completely paid for. *Id.* In February 2004, Encore cold-called Hoffhine and talked him into taking out a loan on the property so that Hoffhine could take equity out of the property in the form of cash. *Id*. The loan had monthly payments of $489.46. *Id*. Thus, Hoffhine's DTI ratio was over 78 percent based solely on the mortgage loan extended by Encore (the $489.46 loan payment divided by Hoffhine's monthly $624 Social Security payment equals 78.4 percent). *Id*. Hoffhine's other debts were not used to calculate the 78+ percent DTI ratio above, and therefore, if he had other debts, his DTI ratio would have been even higher. *Id*. However, in the offering documents describing Encore's underwriting guidelines, it was stated that the maximum DTI ratios allowed under Encore's guidelines were only 50–55 percent. *Id*. Accordingly, Encore did not follow its underwriting guidelines for DTI ratios. *Id*.

25

56.     Even worse, according to *The Oregonian*, a few months later, in December 2004, Encore persuaded Hoffhine to refinance and take out a new loan. *Id*. The monthly payment on the new loan increased to $617 per month, just $7 less than Hoffhine's entire monthly income, generating a DTI ratio of over 98 percent. *Id*. Thus, on the second loan, Encore again ignored its stated underwriting guidelines requiring DTI ratios of 55 percent or less, and gave Hoffhine a loan which generated a DTI ratio of over 98 percent, far in excess of the stated DTI ratio maximums under Encore's underwriting guidelines, and far beyond Hoffhine's ability to repay. *Id*.

57.     Even more disturbing was the fact that Encore engaged in fraudulent activity related to the loan. *The Oregonian* reported that, in Hoffhine's loan file, there was "a document claiming that Hoffhine was earning $3,500 a month as a handyman . . . [u]nderneath [which was] a scrawled signature–Paul Hauck Hoffhine Jr." *Id*. The news article reported that Hoffhine denied making the statement or signing the document, which was an obvious forgery containing fraudulent information. *Id*. The article quoted Hoffhine: "They forged my signature, [and] they inflated my income." *Id*. After being threatened with a lawsuit, Encore quickly and quietly settled with Hoffhine.

58.     As a result of these business practices, in May 2009, Encore was listed as number 17 on the Center for Public Integrity's list of top 25 subprime lenders responsible for the subprime economic meltdown, based on over $22 billion in high-risk, high-interest loans that the company originated between 2005 and 2007. *Who's Behind the Financial Meltdown?: The Subprime 25*, Center for Public Integrity, http://www.publicintegrity.org/2009/05/06/ 13005/no-17-subprime-25-encore-credit-corp-ecc-capital-corpbear-stearns-cos-inc (last updated May 19, 2014 12:19 PM).

26

59.     In November 2013, Bear Stearns, among others, entered into a $13 billion settlement with the DOJ to resolve federal and state civil claims, including the New York lawsuit, arising out of the fraudulent packaging, marketing, sale and issuance of RMBS by Bear Stearns, among others.  As part of the settlement, Bear Stearns acknowledged it made serious misrepresentations to the public about RMBS transactions.  EMC was a wholly-owned subsidiary of Bear Stearns at the time of this settlement.  Flow-conduit loans were acquired by EMC, which Bear Stearns would then securitize and sell to investors.  Bear Stearns represented that entities that sold loans to EMC through the flow-conduit channel were reviewed and approved by Bear Stearns when in fact numerous securitizations included loans originated by entities that Bear Stearns found to be in such poor financial condition they were earmarked as suspended or terminated from doing business with Bear Stearns.  Investors were not made aware of this at the time they purchased the securities.  The resolution required Bear Stearns to provide much needed relief to underwater homeowners and potential homebuyers.  Under the terms of the settlement, JPMorgan received credit for modifying loans, including securitized loans.  JPMorgan has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan, would bear the loss.

F.     **First Horizon Home Loan Corporation**

60.     First Horizon Home Loan Corporation ("First Horizon") was, at all relevant times, in the business of originating, purchasing, selling and servicing mortgage loans.  First Horizon originated the mortgage loans included in the FHAMS 2006-AA1 and SAMI 2005-AR6 Trusts and served as the sponsor for FHAMS 2005-FA5 and FHAMS 2005-FA7 Trusts.

61.     On May 9, 2008, a class action suit was filed against First Horizon, among others, for ERISA violations based on their investment of employee retirement plans in First Horizon's own stock.  Compl., *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293 (W.D. Tenn. May 9, 2008).  There, the plaintiffs claimed that First Horizon required plan participants to invest in the company's stock, which was imprudent because, among other things, First Horizon failed to ensure compliance with its own underwriting standards. *Id.*  In their Third Amended Complaint, the plaintiffs alleged:

- First Horizon placed insufficient emphasis on such functions as internal audit and accounting and governmental compliance, while pouring resources into production.

- As of the beginning of 2006, First Horizon's real estate valuation processes did not comply with regulatory guidance.  While this significant problem was the subject of numerous regulatory examinations and communications, the flaws in First Horizon's processes were so serious that the company failed to attain compliance with applicable regulatory guidance during 2006 into 2007.  Internal reporting cited the fact that First Horizon did not have accurate locations recorded for all real estate collateral and was unable to keep up with the identification of problem assets in the residential commercial real estate portfolio, which delayed timely recognition of losses and appropriate provisioning.  The appraisal processes also had serious flaws, which caused significant problems in the valuation of real estate.

28

- Once First Horizon began to use more appropriate methodologies and data analytics in internal auditing, audit reporting described significant problems and issued "unsatisfactory" ratings, including in the processes, procedures and controls used in consumer appraisal ordering, compliance with loan collateral requirements and customer/credit risk due diligence for its products.

Third Am. Compl. ¶¶ 172, 93, 104, *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293 (W.D. Tenn. Feb. 25, 2011).

62.    On September 30, 2009, the District Court for the Western District of Tennessee denied in part the defendants' motions to dismiss the plaintiffs' claims, holding that the plaintiffs had adequately pleaded that the defendants breached their fiduciary duties to the plaintiffs by investing in First Horizon stock when it was no longer prudent to do so.  *Sims v. First Horizon Nat'l Corp.*, No. 08-cv-2293, 2009 WL 3241689 (W.D. Tenn. Sept. 30, 2009).  On October 10, 2010, the Court confirmed that order, denying the defendants' request for reconsideration.  First Horizon reached a $6 million settlement with the plaintiffs in November 2011, which was approved by the Court on September 13, 2012.

63.    Similarly, in June 2010, shareholders filed a derivative suit against First Horizon in the Western District of Tennessee, alleging that First Horizon engaged in unlawful origination activities, falsified loan documents, concealed internal wrongdoing, failed to disclose the true risks and losses of its origination activities and failed to implement and follow controls designed to minimize risk and loss.  *See* Compl., *Reid v. First Horizon Nat'l*, No. 10-cv-02413 (W.D. Tenn. June 2, 2010).  Although the complaint was dismissed on statute of limitations grounds, its allegations corroborate

29

Commerzbank's claim here that First Horizon systematically failed to adhere to its underwriting guidelines.

64.    Forensic investigations and loan level reviews conducted by investors confirm the pervasive breaches of representations and warranties in First Horizon-label RMBS.  For example, on October 15, 2010, Federal Home Loan Bank of Indianapolis ("FHLB-Indianapolis") filed a securities fraud action against a Bank of America affiliate for recovery of losses on nearly $3 billion in RMBS in thirty-one securitizations. Compl., *Fed. Home Loan Bank v. Banc of Am. Mortg. Sec., Inc.*, No. 10-cv-01463 (S.D. Ind. Nov. 15, 2010).  FHLB-Indianapolis performed a loan level review of loans underlying a First Horizon securitization and found that 8.82 percent of loans had a greater than 100 percent LTV ratio (contrary to First Horizon's representation that no loans had an LTV of greater than 100 percent); loans with greater than 90 percent LTV were understated by 32.8 percent; and loans with greater than 80 percent LTV were understated by 31.91 percent.  *Id.*

65.    On September 2, 2011, the Federal Housing Finance Agency ("FHFA") filed an action against First Horizon, alleging that First Horizon misrepresented the quality of the underlying mortgage loans, the creditworthiness of the borrowers and the practices used to originate such loans in connection with five First Horizon-sponsored securitizations.  Compl., *FHFA v. First Horizon Nat'l Corp.*, 11-cv-06193 (S.D.N.Y. Sept. 2, 2011).

66.    In *CIFG v. Bank of America*, No. 12-cv-654028 (N.Y. Sup. Ct. Nov. 20, 2012), CIFG, a New York-based monoline insurer, wrote insurance relating to two structured transactions arranged by Bank of America, which in turn were backed by

twenty-two securitizations, including six Countrywide-label securitizations and two First Horizon-label securitizations.  Of the 1,656 loans reviewed, CIFG found that 834 loans (or 50.38 percent) contained at least one material defect.  *Id*. ¶ 8.  CIFG similarly found that First Horizon had understated the actual amount of loans with LTV ratios of: (i) 80 percent or greater by more than 39 percent; (ii) 90 percent or greater by more than 20 percent; and (ii) 100 percent or greater by more than 9 percent.  *Id*. ¶¶ 127–29.  CIFG further found that First Horizon overstated the actual percentage of owner occupied properties by more than 7 percent and that more than 11 percent of the sampled loans were assigned to third parties and still held in the originator's name instead of to the Trust.  *Id*. ¶ 148.

67.    In *FDIC v. Chase Mortgage. Financial Corporation*, No. 12-cv-06166 (S.D.N.Y. Aug. 10, 2012), the Federal Deposit Insurance Corporation ("FDIC") filed an action against various investment banks in connection with its purchase of eleven RMBS, including a First Horizon-label securitization.  The FDIC performed a loan level review of a large sample of those loans and found that 27 percent of the loans had LTV ratios in excess of 105 percent (contrary to First Horizon's representation that no loans had an LTV of greater than 100 percent) and 17 percent of the loans misrepresented the owner occupancy status.  *Id*. ¶¶ 51, 76, 83.

68.    Administrative and regulatory proceedings have also brought to light fraudulent underwriting practices at First Horizon.  In July 2008, a former First Horizon corporate security investigator filed a whistleblower complaint with the Department of Labor alleging that the company routinely concealed mortgage and banking fraud prior to her termination in 2006.  *See* Marshall Eckblad, *Complaint Alleges First Horizon*

31

*Concealed Mortgage Fraud*, Dow Jones Newswires (July 2, 2008), *available at*

http://forum.ml-

implode.com/viewtopic.php?t=4345&postdays=0&postorder=asc&start=375.  The

investigator stated that she had uncovered over 50 separate cases of mortgage fraud

during her time at First Horizon, including fraudulent conduct at a First Horizon branch

in Idaho.  Examples of the perpetration of mortgage fraud included:

- At one First Horizon branch in Idaho, "a loan officer conceded that he had illegally altered loan documents and told the investigator that 'everyone in the branch is doing it.'"

- The same First Horizon branch "routinely submitted applications for borrowers for adjustable-rate mortgages that officers knew the borrower could not afford."  In order to accomplish this, First Horizon employees inflated the "borrowers' income on applications for 'stated income' loans – or subprime loans that did [not] require borrowers to substantiate their income –" even though the loan officers were in possession of income tax documents that disproved the stated income.

- According to the investigator, First Horizon, as a general rule, "allowed the loan officers – as long as they were raking in the money – to do whatever they wanted."  As an example, "one top-producing loan officer fabricated and forged a lease agreement between an applicant and the applicant's mother, without either one's knowledge, in order to qualify the applicant for a loan."

- First Horizon also covered up allegations of fraud by removing from internal draft "Suspicious Activity Reports" any references to fraud committed by its loan officers before those reports were provided to regulators.  Instead, First Horizon directed any allegations involving fraud toward the loan applicants themselves.

- When the investigator reported cases of loan fraud to her superiors at First Horizon, the supervisors "'[i]ntervened or overrode' her investigations [or] 'took no action at all.'"

*Id*.

69.     A 2010 United States Department of Housing and Urban Development

("HUD") investigation also illustrates First Horizon's non-compliance with underwriting

32

standards.  In January 2010, HUD Inspector General Kenneth M. Donohue subpoenaed First Tennessee Bank (First Horizon's parent) regarding failed loans issued by First Horizon that resulted in claims paid out by the Federal Housing Administration's ("FHA") mortgage insurance fund.  The HUD Inspector General sought to "aggressively pursue indicators of fraud" at First Horizon based on FHA findings about First Horizon's origination and underwriting practices.  *See* Eric Snyder, *First Tennessee Bank Mortgage Loan Records Subpoenaed*, Nashville Bus. J. (Jan. 13, 2010), http://www.bizjournals.com/nashville/stories/2010/01/11/daily17.html.

70.    At the time of HUD's investigation, First Horizon's "compare ratio," *i.e.*, the percentage of loan defaults and claims on FHA's mortgage insurance fund, was "in excess of 200 percent of the national average as listed" in HUD's Neighborhood Watch underwriting review system.  *See* HUD, Office of Inspector General, Memorandum No. 2010-NY-1807, First Tennessee Bank, N.A., Memphis, TN, Did Not Properly Underwrite a Selection of FHA Loans (Sept. 27, 2010), *available at* http://www.hud.gov/offices/oig/reports/files/ig1021807.pdf.

71.    The report on First Horizon released by HUD on September 27, 2010 concluded that 28 percent of the loans were not written in accordance with HUD/FHA underwriting regulations and were not made to qualified borrowers.  Specific examples of underwriting deficiencies identified by HUD included: (1) excessive debt-to-income ratios without adequate compensating factors; (2) inadequate gift fund documentation or verification of receipt of gift funds; and (3) failure to verify or document whether borrowers met the minimum cash investment requirement.  The report recommended that HUD should "pursue remedies under the Program Fraud Civil Remedies Act" and/or civil

money penalties as a result of these underwriting violations.  *See id.*

72.    First Horizon's poor origination practices eventually caught up to the company and many entities that purchased loans from First Horizon forced the company to buy them back.  In First Horizon's 2010 Annual Report, First Horizon admitted that it had "observed loss severities ranging between 50 percent and 60 percent of the principal balance of the repurchased loans and rescission rates between 30 and 40 percent of the repurchase and make-whole requests."  First Horizon 2010 Annual Report (2010), *available at* http://ir.fhnc.com/financialdocs.aspx?iid=100292.

73.    First Horizon has sued the mortgage brokers and appraisers it utilized in an effort to recoup some of these losses.  First Horizon—acting as plaintiff in those lawsuits—admits to the very underwriting, appraisal and owner-occupancy misrepresentations at the heart of this action.

74.    For example, in *First Horizon Home Loans v. Centerpiece Mortgage, LLC*, No. 11-cv-00995 (D. Ariz. May 19, 2011), First Horizon brought suit against Centerpiece Mortgage and four appraisers after it was "required to purchase the subject properties from Fannie Mae due to the fact that the loans were based on incorrect income and/or employment information."  According to First Horizon, "Centerpiece brokered certain loans based on incorrect income and/or employment information for thirty-two (32) real properties located in Maricopa, County, Arizona."  *Id.* ¶ 14.  Similarly, "all of the properties were consistently overvalued by the Defendant appraisers."  *Id.* ¶ 17.  As a result, loans securitized by First Horizon "were based on incorrect income, employment information and/or overvaluations."  *Id.*

75.    Additionally, in *First Horizon Home Loans v. Security Mortgage Corp.*,

No. 09- cv-2182 (N.D. Tex. Nov. 16, 2009), First Horizon sought relief for fraud, breach of contract and negligent misrepresentation against another mortgage broker, Security Mortgage Corporation ("SMC").  First Horizon's complaint alleged that, for a loan it ultimately approved and funded based on information provided to it by SMC, the mortgage broker failed to reveal that the loan applicant had "obtained four (4) mortgages totaling $590,000.00 prior to the loan application submitted to First Horizon" and "ultimately used the 'second home' as a rental property."  *Id*. ¶ 10.  First Horizon contended that, had it known the actual financial condition and occupancy status of the property, it "would not have approved [the] application and would not have funded the loan."  *Id*. ¶ 11.

## G.    Fremont Investment & Loan

76.    Fremont Investment & Loan ("Fremont") originated mortgage loans included in the HELT 2007-FRE1 Trust.  Fremont was one of the country's largest subprime lenders until March 2007, when the FDIC effectively forced Fremont out of the subprime lending business for extending subprime credit "in an unsafe and unsound manner."  Order to Cease and Desist, *In re Fremont Inv. & Loan,* FDIC-07-035b (Mar. 7, 2007), available at https://www.fdic.gov/ bank/individual/enforcement/2007-03-00.pdf.

77.    Following an extensive investigation, the FDIC issued a Cease & Desist Order to Fremont, concluding that Fremont was, in fact, "operating with inadequate underwriting criteria and excessive risk in relation to the kind and quality of assets held by [Fremont]," "operating with a large volume of poor quality loans," and "engaging in unsatisfactory lending practices."  *Id*. at 2–3.

78.    Further, the *Wall Street and the Financial Crisis: Anatomy of a Financial Collapse* report found that:

> from 2004 to 2007, in exchange for lucrative fees,
> Goldman Sachs helped lenders like . . . Fremont . . .
> securitize high risk, poor quality loans, obtain favorable
> credit ratings for the resulting residential mortgage backed
> securities (RMBS), and sell the RMBS securities to
> investors, pushing billions of dollars of risky mortgages
> into the financial system.

Wall Street and the Financial Crisis: Anatomy of a Financial Collapse (2011), *available at* http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisis Report.pdf? attempt=2 (the "2011 Subcommittee Report"), at 377.

.

79.    The 2011 Subcommittee Report found that Goldman Sachs commissioned a study of Fremont loans that demonstrated that 50 percent of Fremont loans securitized by Goldman Sachs failed to comply with stated underwriting guidelines.  The report further stated: "Despite these and other indications of Fremont's poor quality loans, Goldman continued to underwrite and market securities backed by Fremont loans."  *Id*. at 515.

80.    Senator Carl Levin, at a hearing before the Senate Permanent Subcommittee on Investigations ("Investigations Subcommittee"), singled out Fremont as a lender "known for poor quality loans."  *Wall Street and the Financial Crisis: The Role of Bank Regulators: Hearing Before Subcomm. On Homeland Security and Governmental Affairs Comm., Permanent Subcomm. On Investigations*, 111th Cong. 9 (Apr. 3, 2010) (statement of Carl Levin, Chairman, Permanent Subcomm. on Investigations).  Senator Levin recounted how an analyst with S&P raised concerns about the quality of Fremont-originated loans in a Goldman Sachs RMBS offering:

> In January 2007, S&P was asked to rate an RMBS being assembled by Goldman Sachs using subprime loans from Fremont Investment and Loan, *a subprime lender known for loans with high rates of delinquency*.  On January 24, 2007, an analyst wrote seeking advice from two senior analysts:  "I have a Goldman deal with subprime Fremont collateral. *Since Fremont collateral has been performing not so good, is there anything special I should be aware of*?" One analyst responded:  "*No, we don't treat their collateral any differently.*"  The other asked:  "are the FICO scores current?"  "Yup," came the reply.  Then "You are good to go."  In other words, *the analyst didn't have to factor in any greater credit risk for an issuer known for poor quality loans, even though three weeks earlier S&P analysts had circulated an article about how Fremont had severed ties with 8,000 brokers due to loans with some of the highest delinquency rates in the industry*.  In the spring of 2007, Moody's and S&P provided AAA ratings for 5 tranches of

> RMBS securities backed by Fremont mortgages. By October, both companies began downgrading the CDO. Today all five AAA tranches have been downgraded to junk status.

*Id.* (emphasis added).

81.     In August 2010, Cambridge Place Investment, Inc. ("Cambridge") brought an action against Fremont in which Cambridge submitted testimony from numerous confidential witnesses concerning Fremont's systemic disregard of its underwriting guidelines.  As set forth in an August 15, 2010 article in the Myrtle Beach Sun-News:

> Cambridge hinges much of its case on 63 confidential witnesses who testified in court documents about the reckless lending practices that dominated the subprime market during the real estate boom.
>
> Fremont, for example, regularly approved loans with unrealistic stated incomes – such as pizza delivery workers making $6,000 a month, according to the lawsuit.
>
> Other Fremont witnesses said in court documents that loan officers spotted and ignored fraudulent information, such as falsified pay stubs, every day.

David Wren, *Myrtle Beach Area Loans Lumped Into Spiraling Mortgage-Backed Securities*, Myrtle Beach Sun-News, Jan. 13, 2011, at A.

82.     In that action, Cambridge performed a review of loans underlying an RMBS trust for which Fremont was the sole originator. Compl., *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. Aug. 13, 2010). Cambridge found that over 46 percent of the loans underlying that securitization were delinquent as of June 2010.  *Id.* ¶ 454.

83.     On September 28, 2012, the court denied in principal part defendants' Joint Motion to Dismiss For Failure to State a Claim.  *See Cambridge Place Inv. Mgmt.*

38

*Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. Sept. 28, 2012).  The parties

settled the case on February 20, 2014.

84.      On December 21, 2011, FHFA filed an amended complaint against UBS

Americas, Inc., alleging securities laws violations concerning RMBS purchases made by

Freddie Mac and Fannie Mae.  *See* Second Am. Compl., *FHFA v. UBS Americas, Inc.*,

No. 11-cv- 05201 (S.D.N.Y. Dec. 21, 2011).  In the complaint, FHFA alleged:

> A confidential witness who previously worked at Fremont in
> its system operations and underwriting sections stated that
> Fremont consistently cut corners and sacrificed underwriting
> standards in order to issue loans.  He noted that "Fremont
> was all about volume and profit," and that when he
> attempted to decline a loan, he was regularly told "you have
> signed worse loans than this."  The same witness also said
> that employees at Fremont would create documents that
> were not provided by the borrowers, including check stubs
> and tax documents, in order to get loans approved.  The
> confidential witness stated that Fremont regularly hired
> underwriters with no experience, who regularly missed
> substantial numbers of answers on internal underwriting
> exams.  He explained that like many Fremont employees, he
> quit because he was uncomfortable with the company's
> practices.

*See id*.  The court denied a motion to dismiss the complaint in May 2012.  *See FHFA v.*

*UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012).  On July 25, 2013, FHFA

announced that it had reached an agreement to settle the case for $885 million.

85.      Fremont was also included in the 2008 "Worst Ten in the Worst Ten"

Report, ranking 1st in Miami, Florida; 3rd in Riverside, California; 4th in Denver,

Colorado and Sacramento, California; 5th in Stockton, California; 6th in Detroit,

Michigan and Las Vegas, Nevada; 7th in Bakersfield, California; and 10th in Memphis,

Tennessee.  *See* 2008 Worst Ten Report.  In the 2009 "Worst Ten of the Worst Ten"

Report, Fremont holds the following positions:  2nd in Fort Myers-Cape Coral, Florida

39

and Fort Pierce-Port St. Lucie, Florida; 4th in Riverside-San Bernardino, California; 5th

in Stockton-Lodi, California and Vallejo-Fairfield-Napa, California; 7th in Las Vegas,

Nevada and Modesto, California; and 8th in Bakersfield, California and Merced,

California.  *See* 2009 Worst Ten Report.

## H.    GreenPoint Mortgage Funding, Inc.

86.    GreenPoint Mortgage Funding, Inc. ("GreenPoint"), based in Novato, California, was the wholesale mortgage banking unit of Capital One.  Capital One acquired GreenPoint when it purchased GreenPoint's holding company, North Fork Bancorp, in December 2006.  Capital One shut down GreenPoint's operations less than one year later on August 21, 2007. GreenPoint originated mortgage loans included in the CWALT 2006-OC2 and CWALT 2006-OC4 Trusts.

87.    According to a press release issued by Capital One on August 20, 2007, GreenPoint had an "originate and sell" (*i.e.*, OTD) business model with a focus on "prime non-conforming and near-prime markets, especially the Alt-A mortgage sector."  Capital One eventually liquidated GreenPoint in December 2008, taking an $850 million write-down due to mortgage-related losses associated with GreenPoint's origination business.

88.    When originating stated income loans, GreenPoint often inflated the borrowers' income by as much as 5 percent.  A September 12, 2008 article on Bloomberg reported on GreenPoint's underwriting practices:

> Many Alt-A loans go to borrowers with credit scores higher than subprime and lower than prime, and carried lower interest rates than subprime mortgages.
>
> So-called no-doc or stated-income loans, for which borrowers didn't have to furnish pay stubs or tax returns to document their earnings, were offered by lenders such as GreenPoint Mortgage and Citigroup Inc. to small business owners who might have found it difficult to verify their salaries. . . .
>
> To grow, the market had to embrace more borrowers, and the obvious way to do that was to move down the credit scale,' said Guy Cecala, publisher of Inside Mortgage Finance. Once the door was opened, it was abused. . . .

41

> Almost all stated-income loans exaggerated the borrower's actual income by 5 percent or more, and more than half increased the amount by more than 50 percent, according to a study cited by Mortgage Asset Research Institute in its 2006 report to the Washington-based Mortgage Bankers Association.

Dan Levy & Bob Ivry, *Alt-A Mortgages Next Risk for Housing Market as Defaults Surge*, Bloomberg, Sept. 12, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive &sid=arb3xM3SHBVk.

89. In 2009, U.S. Bank, as indenture trustee of GreenPoint Mortgage Funding Trust 2006-HE1, commenced an action against GreenPoint to force GreenPoint to repurchase the loans that GreenPoint had contributed to the RMBS. U.S. Bank alleged that GreenPoint pervasively failed to follow its underwriting guidelines during the origination of the Loans. Compl. ¶¶ 35–39, *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 09-cv-600352 (N.Y. Sup. Ct. Feb. 5, 2009) (alleging pervasive misrepresentations of borrowers' income, assets, employment, intent to occupy the property, inflated appraisal values and violations of GreenPoint's underwriting guidelines regarding credit scores, DTI and LTV).

90. U.S. Bank based its allegations on its forensic analysis of GreenPoint-originated loans. Of 1,030 randomly sampled loans, U.S. Bank found that 93 percent were in violation of GreenPoint's underwriting guidelines. *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding, Inc.*, No. 09-cv-600352, 2010 WL 841367, at *7 n.4 (N.Y. Sup. Ct. Mar. 3, 2010). Its complaint survived a motion to dismiss. *See id.* at *8.

91. In *Federal Home Loan Bank of Indianapolis v. Banc of America Mortgage Securities, Inc.* a confidential witness confirmed that (i) GreenPoint employees faced

intense pressure to close loans at any cost; (ii) GreenPoint managers overrode employees'

decisions to reject loans and approved loans based upon inflated incomes; (ii) GreenPoint

approved loans that contained exceptions for which there were no reasonable

compensating factors; and (iv) GreenPoint failed to adhere to sound underwriting

guidelines.  This confidential witness was a senior loan underwriter at GreenPoint from

October 1997 through August 2007.  *See* Compl. ¶ 265, *Fed. Home Loan Bank of

Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, No. 49D051010PL045071 (Ind. Sup. Ct.

Oct. 15, 2010) ("FHLB Indianapolis").

92.    According to that confidential witness, sales staff and managers at

GreenPoint received bonuses based on the number of loans closed.  As she said, "sales

had tremendous authority" at GreenPoint, and "[t]hey were in business to make more

money.  They would try to find any way to close a loan."  *Id*. ¶ 266.

93.    Between 2005 and 2007, the confidential witness said that stated income

loans became increasingly popular and GreenPoint managers approved loans based upon

inflated incomes that she believed should not have been approved.  She saw a lot of loans

with stated "income that was more than could be justified by the borrower's

employment."  When she denied loans because she believed the income was inflated,

sometimes the underwriting managers, operations managers, and the regional operations

manager overrode her decisions.  *Id*. ¶ 267.

94.    More often than not, the confidential witness believed that her managers

overrode her denials due to the incentives that they received based upon loan volume.  As

she said, "They were making the decision because they had to hit certain sales numbers."

She was aware of such targets because of comments made in operations meetings about

43

the company needing to meet certain goals.  *Id*. ¶ 268.

95.     The FHLB Indianapolis suit survived a motion to dismiss, with the court holding, "the plaintiff has, indeed, stated a claim upon which relief can be granted on the issue of underwriting guidelines."  *Fed. Home Loan Bank of Indianapolis v. Bank of Am. Mortg. Sec., Inc.*, No. 49D051010PL045071, 2012 WL 2844690 (Ind. Sup. Ct. July 3, 2012).

96.     GreenPoint's pervasive disregard of underwriting standards resulted in its inclusion among the worst ten originators in the 2008 "Worst Ten in the Worst Ten" Report.  GreenPoint was identified 7th worst in Stockton, California, and 9th worst in both Sacramento, California, and Las Vegas, Nevada.  *See* 2008 Worst Ten Report.  In the 2009 "Worst Ten in the Worst Ten" Report, GreenPoint was listed as 3rd worst in Modesto, California; 4th worst in Stockton, Merced and Vallejo-Fairfield-Napa, California; 6th worst in Las Vegas, Nevada; and 9th in Reno, Nevada.  *See* 2009 Worst Ten Report.

## I.      __Impac Funding Corporation__

97.      Impac Funding Corporation ("Impac") is a mortgage company that acquires and sells mortgage loans.  Impac originated mortgage loans included in the CWALT 2005-IM1 and CWHL 2005-HYB9 Trusts.

98.      Impac's faulty loan origination practices were the subject of a suit by a class of its shareholders.  The class action complaint contained detailed accounts of former employees regarding Impac's disregard of its underwriting guidelines.  *See* Third Am. Compl., *Pittleman v. Impac. Mortg. Holdings, Inc.*, No. 07-cv-970 (C.D. Cal. Oct. 27, 2008).

99.      One former employee ("Employee #1") was an underwriting manager in charge of loan due diligence from October 2003 until July 2006.  Employee #1's duties included performing due diligence on bulk loans by conducting a sampling of each loan pool and making recommendations as to whether or not Impac should buy particular loans and/or loan portfolios, which were then resold in the secondary markets.  "Employee #1 reported to Kevin Gillespie, Vice President of Underwriting, and Scott Hedbon, Chief Credit Officer.  Both Gillespie and Hedbon reported to William Ashmore, Impac's President, and Gillespie and Ashmore (plus [Joseph] Tomkinson, [Impac's] CEO) were members of the Loan Committee.  After conducting due diligence on a bulk loan, Employee #1 would generate a detailed report regarding that loan pool, which included an approval or rejection recommendation.  Every report was then emailed to Employee #1's superiors, including Tomkinson and Ashmore." *Id*. ¶¶ 46–47.

100.      Employee #1 stated that "when bulk loan pools did not satisfy Impac guidelines, they were still approved by management on a regular basis, and specifically

45

by Ashmore.  Ashmore's rationale for constantly reversing rejection recommendations was that everyone in the industry was engaging in this type of practice.  Ashmore would justify his overriding the underwriting department recommendations by stating that 'everybody is doing it' or 'if we didn't do it, someone else would.'"  *Id*. ¶ 48.

101.    "Employee #1 left [Impac] out of frustration because he said the majority of loans that were being recommended for rejection were regularly approved for sale to investors.  As a result, he felt that performing due-diligence on bulk loan pools was a waste of his time when Ashmore would just override the results of the due diligence.  According to Employee #1, all management was looking for was a due-diligence officer to 'rubber-stamp' the loan pools because investors in the securitized loan pools required a certain level of quality control concerning these financial instruments."  *Id*. ¶ 51.

102.    Another former employee ("Employee #2") was employed by Impac from January 2005 through October 2007 in the Wholesale Loan Set-up Group.  "He reported that many borrowers had credit scores that were low or did not have enough income.  He also reported that whatever loan came in, the goal was to pass it on to the next step for approval, which was underwriting.  Employee #2 said that a low credit score would not 'kill' the loan.  Rather, the loan would then go to the 'deal desk,' where deals were regularly made to get loans approved.  Employee #2 also explained that Impac inflated the reported incomes of applicants in order to approve loans for which the applicant would not otherwise qualify."  *Id*. ¶  57.

103.    A Former Employee ("Employee #3") worked in Impac's Quality Control from May 2004 through October 2007.  Employee #3's duties and responsibilities included checking for and investigating fraud.  Employee #3 explained "that overstating

46

the income of applicants made everyone happy, realtors, account executives, and Impac

senior management." *Id.* ¶ 59.

104.    Employee #3 further commented that

> in processing 15 loans a day, there would not be enough time
> to check and follow the seller guides . . . . He confirmed that
> management encouraged the selling of loans to customers
> who should have not been eligible for Alt-A loans.
> Employee 3 stated that this was accomplished because 90%
> of the loans done at [Impac] did not have documentation of
> income.

*Id.* ¶ 60.

## J.    JPMorgan Chase Bank, N.A. and Chase Home Finance, LLC

105.    Chase Home Finance, LLC ("CHF") and JPMorgan Chase Bank, N.A. (collectively, the "Chase Originators") compose the mortgage-lending arm of JPMorgan Chase Bank, N.A.  JPMorgan Chase Bank, N.A. is the sole owner of J.P. Morgan Mortgage Acquisition Corporation and is a subsidiary of J.P. Morgan Chase & Co. (collectively, "JPMorgan").  CHF served as the sponsor for the CFLX 2007-M1 Trust. JPMorgan Chase Bank, N.A. originated mortgage loans included in the CFLX 2007-M1 Trust.

106.    JPMorgan's systematic breaches of mortgage loan representations and warranties is evidenced by a memo circulated by employees instructing mortgage associates how to tweak data they entered into the automated underwriting program ("ZiPPY") to get loans approved by the automated underwriting program.  *See* Mark Friesen, *Chase Mortg. Memo Pushes 'Cheats & Tricks'*, Oregonian, http://www.oregonlive.com/ business/index.ssf/2008/03/chase_mortgage_memo_pushes_che.html) (last updated Mar. 28, 2008) ("Chase ZiPPY Memo").

107.    The Chase ZiPPY Memo listed the steps that mortgage associates could use to manipulate the date entered into the ZiPPY automated underwriting program to recommend a mortgage using the "Stated Income/Stated Asset" underwriting guidelines for borrowers.  *See* Chase ZiPPY Memo.

108.    Strikingly, "Step 3" stated: "If you do not get Stated/Stated, try resubmitting with slightly higher income.  Inch it up $500 to see if you can get the findings you want.  Do the same for assets."  In other words, the Chase ZiPPY Memo

instructed mortgage associates to inflate borrower income to "trick" ZiPPY into recommending the use of Stated Income/Stated Asset underwriting guidelines.

109.    In addition, the Chase ZiPPY Memo told mortgage associates not to report gift funds, but to include gift funds in the borrower's bank account and to include all income as base income.

110.    In November 2011, James Theckston, a former regional vice president at CHF in southern Florida, was interviewed regarding the company's lending and securitization practices for a *New York Times* article.  Nicholas D. Kristof, *A Banker Speaks, With Regret*, N.Y. Times, Dec. 1, 2011, at A39.  Theckston's team wrote $2 billion in mortgages in 2007 alone.  *Id*.  According to Theckston, CHF engaged in high-risk lending practices such as making no-documentation loans to borrowers with insufficient resources.  *Id*.  "On the application, you don't put down a job; you don't show income; you don't show assets; but you still got a nod," he said.  *Id*.  "If you had some old bag lady walking down the street and she had a decent credit score, she got a loan. . . . You've got somebody making $20,000 buying a $500,000 home, thinking that she'd flip it.  It was crazy, but the banks put programs together to make those kinds of loans."  *Id*.

111.    These excesses were driven by JPMorgan's vertically integrated securitization business model.  Theckston stated:  "The bigwigs of the corporations knew [about declining lending standards], but they figured we're going to make billions out of it, so who cares? . . . The government is going to bail us out.  And the problem loans will be out of here, maybe even overseas."  *Id*.  Because risky loans were securitized and sold to investors, CHF created incentive structures that rewarded risky lending.  *Id*.  Theckston

49

said that some CHF account executives earned commissions seven times higher from subprime loans rather than prime mortgages. *Id*. As a result, those executives looked for unsophisticated borrowers with less education or limited English abilities and convinced them to take out non-prime loans. *Id*. Theckston's own 2006 performance review indicated that 60 percent of his evaluation depended on him increasing the production of high-risk loans. *Id*.

112. Numerous other former Chase Originator employees have come forward with evidence of the Chase Originators' risky lending practices and abandonment of underwriting guidelines. According to an amended complaint filed in *FHLB of Boston v. Ally Fin. Inc.*, No. 11-cv-10952 (D. Mass. June 29, 2012) (the "FHLB Boston Complaint"), in which a senior underwriter at JPMorgan from 2001 to 2008 claimed that managers often overturned the decisions of lower-level underwriters to reject stated-income loans. "If the manager felt the income made sense and the underwriter didn't, the manager could overturn it." *Id*.

113. In the FHLB Boston Complaint, a loan processor and assistant to the branch manager at a Florida branch of CHF from April 2006 until August 2007 noted that many employees inflated borrowers' income on orders from the branch manager to get loans approved. The loan processor stated, "It was very common to take stuff out of the loan file." *Id*. ¶ 519. Loan officers would often bring their loans to the branch manager for instructions on what the stated income should be to make a loan close. "The branch manager often fixed the loan . . . [he] figured out what LTV [the borrower] needed to close the loan and inflated the income to make the loan work." *Id*. ¶ 521. Branch

50

managers would also call the regional managers above them for instructions on problem loans. *Id.*

114.    "[A]ccording to a former Wholesale Account Executive with CHF from 2002 to 2008, CHF's underwriting process was subject to abuse by brokers who purposely originated loans for people they knew could not repay them.  Additionally, CHF's proprietary automated underwriting system 'ZiPPy' had extremely loose guidelines and was easily and often overridden.  The former Account Executive acknowledged that had ZiPPy's requirements not been so loose or if other measures had been taken in the underwriting process, the loans it approved would otherwise not have seen the light of day."  *See* Am. Compl., *Fort Worth Employees' Ret. Fund v. J.P. Morgan Chase & Co.*, No. 09-cv-03701 (S.D.N.Y. Apr. 9, 2010).

115.    Yet another witness interviewed for the FHLB Boston Complaint, a senior loan underwriter at CHF from December 2004 to August 2005, said that CHF loan personnel also knowingly permitted borrowers to submit false income data, saying that, "[y]ou'd see self-employed people, like a landscaper, who stated they made $10,000 a month."  FHLB Boston Complaint ¶ 524.  When borrowers stated unreasonable income levels, management would push the loans through regardless.  *Id.*  The witness said that in addition to being told to accept unreasonable stated incomes, employees were not permitted to question appraisals that appeared to be inflated.  *Id.* ¶ 525.  He recalled a subdivision in California in which CHF accepted appraisal values that were double the sales prices of identical homes sold just a few months prior.  *Id.*

116.    According to a former senior underwriter at CHF from March 2002 through January 2008, when processing loans that required verification of assets, "we

51

really were not verifying them, what we would do is look to see if a borrower was making, say $15,000 a month, if that's [what] they were listing.  We would hope to see assets that would compare to or be comparable to that type of income." *See* Am. Compl., *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 09-cv-3209 (E.D.N.Y. Mar. 8, 2010) ("Plumbers' & Pipefitters' Complaint").  The former senior underwriter believed that in 2006, 20 to 30 percent of the loans that were approved were approved only based on management overriding underwriters' initial rejection of the loans.  *See id*.

117.   A former senior processor, junior underwriter and compliance controller who worked at CHF between December 2002 and October 2007, stated in the Plumbers' & Pipefitters' Complaint that loan processors were not provided with all of the relevant borrower information:  "there was some information that was being withheld from us." *Id*. ¶ 84.  The witness further claimed that employees were actively encouraged not to investigate or verify suspicious information in loan applications.  *Id*. ¶ 87.

118.   Another complaint alleged that several CHF confidential witnesses confirmed employees would "coach" borrowers to falsify the loan applications and that forgeries were used to "verify" the borrower's assets.  A senior underwriter from CHF saw the real names on bank statements crossed out, with the borrower's name typed in its stead.  Am. Compl., *Prudential Insurance Co. of America v. J.P. Morgan Securities*, No. 12-cv-03489 (D.N.J. Aug. 30, 2012)

119.   CHF's departure from industry standards was confirmed by Jamie Dimon, CEO of JPMorgan Chase.  On January 13, 2010, Dimon testified under oath to the FCIC that "the underwriting standards in our mortgage business, for example, should have been

52

higher, and we wish we had done an even better job in managing our leveraged lending and mortgage-backed securities exposures." *See The Causes and Current State of the Financial Crisis: Hearing Before the Fin. Crisis Inquiry Comm., Permanent Subcomm. On Investigations*. (2010) (statement of Jamie Dimon, Chairman and CEO, JP Morgan Chase & Co.). JPMorgan also "misjudged the impact of more aggressive underwriting standards and should have acted sooner and more substantially to reduce the loan-to-value ratios." *Id*. Dimon further testified that JPMorgan would, in the wake of the financial crisis, enhance its mortgage underwriting standards, "returning to traditional 80 percent loan to value ratios and requiring borrowers to document their income." *Id*.

120.    On September 15, 2010, William Collins Buell VI, formerly of J.P. Morgan Securities, told the FCIC: "[T]here was a very competitive process to offer a wider and wider array of products to borrowers . . . there was a tremendous amount of competition to try to make products that people could actually get . . . and that investors and lenders would be interested in buying." *See* FCIC Report at 583. This competition led to a reduction in diligence and oversight on the part of JPMorgan. Buell confirmed that from 2005 to 2007, JPMorgan's underwriting guidelines and origination standards were "deteriorating." *Id*.

121.    Additionally, according to documents provided to the FCIC, as of August 31, 2010, Fannie Mae had required JPMorgan Chase to repurchase 6,456 loans originated by its subsidiaries JPMorgan and CHF with an unpaid principal balance of $1.359 billion. Fannie Mae had also requested that JPMorgan Chase repurchase an additional 1,561 JPMorgan and CHF loans with an outstanding principal balance of $345 million.

Likewise, in 2007, Freddie Mac required JPMorgan Chase to repurchase 5,427 CHF loans with an unpaid principal balance of $1.188 billion.

122.    JPMorgan's abandonment of underwriting guidelines and systematic securitization of non-compliant mortgage loans was further revealed by a "whistle-blower", former employee Alayne Fleischmann. *See* Matt Taibbi, *The $9 Billion Witness: Meet JPMorgan Chase's Worst Nightmare*, Rolling Stone, Nov. 6, 2014, *available at* http://www.rollingstone.com/politics/news/the-9-billion-witness-20141106.  According to the article, Fleischmann, a securities law attorney, began working as a transaction manager at JPMorgan in 2006 and quickly uncovered JPMorgan's securitization of defective loans, which she described as "massive criminal securities fraud."

123.    For example, in late 2006, Fleischmann reviewed a pool of GreenPoint-originated loans that were "suspiciously old," which meant that they "had either been previously rejected by Chase or another bank, or were what are known as 'early payment defaults.'"  At this time, Fleischmann also encountered high percentages of overstated incomes in pools of loans.  After a meeting regarding these issues, Fleischmann pleaded with Greg Boester, a managing director, to reconsider securitizing the loans, saying that the bank could not sell the high-risk loans as low-risk securities without committing fraud, however her pleas were ignored. *Id.*

124.    Fleishmann later brought her concerns to another managing director, William Buell, sending him a letter in early 2007 warning of the consequences of reselling defective loans and giving detailed descriptions of breakdowns in JPMorgan's diligence process, however her concerns were again dismissed.  After alerting her bosses

54

to JPMorgan's fraud, Fleischmann was terminated in February 2008. Fleischmann would later reveal JPMorgan's RMBS fraud to the United States attorney office. *Id.*

125.    Finally, in November 2013, following Fleischmann's interviews with the U.S. attorney's office, JPMorgan entered into a $13 billion settlement with the DOJ to resolve federal and state civil claims arising out of the fraudulent packaging, marketing, sale and issuance of RMBS by JPMorgan and Washington Mutual Bank.  As part of the settlement, JPMorgan acknowledged it made serious misrepresentations to the public about numerous RMBS transactions.  The resolution required JPMorgan to provide much needed relief to underwater homeowners and potential homebuyers.  Under the terms of the settlement, JPMorgan receives credit for modifying loans, including securitized loans. JPMorgan has modified loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not JPMorgan would bear the loss.

K.    **Long Beach Mortgage Company**

126.    Long Beach Mortgage Company ("Long Beach") was a subsidiary of

Washington Mutual Bank ("WaMu").  Long Beach served as the originator for mortgage

loans included in BSABS 2006-4.

127.    In 2011, the Investigations Subcommittee issued the 2011 Subcommittee

Report, which used WaMu and Long Beach as its case study into lending practices of the

mortgage industry during the housing bubble.  Citing internal emails and correspondence

obtained as part of its investigation, the Investigations Subcommittee made the following

factual findings:

> (1)    High Risk Lending Strategy.  [WaMu] executives embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.
>
> (2)    Shoddy Lending Practices.  WaMu and its affiliate, [Long Beach], used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.
>
> (3)    Steering Borrowers to High Risk Loans.  WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.
>
> (4)    Polluting the Financial System.  WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

56

(5)     Securitizing Delinquency-Prone and Fraudulent Loans.  At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6)     Destructive Compensation.  WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its High Risk Lending Strategy placed the bank in financial jeopardy.

*Id*. 50–51.

128.    In particular, the 2011 Subcommittee Report noted that WaMu had engaged in internal reviews of its lending practices and the lending practices of its subsidiary, Long Beach.  WaMu's Chief Risk Officer, Ron Cathcart commissioned a study to look into the quality of loans originated by Long Beach.  The review found that the "top five priority issues" were as follows:

Appraisal deficiencies that could impact value and were not addressed[:] Material misrepresentations relating to credit evaluation were confirmed[;] Legal documents were missing or contained errors or discrepancies[;] Credit evaluation or loan decision errors[; and] [r]equired credit documentation was insufficient or missing from the file.

*Id*. at 82 (quoting email from Ron Cathcart, Chief Risk Officer, WaMu, to Cory Gunderson (Dec. 11, 2006 9:21 AM PST)).

129.    WaMu management knew about the pattern of "first payment default" for loans its Long Beach subsidiary originated.  In June 2007, WaMu closed Long Beach as a separate entity and placed its subprime lending operations in a new division called

57

"Wholesale Specialty Lending."

130.    Long Beach also specialized in the riskiest of loans—subprime mortgages. Internal WaMu documents reveal a well-documented pattern of underwriting deficiencies at Long Beach.  A memorandum to the Washington Mutual, Inc. and WaMu Board of Directors' Audit Committees, dated April 17, 2006, re:  *Long Beach Mortgage Company—Repurchase Reserve Root Cause Analysis* states:  "[Long Beach] experienced a dramatic increase in EPDs[] during the third quarter of 2005. . . .  [R]elaxed credit guidelines, breakdowns in manual underwriting processes, and inexperienced subprime personnel . . . coupled with a push to increase loan volume and the lack of an automated fraud monitoring tool, exacerbated the deterioration in loan quality."  PSI High Risk Home Loans Hearing, Senate Exhibit 10, "Washington Mutual Memorandum: Long Beach Mortgage Company—Repurchase Reserve Root Cause Analysis" at 1–2 (Apr. 17, 2006).

131.    A WaMu Audit Report titled *Long Beach Mortgage Loan Origination & Underwriting*, dated August 20, 2007, states:  "[T]he overall system of risk management and internal controls has deficiencies related to multiple, critical origination and underwriting processes. . . . These deficiencies require immediate effective corrective action to limit continued exposure to losses."  PSI High Risk Home Loans Hearing, Senate Exhibit 19, "Long Beach Mortgage Loan Origination & Underwriting" at 2 (Aug. 20, 2007).  In its "Executive Summary" section, this Audit Report states:

> In response to challenges resulting from the softening housing market, rising interest rates, tightening capital markets, poor portfolio performance and underwriting deficiencies, [Long Beach] continually refines their processes and guidelines.  While management has been responsive to these challenges by identifying and

58

> implementing corrective actions, actual underwriting practices have not been consistent to achieve the desired levels of improvement. Continued patterns of loans being underwritten outside of established underwriting and documentation guidelines have been previously identified.

*Id*. at 2. It also identifies the following as the number one high rated "repeat issue" to correct: "Underwriting guidelines established to mitigate the risk of unsound underwriting decisions are not always followed and the decisioning methodology is not always fully documented." *Id.* at 8. The number two "repeat issue" was identified as "[p]olicies and procedures defined to allow and monitor reasonable and appropriate exceptions to underwriting guidelines are not consistently followed." *Id.* at 10. An email from a WaMu executive describes the Long Beach audit report as "the ultimate in bayonetting the wounded, if not the dead." PSI High Risk Home Loans Hearing, Senate Exhibit 20 at 1.

132. The Office of Thrift Supervision ("OTS") also reported concerns with subprime underwriting practices by Long Beach from 2006 to 2007. *See Wall Street and the Financial Crisis: The Role of Bank Regulators: Hearing Before Subcomm. On Homeland Security and Governmental Affairs Comm., Permanent Subcomm. On Investigations* at 9-10 (Apr. 16, 2010) (statement of the Hon. Eric M. Thorson, Inspector General, Dep't of the Treasury) ("Thorson Statement").

133. As a result of its systematic disregard of underwriting standards, Long Beach also appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report. In fact, Long Beach was in the top five in every city other than Las Vegas, Nevada (1st in Stockton, California, Sacramento, California, Denver, Colorado and Memphis, Tennessee; 2nd in Bakersfield, California and Detroit, Michigan; 3rd in Cleveland, Ohio

59

and Miami, Florida; and 4th in Riverside, California).  *See* 2008 "Worst Ten in the Worst Ten" Report.  Long Beach again ranked near the top in nearly every city in the 2009 "Worst Ten in the Worst Ten" Report (1st in Stockton-Lodi, California, Merced, California and Vallejo-Fairfield-Napa, California; 5th in Fort Pierce-Port St. Lucie, Florida; and 6th in Riverside-San Bernardino, California).  *See* 2009 "Worst Ten in the Worst Ten" Report.

134.    Private litigation has also illustrated the fact that WaMu and Long Beach failed to comply with underwriting guidelines.  In *Cambridge Place Investment Management Inc. v. Morgan Stanley & Co.*, No. 10-cv-2741 (Mass. Sup. Ct. July 9, 2010), multiple confidential witnesses stated that Long Beach compensated account executives and underwriters based on volume of loans with no consideration to quality; that directions from management was simply to fund loans; that there was little to no verification of information; that there was constant pressure on underwriters to close loans no matter what; that loans that were not approved were often pushed through by management; that problematic trends were never addressed; that employees were compensated more for higher risk loans with higher profit margins; that employees were encouraged to push risky adjustable-rate loans; that underwriting guidelines changed constantly; that loans were put back in the system for approval if one underwriter refused; and that information on applications was changed in order to receive automatic approval from the computer system.

### L.    MortgageIT, Inc.

135.    MortgageIT, Inc. ("MortgageIT") is a residential mortgage banking company headquartered in New York, New York.  On January 3, 2007, MortgageIT was acquired by Deutsche Bank Structured Products, Inc. ("DBSP").  Less than a year after the acquisition, MortgageIT began its precipitous decline from one of the largest mortgage originators in the country, laying off hundreds of employees and closing multiple branches.  MortgageIT originated mortgage loans included in the CWALT 2006-OA11, CWALT 2006-OA6, and CWALT 2006-OA9 Trusts.

136.    MortgageIT faced a civil mortgage fraud lawsuit brought in May 2011 by the DOJ that alleges MortgageIT made repeated false certifications to HUD in connection with its residential mortgage origination and sponsorship practices.  *See* Am. Compl., *United States v. Deutsche Bank AG and MortgageIT, Inc.*, No. 11-cv-02976 (S.D.N.Y. Aug. 22, 2011) ("DOJ Complaint").

137.    In the DOJ Complaint, the United States alleges that "MortgageIT repeatedly lied to be included in a Government program to select mortgages for insurance by Government.  Once in that program, they recklessly selected mortgages that violated program rules in blatant disregard of whether the borrowers could make mortgage payments."  DOJ Complaint ¶ 1.

138.    The DOJ Complaint details how MortgageIT ignored its own quality control measures.  For example, MortgageIT contracted with an outside vendor to conduct quality control reviews of loans insured by the FHA.  *Id*. ¶ 31.  The vendor provided the reviews in letters detailing underwriting violations found in FHA-insured mortgages to MortgageIT.  The findings included identification of serious underwriting

violations.  *Id*.  Instead of reading the letters, MortgageIT employees "stuffed the letters, unopened and unread, in a closet at MortgageIT's Manhattan headquarters."  *Id*.  ¶ 32.  It was not until MortgageIT hired its first quality control manager that these letters were taken out of the closet and read.  *Id*.  Accordingly, "MortgageIT's failure to read the audit reports from its outside vendor prevented MortgageIT from taking appropriate actions to address patterns of ongoing underwriting violations" *and* "Deutsche Bank's and MortgageIT's failure to implement the required quality control systems rendered them unable to prevent patterns of mortgage underwriting violations and mortgage fraud."  *Id*.

139.    Additionally, the DOJ Complaint alleges that "contrary to the certifications appearing on each and every mortgage endorsed by MortgageIT, MortgageIT engaged in a nationwide pattern of failing to conduct due diligence in accordance with HUD rules and with sound and prudent underwriting principles."  *Id*. ¶ 162.

140.    The DOJ Complaint cites many examples of MortgageIT's failure to perform due diligence.  These examples, all violations of HUD rules, include the following:

- failure to develop a credit score for borrowers who had no credit score;

- failure to verify a borrower's cash investment in a property;

- failure to verify employment by telephone, and to record the name and telephone number of the person who verified employment on behalf of the employer;

- failure to verify the source of earnest money deposits that appear excessive in relation to the borrower's savings by completing a verification of deposit, or by collecting bank statements, to document that the borrower had sufficient funds to cover the deposit;

- failure to ensure that gift funds are not provided by a party to the sales

transaction;

- failure to examine irregularities in mortgage applications such as conflicting records of employment in the same file;

- failure to obtain the required documentation to verify the borrower's mortgage payment history and income;

- failure to obtain the required documentation to verify the borrower's employment, income, and depositary assets;

- failure to verify a borrower's current employment and obtain the borrower's most recent pay stub, along with failure to obtain income tax returns for a self-employed borrower or borrower paid on commission; and

- failure to obtain a credit report on all borrowers who will be obligated on the mortgage note.

*See id.* ¶¶ 162–230.

141.    On May 9, 2012, the parties settled the case for $202.3 million.

142.    Several private investigations and lawsuits also illustrated the fact that MortgageIT failed to comply with its stated underwriting guidelines.  The complaint in *Laudesbank Baden-Wurttemberg v. Deutsche Bank*, No. 12-cv-654543 (N.Y. Sup. Ct. Dec. 27, 2012) quotes confidential witnesses demonstrating that there was virtually no effort at compliance at MortgageIT.  The confidential witnesses said that loan officers did not care what happened with loans as long as MortgageIT received the commission; that the sales team rejected any attempt to stop using brokers because of likely fraudulent activity; that the due diligence was far from adequate; and that compensation was tied to loan volume and there was no disincentive to originate and sell loans that would later default.  *Id.* ¶¶ 87–89, 91.

143.    The second amended complaint in *Pension Trust Fund for Operating Engineers v. Mortgage Asset Securitization Transactions, Inc.*, identified a confidential

witness who was employed with MortgageIT as an underwriter from June 2005 through May 2007. ¶ 52, No. 10-cv-898 (D.N.J. Oct. 13, 2011). That witness also confirmed the pressure to approve loans and the fact that his superiors instructed him to avoid over-analyzing loans so as not to lose business. *Id*. ¶ 153. The witness said that executives would often overrule decisions to seek more documentation, and that loans would be taken away from underwriters if the underwriter recommended non-approval. *Id*.

144. Deutsche Bank AG, MortgageIT's parent company, admitted in the Stipulation and Settlement it entered into with the DOJ on May 10, 2012, that loans originated by MortgageIT had serious deficiencies that were not disclosed. *United States v. Deutsche Bank AG*, 11-cv-296 (S.D.N.Y. May 10, 2012).

## M.    Nationstar Mortgage LLC

145.    Nationstar was an originator and sponsor of mortgage loans pooled into the NSTR 2006-B and NSTR 2007-A Trusts. Nationstar, founded in 1997, was formerly known as Centex Home Equity Corporation ("Centex"). In March 2006, Fortress Investment Group ("Fortress"), a large hedge fund, purchased Centex for $575 million. Shortly after the purchase, Fortress changed Centrex's name to Nationstar. The Nationstar-label Trusts have also been afflicted by abject performance as a result of the poor credit quality of the loan pools.

146.    Nationstar was one of the ten largest subprime lenders in the country, originating $4.4 billion in the first quarter of 2007 before the market evaporated. The company provided non-prime mortgages and home loans directly to consumers and indirectly through mortgage brokers and bankers. Much of Nationstar's success came as a result of the company's loose underwriting standards and lending practices. Nationstar routinely provided loans to borrowers without regard for their ability to repay, required little or no documentation for loans, and used fraudulently inflated appraisals. These risky lending practices resulted in serious financial trouble for Nationstar after the subprime market went bust. In September 2007, Nationstar announced that it was shutting down its wholesale loan origination business for good.

147.    As a result of its loose lending practices, Nationstar became the target of a number of consumer lawsuits. For example, in September 2008, a class action was filed in San Diego Superior Court, alleging that Nationstar and its predecessor Centex had coerced the plaintiffs into entering bad loans that destroyed plaintiffs' credit and resulted in numerous foreclosures. See *Richter v. Nationstar Mortg., LLC*,

65

No. 37-2008-00092170-CU-BT-CTL (Cal. Super. Ct. Sept. 23, 2008). The complaint claimed that Nationstar knew that its San Diego branch manager, Cindy Kelly, was fraudulently selling unregistered securities to customers and that Nationstar encouraged her to ignore sound underwriting guidelines and to complete loan applications using false and incomplete information. Moreover, the defendants had promised borrowers that excess proceeds from their loans would be used as investments in Stonewood Consulting, Inc., a fraudulent investment firm that later became the target of an SEC proceeding in the Central District of California.

148.    Similarly, in September 2010, a complaint was filed in the State of Florida's Circuit Court in Sarasota County, alleging violations of Truth in Lending Act of 1968 ("TILA") based on Nationstar's failure to disclose material terms of the plaintiffs' mortgage. *McClendon v. Nationstar Mortg., LLC*, No. 2010 CA 009303 NC (Fl. Cir. Ct. Sept. 3, 2010). The borrowers claimed that Nationstar failed to verify their ability to repay the loan before extending them credit and that the loan application contained no information about the plaintiffs' monthly income. As a result, plaintiffs were saddled with a multitude of miscellaneous fees and ended up with a loan that they could not afford.

149.    Nationstar-originated loans have also been subject of several significant RMBS actions. For example, on December 29, 2011, plaintiff Stichting Pensioenfonds ABP ("ABP") sued Credit Suisse Group AG and various of its affiliates in connection purchases of certificates from ten securitizations, which Nationstar was a significant originator. ABP alleged that Nationstar systemically abandoned its underwriting guidelines and appraisal standards.

66

150.    Forensic investigations and loan level reviews conducted by investors confirm the pervasive breaches of representations and warranties in Nationstar-label RMBS.  For example, in *Phoenix Light SF Ltd., et al. v. The Royal Bank of Scotland Group, PLC, et al.*, Case No. 13-cv-653060 (N.Y. Sup. Ct.), plaintiffs performed an industry-accepted historical valuation analysis on the actual loans underlying a securitization in which 100 percent of the underlying mortgage loans were originated or acquired by Nationstar. Plaintiffs in that case determined that 23 percent of the loans within the securitization had an LTV ratio over 100 percent, contrary to Nationstar's representation that no loans had an LTV ratio exceeding 100 percent.

67

### N.   New Century Mortgage Corporation

151.   New Century Mortgage Corporation was a subsidiary of New Century Financial Corp. (collectively, "New Century").  New Century was founded in 1995 in Irvine, California, and grew to be one of the nation's largest subprime lenders—originating $60 billion in loans in 2006 alone.  New Century originated mortgage loans included in the BSABS 2006-4 Trust.

152.   New Century failed amid revelations that its financial records contained numerous accounting errors, government investigations and a liquidity crisis when its Wall Street backers pulled the financial plug on loan funding.  The circumstances leading to its collapse tell the story of a company that was far more concerned with originating mortgages to fuel the securitization machine than in the quality of those mortgages.

153.   A June 2, 2008 article in the Columbus Dispatch summarized New Century's reputation in the industry:

- The California-based mortgage company catered to the riskiest borrowers, even those with credit scores as low as 500.  Its brokers cut deals by asking few questions and reviewing even fewer documents, investigators say.

- Homeowners struggling to pay their existing mortgages signed up for what they believed to be redemption: a new loan.  They were unaware of the warnings from lending and legal experts that New Century loaned money with a devil-may-care-attitude.

- New Century typified the book-'em-at-any-cost mentality that fueled the national mania for high-rate mortgages, commonly called subprime.

Jill Riepenhoff & Doug Haddix, *Risky Refinancings Deepen Financial Hole*, Columbus Dispatch, June 2, 2008, at 1A.

154. New Century's foreclosure rates reflected its inattention to underwriting standards. Indeed, New Century appeared in the OCC's 2008 "Worst Ten in the Worst Ten" Report in every housing market highlighted. Incredibly, New Century appeared in the top five in every market—1st in Las Vegas, Nevada and Riverside, California; 2nd in Cleveland, Ohio, Denver, Colorado, Sacramento, California and Stockton, California; 3rd in Bakersfield, California and Detroit, Michigan; and 5th in Miami, Florida and Memphis, Tennessee. *See* 2008 Worst Ten Report. When the OCC issued its updated 2009 "Worst Ten in the Worst Ten" Report, New Century rose to the top three in every one of the ten worst markets, holding 1st place in Reno, Nevada, Bakersfield, California, Riverside-San Bernardino, California and Fort Myers-Cape Coral, Florida; 2nd place in Modesto, California, Las Vegas, Nevada, Merced, California and Stockton-Lodi, California; and 3rd place in Fort Pierce-Port St. Lucie, Florida and Vallejo-Fairfield-Napa, California. 2009 Worst Ten Report.

155. The U.S. Bankruptcy Court for the District of Delaware presiding over New Century's bankruptcy case appointed Michael J. Missal ("the Examiner") to examine "any and all accounting and financial statement irregularities, errors and misstatements" in connection with New Century's practices and procedures. The Examiner engaged a law firm, forensic accountants and financial advisors to assist in his investigation and reporting. His final report to the Bankruptcy Court was unsealed and publicly released on March 26, 2008. Final Report of Michael J. Missal Bankruptcy Court Examiner (Feb. 29, 2008), *available at* http://pdfserver. amlaw.com/ca/newcentury01_0327.pdf ("Examiner's Report").

156.    The Examiner concluded that New Century "engaged in a number of significant improper and imprudent practices related to its loan originations, operations, accounting and financial reporting processes." Examiner's Report at 2. The Examiner summarized the findings:

- New Century had a brazen obsession with increasing loan originations, without due regard to the risks associated with that business strategy. Loan originations rose dramatically in recent years, from approximately $14 billion in 2002 to approximately $60 billion in 2006. The Loan Production Department was the dominant force within the Company and trained mortgage brokers to originate New Century loans in the aptly named "CloseMore University." Although a primary goal of any mortgage banking company is to make more loans, New Century did so in an aggressive manner that elevated the risks to dangerous and ultimately fatal levels. *Id*. at 3.

- The increasingly risky nature of New Century's loan originations created a ticking time bomb that detonated in 2007. Subprime loans can be appropriate for a large number of borrowers. New Century, however, layered the risks of loan products upon the risks of loose underwriting standards in its loan originations to high risk borrowers. *Id*.

- More than 40% of the loans originated by New Century were underwritten on a stated income basis. These loans are sometimes referred to as "liars' loans" because borrowers are not required to provide verification of claimed income, leading a New Century employee to tell certain members of Senior Management in 2004 that "we are unable to actually determine the borrowers' ability to afford a loan." *Id*.

- New Century also made frequent exceptions to its underwriting guidelines for borrowers who might not otherwise qualify for a particular loan. A Senior Officer of New Century warned in 2004 that the "number one issue is exceptions to guidelines." Moreover, many of the appraisals used to value the homes that secured the mortgages had deficiencies. *Id*. at 3–4.

70

- Senior Management turned a blind eye to the increasing risks of New Century's loan originations and did not take appropriate steps to manage those risks. New Century's former Chief Credit Officer noted in 2004 that the Company had "no standard for loan quality." Instead of focusing on whether borrowers could meet their obligations under the terms of the mortgages, a number of members of the Board of Directors and Senior Management told the Examiner that their predominant standard for loan quality was whether the loans New Century originated could be initially sold or securitized in the secondary market. *Id*. at 4.

- New Century's information technology and data entry and processing systems were not "state of the art" and were not sufficient for a business of the size and nature of New Century's. In particular, New Century's loan production processes were apparently manual and people-intensive through the fall of 2005. Up to that time, New Century apparently used an outdated DOS-based loan underwriting and appraisal operating system, which according to one Management interviewee, allowed users to "finagle anything." *Id*. at 54.

157.    Brad Morrice, New Century's CEO beginning in 2006, acknowledged that "bad appraisals were a frustrating source of concern and the main cause of loan 'kickouts,'" *i.e.*, a rejection of certain loans by investors, and that "improper appraisals were the biggest contributors to losses when loans went bad." *Id.* at 61–62.

158.    The Examiner identified several "red flags" that were indicative of the poor quality of New Century's loans and the fact that New Century was not adhering to its underwriting guidelines. Specifically, the Examiner noted that "defective appraisals, incorrect credit reports and missing documentation" had led to a high number of kick-outs by investors, all of which "suggested that New Century's loan origination processes were not consistently producing loans that met New Century's underwriting standards and investor guidelines." *Id.* at 109.

71

159.    The Examiner found:

> New Century's Senior Management recognized that the Company had serious loan quality issues beginning as early as 2004. For example, in April 2004, New Century's Chief Credit Officer reported that "the QA [quality assurance] results [pertaining to the loan origination processes] are still at unacceptable levels" and that "Investor Rejects [kickouts] are at an incline as well." Two months later, in June 2004, the head of Secondary Marketing remarked in an e-mail that "we have so many issues pertaining to quality and process!"

*Id*. at 110.

160.    Further adding to the problem was the fact that exceptions were frequently granted to underwriting guidelines, but "New Century had no formal exceptions policy." *Id.* at 174. With no policy in place, the granting of exceptions was arbitrary. Despite upper management's awareness of the tremendous problems regarding loan quality, the Examiner concluded that "New Century continued to focus on generating greater quantities of ever riskier loans, devoting little effort to such basic issues as making sure that the Company's loan origination and underwriting policies and procedures were followed to avoid kickouts of loans offered for sale." *Id.* at 111.

161.    On April 7, 2010, Patricia Lindsay, former Vice President of Corporate Risk at New Century, who worked for the company from 1997 through December 2007, corroborated the Examiner's findings in her testimony before the FCIC. She testified that at New Century, risk managers were often viewed as a roadblock rather than a resource and that:

> Account executives, who were New Century employees who brought loans in from brokers, were primarily compensated on commission of closed loans that they brought in. . . . Many of the sales managers and account executives lacked any real estate or mortgage experience. They were missing the depth of experience necessary to make an informed

72

lending decision.  These same sales managers had the ability to make exceptions to guidelines on loans, which would result in loans closing with these exceptions, at times over the objections of seasoned appraisers, underwriters or risk personnel. . . .

*Subprime Origination and Securitization: Hearing Before the Fin. Crisis. Inquiry Comm'n, Sect. 2* (Apr. 7, 2010) (testimony of Patricia Lindsay, former Vice President of Corporate Risk, New Century).

162.    Lindsay also testified to systematic problems in the appraisal process:

In my experience at New Century, fee appraisers hired to go to the properties were often times pressured into coming in "at value," fearing if they didn't, they would lose future business and their livelihoods.  They would charge the same fees as usual, but would find properties that would help support the needed value rather than finding the best comparables to come up with the most accurate value.

*Id*.

163.    Lindsay noted that at the end, New Century's approach to lending lacked "common sense"—that the business became "volume driven and automated" with a broker being able to get a loan pre-approved in "12 seconds or less."  *Id.*

164.    New Century's volume-driven abandonment of its underwriting guidelines resulted in enforcement actions by (and subsequent settlements with) numerous government agencies, including the SEC and Massachusetts and Ohio Attorneys General.

165.    Additionally, private litigation has also illustrated the fact that New Century failed to comply with its stated underwriting guidelines.  For example, in the complaint in *Cambridge Place Inv. Mgmt. Inc. v. Morgan Stanley & Co.*, No. 10-2741 (Mass. Supp. July 9, 2010), confidential witnesses stated that New Century abandoned underwriting guidelines to approve more loans; employees were told to do whatever they

73

had to in order to increase volume; and loans that were not initially approved by

underwriters were often later approved by superiors.

O.    **NovaStar Mortgage, Inc.**

166.    NovaStar Mortgage, Inc. ("NovaStar") was a residential mortgage lender based in Kansas City, Missouri.  NovaStar served as the sponsor for and originated mortgage loans included in the NHEL 2005-3 and NHEL 2006-3 Trusts.

167.    Several former NovaStar employees have confirmed that NovaStar breached its underwriting guidelines by failing to evaluate its borrowers' true repayment abilities or the adequacy of the properties serving as collateral for its loans.  *See Phoenix Light SF Ltd. v. JPMorgan*, No. 13-cv-652921 (NY Sup. Ct. Aug. 20, 2013).  Based on accounts of these employees, NovaStar's underwriting guidelines were applied inaccurately and subjectively, with different interpretations across each of NovaStar's regional centers.  *Id.*  Further, NovaStar's highest level of management pressured loan underwriters to approve loans and encouraged them to "think outside the box," *i.e.*, condoning the approval of loans that did not meet the underwriting guidelines.  *Id.* Examples of the types of deviations from the guidelines uncovered include:

> Promotional materials that NovaStar sent to its network of brokers expressly indicated that NovaStar ignored its underwriting guidelines.  For example, brokers were sent a memo that stated "Did You Know NovaStar Offers to Completely Ignore Consumer Credit!," an obvious concession that NovaStar would not evaluate whether borrowers could afford to repay their loans. Another memo similarly stated: "Ignore the Rules and Qualify More Borrowers with our Credit Score Override Program!"

*See id.*

168.    A former NovaStar underwriter based in Ohio, who held several positions between 2002 and 2007 stated that:

75

- He approved loans that did not comply with the underwriting guidelines by granting 'exceptions' without even seeing the loan file.  *Id.*

- He was advised by the Vice President of Sales to be more aggressive in granting exceptions to loans that did not meet the underwriting guidelines in order to bring in more business.  *Id.*

- NovaStar often only paid attention to one of its many required criteria–a borrower's credit score.  *Id.*

- NovaStar treated its underwriting guidelines as simple parameters, with the actual "unspoken law" to be to approve loans.  *Id.*

- He personally saw loan files with fabricated employment information and misrepresentations about whether loans were for a primary residence or an investment property.  *Id.*

- NovaStar continued to accept loans from a company called Phoenix Mortgage even though it was known at NovaStar that Phoenix Mortgage engaged in fraudulent lending.  *Id.*

**P.** **SouthStar Funding, LLC**

169.    SouthStar Funding, LLC ("SouthStar") was a subprime lender based in Sandy Springs, Georgia, which offered a wide range of mortgage products but primarily specialized in funding subprime mortgages.  SouthStar originated mortgage loans included in the SAMI 2005-AR6 Trust.

170.    On April 13, 2007, the New Jersey Department of Banking and Insurance issued legal documents ordering SouthStar to stop doing business in the state and took the initial step toward revoking the company's mortgage lender license.  *See Mortgage Broker Alert: SouthStar Funding, LLC*, State of N.J. Dep't of Banking & Ins., Apr. 13, 2007, *available at* http://www.state.nj.us/dobi/ocf_orders/southstarbroker_0704.html.

171.    Other private litigations also highlight SouthStar's violations of its underwriting guidelines.  Compl., *Bayerische Landesbank v. Bear Stearns & Co.*, No. 11-cv-653239 (N.Y. Sup. Ct. Nov. 21, 2011).

Q.    **Wells Fargo Bank, N.A.**

172.    Wells Fargo Bank, N.A. ("Wells Fargo") is the fourth largest bank in the U.S. by assets and the largest bank in the U.S. by market capitalization.  Wells Fargo originated mortgage loans included in the BSABS 2006-4 Trust.

173.    The City of Memphis sued Wells Fargo in 2010 over its mortgage practices claiming violations of the Fair Housing Act.  *See* Am. Complaint, *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857 (W.D. Tenn. Apr. 7, 2010) ("Memphis Complaint").  The Memphis Complaint includes sworn declarations from former Wells Fargo employees describing Wells Fargo's abandonment of underwriting guidelines.

174.    Camille Thomas was a loan processor at Wells Fargo from January 2004 to January 2008.  She handled the paperwork involved in the loan, including processing the file for review and approval by the underwriters.  To do her job, she had to be familiar with Wells Fargo's underwriting guidelines.  Memphis Complaint Ex. D at 1-2.  Thomas recounted how the bonus structure placed pressure on credit managers to make loans that should not have been made.  She stated that managers manipulated LTV ratios by using inflated appraisals they knew were not accurate.  *Id.* at 4.  She also knew that documents were falsified to inflate borrowers' incomes.  When she complained, a branch manager told her, "we gotta do what we gotta do."  *Id.* at 5.  Finally, she stated that borrowers were not informed that their loans were adjustable-rate mortgages with low "teaser rates," or about prepayment penalties, potential violations of lending laws, which would also be violations of the underwriting guidelines.  *Id.* at 4.

78

175.    Doris Dancy was a credit manager at Wells Fargo from July 2007 to January 2008.  She stated that the district manager put pressure on credit managers to convince people to apply for loans even if the person could not afford the loan or did not qualify for it.  To her shock, many people with bad credit scores and high DTI ratios were approved for subprime loans.  Memphis Complaint Ex. A at 1-3.  Dancy would shake her head in disbelief and ask herself, "How could that happen?"  *Id.* at 3.  She knew that Wells Fargo violated its underwriting guidelines to make those loans.  Although she never witnessed it herself, she also heard from other employees that some branch managers falsified information to get customers to qualify for subprime loans.  *Id.* at 4.  She stated that a bonus system was used to pressure her to make loans she thought should not be funded.  *Id.*

176.    Michael Simpson was a credit and branch manager at Wells Fargo from 2002 to 2008.  Simpson stated that Wells Fargo was "very aggressive" in mortgage lending.  Memphis Complaint Ex. B at 3. The culture was "completely results driven."  *Id.* at 6.  According to Simpson, Wells Fargo employees did not tell customers about the fees and costs associated with closing a loan – again, potential violations of lending laws, and also violations of the underwriting guidelines.  *Id.* at 4-5.  He also knew managers who falsified information in loan files, such as income documentation, to get loans approved.  *Id.* at 5.  Simpson further confirmed that Wells Fargo's bonus system was "lucrative" for those employees generating the loans.  *Id.* at 6.

177.    Mario Taylor was a credit manager at Wells Fargo from June 2006 to February 2008.  His job was to find potential borrowers and to get them to apply for loans.  His manager pressured him to push loans on borrowers whether they were qualified for

the loan or not, disregarding whether they could pay back the loan. Memphis Complaint Ex. C at 1-3. He was also told to mislead borrowers by only telling them the "teaser rate" without disclosing the rate was adjustable and by not telling them about the "fine print." *Id.* at 4. One of his branch managers changed pay stubs and used white-out on documents to alter the borrower's income. Finally, Taylor confirmed that Wells Fargo employees were heavily incentivized by the bonus structure to generate large volumes of loans. *Id.* at 5.

178. Elizabeth Jacobson was a loan officer and sales manager at Wells Fargo from 1998 to December 2007. She described the financial incentives to sign borrowers up for loans. In two years, she made more than $1.2 million in sales commissions. Memphis Complaint Ex. G at 1-2. She knew loan officers who would lie to potential borrowers about whether they could refinance their loan once the "teaser rate" period expired. *Id.* at 4. Jacobson also knew loan officers who falsified loan applications to qualify them for loans they should not have received. One loan officer would "cut and paste" the credit report of an approved borrower into other borrowers' applications. *Id.* at 6-7. She reported this conduct to management but was not aware of any action taken to correct the problems. *Id.* at 11.

179. The district court denied a motion to dismiss. *City of Memphis v. Wells Fargo Bank, N.A.*, No. 09-cv-2857, 2011 WL 1706756 (W.D. Tenn. May 4, 2011). The case subsequently settled.

180. The FCIC's investigation supports the affidavits of these former Wells Fargo employees. The FCIC interviewed Darcy Parmer, a former employee of Wells Fargo, who worked as an underwriter and a quality assurance analyst from 2001 until

2007.  According to Parmer, at least half the loans she flagged as fraudulent were approved.  She also told the FCIC that "hundreds and hundreds and hundreds of fraud cases" within Wells Fargo were never referred to the Treasury Department's Financial Crimes Enforcement Network.  FCIC Report at 162.

181.    In July 2011, the Federal Reserve Board issued a consent cease and desist order, and assessed an $85 million civil money penalty against Wells Fargo & Co. (the parent company of Wells Fargo Bank) and Wells Fargo Financial, Inc.  Press Release, Federal Reserve Board (July 20, 2011), *available at* http://www.federalreserve.gov/newsevents/press/enforcement /20110720a.htm.  At the time, this was the largest penalty assessed by the Federal Reserve Board in a consumer-protection enforcement action.  The order addressed allegations that Wells Fargo had falsified income information in mortgage applications.  These practices were allegedly fostered by Wells Fargo's incentive compensation and sales quota programs and the lack of adequate controls to manage the risks resulting from these programs.  *Id.*

182.    There is widespread evidence of pervasive breaches of seller representations and warranties in Wells Fargo sponsored RMBS, including detailed allegations in securities cases against Wells Fargo.  For example, Wells Fargo settled *In Re Wells Fargo Mortgage-Backed Certificates Litigation*, No. 09-cv-1376 (N.D. Cal.) for $125 million.  This action and others have demonstrated systemic and pervasive deficiencies in Wells Fargo's underwriting practices, which led to inaccurate representations and warranties regarding LTV ratios and owner occupancy.

183.     In *Federal Home Loan Bank of Atlanta v. Countrywide Fin. Corp*, No. 11-cv-00489 (N.D. Georgia Feb. 17, 2011), the plaintiff performed a forensic review of 30 trusts, including at least one trust sponsored by Wells Fargo.  The Federal Home Loan Bank of Atlanta found that in its sample of more than 21,000 loans "over 58% of the appraised property values in this sample were overstated by 5% or more."  *Id.* ¶ 167. Moreover, the analysis revealed that although the offering documents for all 30 trusts represented that no loans had an LTV at origination over 100 percent, of the "more than 21,000 loans the Bank analyzed, over 2,490 had an AVM value (at the time of origination) that was less than the amount of the original mortgage (i.e., an LTV over 100%)."  *Id.* ¶ 171.

184.     In a similar action brought by the Federal Home Loan Bank of Indianapolis, *Federal Home Loan Bank Indianapolis v. Banc of America Mort. Sec., Inc., et al.*, No. 10-cv- 01463 (S.D. Ind. Nov. 15, 2010), the bank conducted a forensic review of 32 offerings, including some Wells Fargo sponsored trusts.  For four of those trusts, Wells Fargo represented that no loan in the pool had an LTV ratio over 100 percent, but the review revealed that 9.02 percent, 14.29 percent, 17.39 percent, and 8.33 percent of the loans respectively had an LTV ratio greater than 100 percent.  The review also revealed that the owner occupancy percentages were understated.

185.    The Sponsors' and Originators' failure to adhere to applicable underwriting guidelines, as described above, constituted a default under the Pooling and Servicing Agreements ("PSAs") because they represented and warranted that the loans included in the Covered Trusts complied with their underwriting guidelines. The Master Servicer, the Depositors, the Sponsors, and Bank of New York Mellon

(BNY Mellon) failed to provide notice of those breaches as they were required to do under the PSAs.  If BNY Mellon had provided notice, the applicable sponsors and originators would have had to replace or repurchase the relevant loans and stop including large numbers of defective and non-compliant loans in mortgage loan securitizations.