**<u>Exhibit G</u>**

**The Servicers' and Master Servicers'
Cover-up of the Sponsors' Document Delivery Failures**

A.    Countrywide Home Loans, Inc.,
      Countrywide Home Loans Servicing LP, and Bank of America, N.A. ....................1

B.    First Horizon Home Loan Corporation
      and First Tennessee Mortgage Services, Inc...........................................................5

C.    JPMorgan Chase Bank, N.A., Chase Home Finance, LLC,
      ECC Capital Corporation, and EMC Mortgage Corporation ..................................8

D.    Wells Fargo Bank, N.A.........................................................................................13

E.    NovaStar Mortgage, Inc........................................................................................16

A.      **Countrywide Home Loans, Inc., Countrywide**
        **Home Loans Servicing LP, and Bank of America, N.A**

1.      Bank of America, N.A. is an affiliate of Bank of America Corporation ("BAC"). In 2008, BAC acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc. (collectively, "Countrywide"). Countrywide acted as a servicer for the fifty-nine Countrywide issued trusts, SAMI 2005-AR4, SAMI 2005-AR6, and SAMI 2006-AR3.

2.      Countrywide, Bank of America, and their affiliates or agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors (including Countrywide) for securitizations in which Countrywide and Bank of America were servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

3.      The Board of Governors of the Federal Reserve System ("Federal Reserve"), Office of the Comptroller of the Currency ("OCC"), Federal Deposit Insurance Corporation ("FDIC") and OTS issued a report finding that BAC, including its affiliates Countrywide and Merrill Lynch, routinely did not transfer the original mortgage loan documents to the issuing trusts for mortgage-backed securities transactions. Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www.federalreserve.gov/boarddocs/rptcongress/ interagency/interagency.htm. In the report, the regulators noted that their review of the mortgage servicers' loan files showed that there may be "disputes over note ownership or authority to foreclose." *Id*. at 6. The regulators also noted "concerns about the prevalence of irregularities in the documentation of ownership [that] may cause uncertainties for investors of securitized mortgages." *Id*.

4.      As a direct result of this misconduct, in September 2010, BAC and its affiliates had to suspend foreclosures in 23 states to allow the company to undertake a review of internal procedures while publicly acknowledging that tens of thousands of foreclosure proceedings were improperly filed.  Robbie Whelan, *WSJ: Bank of America Suspends Foreclosures*, Wall St. J., http://online.wsj.com/articles/SB100014240 5274870385920457552649139311572 (last updated Oct. 2, 2010 10:41 AM).  On October 9, 2010, BAC and its affiliates' documentation failures and lack of internal controls forced them to suspend foreclosures nationwide.  David Streitfeld & Nelson D. Schwartz, *Largest U.S. Bank Halts Foreclosures in All States*, N.Y. Times, Oct. 9, 2010, at A1.

5.      On April 13, 2011, the OCC issued a Consent Order finding that Bank of America N.A., including in its role as successor to Countrywide, engaged in improper foreclosure practices to cover up the fact that issuing trusts lacked legal title sufficient to foreclose upon underlying mortgage loans.  *In re Bank of Am., N.A.*, Consent Order, AA-EC-11-12 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47b.pdf.

6.      On August 4, 2011, the New York State Attorney General ("NYAG") filed fraud claims against The Bank of New York Mellon ("BNY Mellon"), as trustee for securitizations created and serviced by BAC and its affiliates.

7.      The NYAG found that the blatant disregard for the rules governing assignment by BAC and its affiliates has caused, and is continuing to cause, serious harm to certificateholders.  As the NYAG stated in his petition in *In re Bank of New York Mellon (as Trustee under various Pooling and Servicing Agreements and*

2

*Indenture Trustee under various Indentures)*, No. 11-cv-651786 (N.Y. Sup. Ct. Aug. 5, 2011) (the "BNY Article 77 Proceeding"):

> [Assignment] provisions are central to any mortgage securitization, but they are now vitally important to trust investors in light of the housing market collapse. Any action to foreclose requires proof of ownership of the mortgage. This must be demonstrated by actual possession of the note and mortgage, together with proof of any chain of assignments leading to the alleged ownership. Moreover, complete mortgage files give borrowers assurance that their properties are properly foreclosed upon. The failure to properly transfer possession of complete mortgage files has hindered numerous foreclosure proceedings and resulted in fraudulent activities including, for example, 'robo-signing.'

8. The NYAG's petition reported that an extensive review of foreclosure proceedings commenced by BAC and its affiliates found widespread misconduct. For example, BAC admitted in *Bank of New York v. Kirkland*, No. 07-cv-16839 (N.Y. Sup. Ct. Dec. 11, 2007) that an action to foreclose on a mortgage had been commenced despite the fact that the promissory note had not been assigned to the trust that purportedly owned the note. Similarly, in *Bank of New York v. Gioio*, No. 08-cv-9865 (N.Y. Sup. Ct. Sept. 22, 2008), BAC admitted that a note assignment had been executed two days prior to commencement of the action, contrary to requirements of state law.

9. The NYAG reported in documents filed in the BNY Article 77 Proceeding, that the "failure of Countrywide to transfer complete mortgage loan documentation to the trusts hampered the trusts' ability to foreclose on delinquent mortgages thereby impairing the value of the notes secured by those mortgages." Schneiderman Verified Pleading ¶ 23, *In re Bank of N.Y. Mellon*, No. 11-cv-651786 (N.Y. Sup. Ct. Aug. 5, 2011).

10.     In 2012, BAC, including as successor to Countrywide and Merrill Lynch, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of, among other things, their robo-signing misconduct. The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/ February/12-ag-186.html.

11.     As a result of Countrywide's systemic failure to transfer essential mortgage documentation to securitization trusts, Phillip R. Burnaman II, an expert retained by BNY Mellon in the BNY Article 77 Proceeding, issued an expert report revealing that BNY Mellon's exception reports for Countrywide securitizations as of June 2011 showed *117,899* loans lacking complete documentation.  Burnaman Expert Report at 50, *In re Bank of N.Y. Mellon*, No. 11-cv-651786 (N.Y. Sup. Ct. Mar. 14, 2013) (emphasis added).  The document cure provisions in the Countrywide-Bank of America Settlement Agreement apply to only 1,116 of the 117,899 loans with defective documentation.  *Id*.

12.     On December 1, 2011, the Massachusetts Attorney General commenced an action against Bank of America, among others, alleging "rampant violations" of state law in foreclosure proceedings.  Compl., *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1, 2011).

**B.**    **First Horizon Home Loan Corporation
and First Tennessee Mortgage Services, Inc.**

13.    First Tennessee Mortgage Services, Inc. is an affiliate of First Tennessee Bank, N.A, which is the successor in interest to First Horizon Home Loan Corporation (collectively "First Horizon"). First Horizon and its affiliates or agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors (including First Horizon) for securitizations in which First Horizon was servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers. First Horizon utilized robo-signers who executed numerous foreclosure affidavits a month, all necessarily false because they were purportedly based on personal knowledge when the robo-signers lacked any such knowledge and many of the false affidavits lacked proper documentation including evidence of possession of the underlying mortgage note.

14.    First Horizon acted as the servicer and master servicer for the FHAMS 2006-AA1 securitization.

15.    First Horizon's systemic failures to transfer proper documentation for the mortgage loans to securitization trusts has negatively impacted foreclosure proceedings involving First Horizon mortgage loans in courts nationwide, where courts have found required paperwork to transfer title to the securitization trusts to be faulty, missing or inadequate, which at a minimum caused a delay in the foreclosure proceedings. *See, e.g.*, *Grunberg v. First Horizon Home Loans*, No. FSTCV126012649S, 2014 Conn. Super. LEXIS 359 (Conn. Super. Ct. Feb. 14, 2014); *Rosario v. Mortg. Elec. Reg. Sys.*, No. C.A. No. PC 2011-2999, 2013 R.I. Super. LEXIS 30 (R.I. Super. Ct. Feb. 11, 2013); *Grant v. First Horizon Home Loans*, No. 66721-1-I, 2012 Wash. App. LEXIS 1246 (Wash. Ct.

5

App. May 29, 2012); *Murphy v. First Horizon Home Loan*, No. 12-cv-000818, 2013 U.S. Dist. LEXIS 42353 (D. Or. Mar. 26, 2013).

16.    In 2008, First Horizon sold its loan servicing platforms to Metlife Bank, N.A. ("MetLife").

17.    On April 13, 2011, the OCC issued a Consent Order finding that Metlife, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to borrowers when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re MetLife Bank, N.A.*, Consent Order, AA-EC-11-16 (April 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47g.pdf.

18.    MetLife stipulated to the Consent Order. *Id*.

19.    The OCC ordered MetLife to undertake a sweeping review of its foreclosure practices, including (i) instating processes to ensure that all fees, expenses and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and that the fees were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents and applicable state and federal law.  Id.

20.    Additionally, in October 2010, the Texas Attorney General ordered First

6

Horizon to stop all foreclosures in the state of Texas due to improprieties relating to First

Horizon's practice of using robo-signers.  Press Release, Oct. 5, 2010, *available at*

https://www.texasattorneygeneral.gov/oagnews/release.php?id=3500.

C.      **JPMorgan Chase Bank, N.A., Chase Home Finance, LLC,**
        **ECC Capital Corporation, and EMC Mortgage Corporation**

21.     In February 2007, Bear Stearns Companies Inc. ("Bear Stearns") acquired ECC Capital Corporation ("ECC"). Chase Home Finance is an affiliate of JPMorgan Chase Bank, N.A. and JPMorgan Chase Bank, N.A. is the sole owner of J.P. Morgan Mortgage Acquisition Corporation and is a subsidiary of J.P. Morgan Chase & Co. (collectively, "JPMorgan"). EMC Mortgage Corporation and its subsidiary EMC Residential Mortgage Corporation (collectively, "EMC") is a subsidiary of JPMorgan Chase & Co.

22.     EMC was a servicer for the BSABS 2006-4, SAMI 2005-AR6, and SAMI 2006-AR3 securitizations. JPMorgan was the servicer and master servicer for the CFLX 2007-M1 securitization.

23.     Courts have concluded that JPMorgan, ECC, EMC and their affiliates and agents have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors (including EMC and ECC ) for securitizations in which JPMorgan, EMC, and ECC were servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

24.     For example, in *JP Morgan Chase Bank v. Pocopanni*, No. 16-2008-CA-3989 (Fla. Cir. Ct. Aug. 9, 2010), the court stated as follows:

> The Court finds by clear and convincing evidence that WAMU, Chase and [counsel for JPMC Bank] committed fraud on this Court. . . . The Court finds that WAMU and Chase made representations to this Court during the course of the instant action that are known to be false. . . . Throughout the litigation, WAMU and Chase and [their counsel] have represented to this Court that plaintiff owns and holds the note and mortgage. Moreover, WAMU and [counsel] created a false Assignment of Mortgage dated

8

> April 11, 2008 as evidence of these assertions. . . .  The Court finds by clear and convincing evidence that these acts committed by WAMU, Chase and [counsel] amount to a "knowing deception intended to prevent the defendants from discovery essential to defending the claim" and are therefore fraud.

*Wall Street and the Financial Crisis:  The Role of High Risk Home Loans: Hearing Before S. Permanent Subcomm. On Investigations*, 112th Cong. (2010), Senate Ex. 30 "Significant Incident Notification (SIN)" at 1 (Apr. 1, 2008).

25.     Beth Ann Cotrell, a JPMorgan robo-signer, based in Franklin County, Ohio, testified that she signed 18,000 foreclosure related documents a month, candidly admitting that she had absolutely no personal knowledge regarding assertions made in the documents she was signing.  It was absolute fiction.  Cottrell Dep., *Chase Home Fin., LLC v. Fleming*, No. 50-2009-CA-026599 (Fla. Cir. Ct. May 17–18, 2010).

26.     Upon information and belief, JPMorgan employed individuals such as Barbara Hindman, based in Jacksonville, Florida who robo signed documents to be used in foreclosures.  In some of these foreclosure documents filed in state courts, Hindman represented that she was "Vice President of Mortgage Electronic Registration Systems, Inc."  Sometimes she represented she was "Vice President, Bank of America, N.A." Other times she represented that she was "Vice President, JP Morgan Chase Bank, N.A., as successor-in-interest to Washington Mutual Bank."  Hindman works with Margaret Dalton, another JPMorgan robo-signer based in Jacksonville, Florida.

27.     Upon information and belief, other JPMorgan robo-signers include Whitney Cook, Christina Trowbridge and Stacy Spohn.

28.     As a direct result of this misconduct, in September 2010, JPMorgan and its affiliates had to suspend foreclosures in 23 states to undertake a review of internal

9

procedures and publicly acknowledged that they systemically submitted forged or otherwise improper documentation in foreclosure proceedings.

29.     In November 2010, Legal Services of New Jersey provided a report to the New Jersey Supreme Court detailing numerous instances of robo-signing and false affidavits in connection with foreclosure proceedings in New Jersey and throughout the nation.  Legal Services of New Jersey: Report and Recommendations to the New Jersey Supreme Court Concerning False Statements and Swearings in Foreclosure Proceedings, Nov. 4, 2010, at 1, *available at* www.lsnj.org/newsannouncements/Foreclosure/materials/LSNJReport.pdf.  The report was supported by evidentiary exhibits such as deposition transcripts of robo-signers indicating that they lied in court documents, falsified and back-dated documents, and other evidence of fraud.  *Id*.  The report concluded that "[a] great volume of national information . . . suggests a pervasive, industry-wide pattern of false statements and certifications at various stages of foreclosure proceedings."  The report specifically implicated JPMorgan.  *Id*. at 9–10.

30.     On April 13, 2011, the OCC issued a Consent Order finding that JPMorgan engaged in improper foreclosure practices to cover-up the fact that issuing trusts lacked legal title sufficient to foreclosure upon underlying mortgage loans.  *In re JP Morgan*, Consent Order, AA-EC-11-15, (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

31.     On December 1, 2011, the Massachusetts Attorney General commenced an action against JPMorgan, among others, alleging "rampant violations" of state law in foreclosure proceedings.  Compl., *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363

10

(Mass. Super. Ct. Dec. 1, 2011).

32.     The Office of the Comptroller of the Currency ("OCC") issued a Consent Order dated April 13, 2011 finding that JPMorgan and EMC engaged in improper foreclosure practices to cover-up the fact that issuing trusts lacked legal title sufficient to foreclose on underlying mortgage loans. *In re JP Morgan*, Consent Order, AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

33.     Further, the complaint filed by the NYAG on February 3, 2012 ("NYAG Complaint") charges various loan servicers, including JPMorgan, with persistent fraud and deceptive acts in connection with mortgage foreclosure proceedings.  The NYAG Complaint notes that servicers such as JPMorgan "have repeatedly submitted court documents containing false and misleading information that made it appear that the foreclosing party had the authority to bring a case when in fact it may not have."  Press Release, N.Y. Attorney Gen., A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks For Deceptive & Fraudulent Use Of Electronic Mortgage Registry (Feb. 3, 2012), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-nation%E2%80%99s-largest-banks-deceptive.

34.     JPMorgan was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of, among other things, its robo-signing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations included servicers' use of robo-signed affidavits, improper documentation and

11

lost paperwork.  See Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

35.     On March 30, 2012, Jamie Dimon, CEO of JPMorgan, sent a letter to JPMorgan's shareholders admitting that JPMorgan engaged in robo-signing:  "Our servicing operations left a lot to be desired: There were too many paperwork errors, including affidavits that were improperly signed because the signers did not have personal knowledge about what was in the affidavits but, instead, relied on the company's processes."  JP Morgan Chase & Co., 2011 Annual Report 27 (2011), *available at* http://files.shareholder.com/downloads/ONE/1766191294x0x556139/ 75b4bd59-02e7-4495-a84c-06e0b19d6990/JPM_2011_annual_report_ complete.pdf.

**D.** **Wells Fargo Bank, N.A.**

36. Wells Fargo Bank, N.A. and its affiliates (collectively "Wells Fargo") have engaged in widespread misconduct to cover-up the systemic failure of depositors and sponsors for securitizations in which Wells Fargo was servicer to properly assign the underlying mortgage loans to the issuing trusts, including through the use of robo-signers.

37. Wells Fargo was the master servicer for the BSABS 2006-4, HELT 2007-FRE1, SAMI 2005-AR4, SAMI 2005-AR6, and SAMI 2006-AR3 securitizations.

38. One of Wells Fargo's robo-signers is a woman named Xee Moua who admitted that she executed hundreds of foreclosure documents every day without reading them. Marshall Eckblad, *"Signer" Issue Raised for Wells Fargo*, Wall St. J., http://online.wsj.com/articles/SB10001424052748704361504575552192790748342 (last updated Oct. 15, 2010 12:01 AM). Moua admitted she reviewed up to 500 foreclosure documents on a daily basis. *Id*.

39. After Moua disclosed Wells Fargo's widespread practice of filing false mortgage documents, Wells Fargo admitted that it had filed false foreclosure documentation in approximately 55,000 foreclosure proceedings. Yang, Jia Lynn, *Wells Fargo Acknowledges Problems in Foreclosure Paperwork*, The Washington Post, Oct. 27, 2010, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2010/10/27/AR2010102707361.html?hpid=topnews

40. The Ohio Attorney General commenced an investigation in the wake of Moua's admission and asked Wells Fargo to voluntarily vacate all foreclosures based on improper paperwork.

13

41.      Wells Fargo also utilized the forgery mill—DOCx.  60 Minutes reported that Wells Fargo and other servicers retained DOCx to falsify mortgage loan documentation in an effort to cover-up the fact that there was a systemic failure to deliver mortgage loan documents and assign mortgage notes to issuing trusts in connection with securitization transactions.  *The Next Housing Shock* (CBS 60 Minutes Apr. 3, 2011), available at http://www.cbsnews.com/videos/the-next-housing-shock.  Robo-signers employed by DOCx were required to robo-sign 340 documents an hour and 4,000 documents per day for Wells Fargo and other bank clients.

42.      In April 13, 2011, the OCC filed a Consent Order based upon findings that Wells Fargo engaged in fraudulent and improper foreclosure practices to cover-up the fact that issuing trusts lacked legal title sufficient to foreclose upon the underlying mortgage loans.  *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011).  Wells Fargo stipulated to the OCC consent order.  *Id*.

43.      On December 1, 2011, the Massachusetts Attorney General commenced an action against Wells Fargo (and others) alleging "rampant violations" of state law in foreclosure proceedings.  *Massachusetts v. Bank of Am., N.A.*, No. 11-cv-4363 (Mass. Super. Ct. Dec. 1, 2011).

44.      Further, the NYAG charged various loan servicers, including Wells Fargo, with persistent fraud and deceptive acts in connection with mortgage foreclosure proceedings.  Compl., *New York v. JP Morgan*, No. 12-cv-2768 (N.Y. Sup. Ct. July 12, 2012).  As the NYAG Complaint points out: "[The defendant loan servicers] have repeatedly submitted court documents containing false and misleading information that

14

made it appear that the foreclosing party had the authority to bring a case when in fact it may not have." Press Release, N.Y. Attorney Gen., A.G. Schneiderman Announces Major Lawsuit Against Nation's Largest Banks for Deceptive & Fraudulent Use of Electronic Mortgage Registry (Feb. 3, 2012), *available at* http://www.ag.ny.gov/press-release/ag-schneiderman-announces-major-lawsuit-against-nation%E2%80%99s-largest-banks-deceptive.

45.     Wells Fargo was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of, among other things, its robo-signing misconduct. The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law. These violations included servicers' use of robo-signed affidavits, improper documentation and lost paperwork. *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), available at http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.

**E.**     **NovaStar Mortgage, Inc.**

46.     NovaStar Mortgage, Inc. operated as a subsidiary of NovaStar Financial Inc. (together, "NovaStar"). In October 2007, Saxon Mortgage Services, Inc. and Saxon Funding Management LLC (together, "Saxon") acquired all of NovaStar's servicing rights.  Morgan Stanley acquired Saxon in December of 2006.

47.     NovaStar was the servicer for the NHEL 2005-3 and NHEL 2006-3 securitizations.

48.     In November 2011, the New York Department of Financial Services entered into an agreement with Morgan Stanley/Saxon to redress its unlawful practices. Press Release, Dep't of Fin., Superintendent Lawsky Announces Agreements with Morgan Stanley, Saxon, AHMSI & Vericrest on Groundbreaking New Mortgage Practices (Nov. 10, 2011), *available at* http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required Morgan Stanley/Saxon to cease robo-signing and impose staffing and training requirements to prevent future robo-signing.  *Id*.  The agreement also required Morgan Stanley/Saxon to withdraw from any pending foreclosure proceedings in which the filed affidavits were robo-signed or inaccurate.  *Id*.

16