## Exhibit H

### Bank of New York Mellon Failed to Address the
### Master Servicers' and Servicers' Looting of Trust Assets

A.     Countrywide Home Loans, Inc.,
       Countrywide Home Loans Servicing LP, and Bank of America, N.A. ...............................1

B.     First Horizon Home Loan Corporation and First Tennessee Mortgage Services, Inc. ........5

C.     JPMorgan Chase Bank, N.A.,
       ECC Capital Corporation, and EMC Mortgage Corporation .............................................7

D.     NovaStar Mortgage, Inc. ...................................................................................................11

E.     Wells Fargo Bank, N.A. .....................................................................................................13

**A.    Countrywide Home Loans, Inc., Countrywide**
**Home Loans Servicing LP, and Bank of America, N.A**

1.    Bank of America, N.A. is an affiliate of Bank of America Corporation (collectively, "BAC").  In 2008, BAC acquired Countrywide Financial Corporation, including Countrywide Home Loans Servicing LP and Countrywide Home Loans, Inc. (collectively, "Countrywide").  Countrywide acted as a servicer for the fifty-nine Countrywide issued trusts, SAMI 2005-AR4, SAMI 2005-AR6, and SAMI 2006-AR3.

2.    When a borrower defaults, the servicer is supposed to take action to preserve the value of the mortgaged property.  For example, BAC may order a property inspection for the purpose of verifying the occupancy status of a defaulting borrower's home.  When homes are in the foreclosure process, BAC may provide maintenance services such as lawn mowing and security.

3.    BAC uses affiliated entities, including LandSafe Default, Inc. (also known as LandSafe National Default) and ReconTrust Company, N.A. to hire third party vendors to perform default-related services.  BAC in turn charges the defaulting borrowers. Notwithstanding that mortgage loan documents require BAC to charge no more than actual cost, it routinely marked up its servicing charges by up to 100%.

4.    David Sambol, former CEO of Countrywide, touted this profiteering from default-related services during an October 2007 earnings call:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs.  And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses

> involved in foreclosure trustee and default title services and property inspection services.

Lesley Fair, *$108 Million for Homeowners in Distress*, Bureau of Consumer Protection Business Center, http://www.business.ftc.gov/blog/2011/07/108-million-homeowners-distress (last updated July 20, 2011 11:27 AM).

5. On June 7, 2010, the Federal Trade Commission ("FTC") commenced a lawsuit against Countrywide and BAC for gouging borrowers for default-related services. Countrywide and BAC eventually paid $108 million to settle the charges.

6. The FTC found that Countrywide and BAC committed numerous frauds in bankruptcy proceedings. According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans. Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts." Press Release, Fed. Trade Comm'n, Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), *available at* http://www.ftc.gov/news-events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

7. On February 9, 2012, Bank of America Corp. agreed to settle FTC charges that it illegally assessed more than $36 million worth of fees against struggling homeowners, in violation of an earlier settlement with the FTC. In its press release, the FTC noted "[i]t's clear to us that the Bank of America subsidiary violated the 2010 court order, and as a result, they will have to return all of the money they illegally charged homeowners who were already having trouble paying their mortgages." Press Release, Fed. Trade Comm'n, Bank of America Subsidiary Reversing or Refunding $36 Million in Fees to Resolve FTC Allegations That it Overcharged Struggling Homeowners (Feb. 9, 2012),

*available at* http:// www.ftc.gov/news-events/press-releases/2012/02/bank-america-subsidiary-reversing-or-refunding-36-million-fees.

8.      Countrywide and BAC also ran an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, BAC replaced the borrowers' homeowner policies with policies underwritten by Balboa Insurance Company ("Balboa"), an affiliate of Bank of America until mid-2011.  Balboa charges substantially above-market premiums for these so called force-placed insurance policies, typically several times the premium under the original policy.  This force-placed insurance scam violated Countrywide and BAC's obligation to service loans prudently.

9.      On April 18, 2013, the New York State Department of Financial Services announced a settlement of its investigation into Balboa, which includes restitution for homeowners who were harmed, a $10 million penalty paid to the State of New York, and a set of reforms.  *See* Cuomo Administration Settles With Country's Second Largest 'Force-Placed' Insurer, Leading Nationwide Reform Effort and Saving Millions for Homeowners and Investors (Apr. 18, 2013), *available at https://www.governor.ny.gov/news/cuomo-administration-settles-countrys-second-largest-force-placed-insurer-leading-nationwide*.

10.      Following a 16-month investigation led by Iowa Attorney General Tom Miller, a coalition of state attorneys general and federal agencies (the "Coalition") reached a settlement with, among others, Bank of America.  In its complaint, the Coalition reported its investigative findings.  The Coalition concluded that Bank of America committed unfair and deceptive practices including (i) failing to timely and accurately apply payments made by borrowers and failing to maintain accurate account statements; (ii) charging excessive or improper fees for

default-related services; (iii) failing to properly oversee third-party vendors involved in servicing activities on behalf of the servicers; and (iv) imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

11. In August 2014, BAC reached a $16.65 billion settlement with the Department of Justice ("DOJ") to resolve federal and state claims against Bank of America and its former and current subsidiaries, including Countrywide. The resolution required BAC to provide much needed relief to underwater homeowners and potential homebuyers. Under the terms of the settlement, BAC receives credit for modifying loans, including securitized loans. However, BAC has modified securitized loans that did not qualify for modification under prudent servicing standards or the governing servicing agreements in order to receive credit because the investors, not BAC, would bear the loss for modifications of securitized loans.

12. Bank of America, including as successor to Countywide, was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its servicing misconduct. The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law. These violations include servicers' deceptive practices in the offering of loan modifications and failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages. *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/ 12-ag-186.html.

4

**B.**      <u>First Horizon Home Loan Corporation and First Tennessee Mortgage Services, Inc.</u>

13.     First Tennessee Mortgage Services, Inc. is an affiliate of First Tennessee Bank, N.A., which is the successor in interest to First Horizon Home Loan Corporation (collectively, "First Horizon"). In 2008, First Horizon sold its loan servicing platforms to Metlife Bank, N.A. ("MetLife").

14.     First Horizon acted as the servicer and master servicer for the FHAMS 2006-AA1 securitization.

15.     On April 13, 2011, the OCC issued a Consent Order finding that First Horizon (or MetLife), in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, filed in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to borrowers when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re MetLife Bank, N.A.*, Consent Order, AA-EC-11-16 (April 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47g.pdf.

16.     MetLife stipulated to the Consent Order. *Id.*

17.     The OCC ordered MetLife to undertake a sweeping review of its foreclosure practices, including (i) instating processes to ensure that all fees, expenses and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable legal requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and that the fees were reasonable and customary; and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the

borrower's loan documents and applicable state and federal law. *Id*.

18. Additionally, First Horizon was part of the Coalition's investigation and eventually entered into the Coalition Settlement to resolve claims that First Horizon committed unfair and deceptive practices including overcharging borrowers for default related services. *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

C.    **JPMorgan Chase Bank, N.A.,**
      **ECC Capital Corporation, and EMC Mortgage Corporation**

19.    In February 2007, Bear Stearns Companies Inc. ("Bear Stearns") acquired ECC Capital Corporation ("ECC"). JPMorgan Chase Bank, N.A. is the sole owner of J.P. Morgan Mortgage Acquisition Corporation and is a subsidiary of J.P. Morgan Chase & Co. (collectively, "JPMorgan"). In early 2008, JPMorgan acquired Bear Stearns. EMC Mortgage Corporation ("EMC") is a subsidiary of JPMorgan.

20.    EMC was a servicer for the BSABS 2006-4, SAMI 2005-AR6, and SAMI 2006-AR3 securitizations. JPMorgan was the servicer and master servicer for the CFLX 2007-M1 securitization.

21.    On April 13, 2011, the OCC issued a consent order finding that, in connection with certain foreclosures of loans in its residential mortgage servicing portfolio, JPMorgan, including ECC and EMC, filed with state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records. *In re JPMorgan Chase Bank, N.A.*, Consent Order, AA-EC-11-15 (Apr. 13, 2011), *available at* http://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47e.pdf.

22.    JPMorgan, including ECC and EMC, stipulated to the Consent Order.

23.    The OCC ordered JPMorgan, including ECC and EMC, to undertake a sweeping review of its foreclosure practices, including (i) instating processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable Legal Requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan

7

documents, applicable state and federal law, and were reasonable and customary and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.

24.    In April 2011, the Federal Reserve, the FDIC, the OCC and the OTS issued a report concerning foreclosure-processing reviews of 14 servicers, including JPMorgan. Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www. federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  The report found that the foreclosure governance processes were underdeveloped and insufficient and that weaknesses included (i) lack of sufficient audit trails to show how information set out in servicer affidavits (including the amount of fees and penalties charged) was linked to servicers' internal records, (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed, and (iii) lack of sufficient oversight of default management service providers.  *Id.* at 3.

25.    Further, private litigation has brought to light that JPMorgan charged marked-up and unnecessary servicing fees (including through the use of default-related service vendors) and assessed them against borrowers' accounts for profits.  *See, e.g.*, *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1068 (N.D. Cal. 2013)(JP Morgan allegedly adopted a uniform practice designed to maximize fees assessed on delinquent borrowers' accounts, which included marked-up fees that were not disclosed to borrowers).

26.    Additionally, JPMorgan was part of the Coalition's investigation and eventually entered into the Coalition Settlement amidst claims that JPMorgan committed unfair and deceptive practices including overcharging borrowers for default related services.  *See United States v. Bank of Am.*, No. 12-cv-00361 (D.D.C. Mar. 14, 2012).

8

27.    JPMorgan also ran an insurance scam involving property and casualty insurance.  When borrowers default on their mortgage loans, they often stop paying their homeowners' insurance premiums.  When that happened, JPMorgan and its affiliate, Chase Insurance Agency, Inc., replaced the borrowers' homeowner policies with policies underwritten by insurance affiliates of JPMorgan or other insurance companies that agreed to provide authorized benefits—*i.e.*, kickbacks—to JPMorgan.  The "force-placed" insurance providers charge substantially above-market premiums for these so called "force-placed" insurance policies, typically several times the premium under the original policy.  When a defaulted loan is foreclosed upon, the cost of the inflated force-placed insurance premiums are charged to securitization trusts, such as the Covered Trusts.  This force-placed insurance scam violated JPMorgan Chase Bank's obligation to service loans in the JPMorgan Trusts prudently.

28.    On February 28, 2014, the United States District Court for the Southern District of Florida approved a $300 million settlement of claims by a class of mortgage borrowers against JPMorgan Chase Bank for inflated force-placed insurance premiums they were charged.  *Saccoccio v. J.P.Morgan Chase Bank, N.A.*, 297 FRD 683 (S.D. Fla. 2014).

29.    On September 9, 2008,  Bear Stearns Companies, LLC, and its subsidiary, EMC Mortgage Corporation agreed to pay $28 million to settle FTC charges that for gouging borrowers for default-related services.  The FTC alleged that EMC misrepresented the amounts borrowers owed, charged unauthorized fees, such as late fees, property inspection fees, and loan modification fees, and engaged in unlawful and abusive collection practices.

30.    The FTC found that Countrywide and BAC committed numerous frauds in

9

bankruptcy proceedings.  According to the FTC, "Countrywide made false or unsupported claims to borrowers about amounts owed or the status of their loans.  Countrywide also failed to tell borrowers in bankruptcy when new fees and escrow charges were being added to their loan accounts."  Press Release, Fed. Trade Comm'n, Countrywide Will Pay $108 Million for Overcharging Struggling Homeowners; Loan Servicer Inflated Fees, Mishandled Loans of Borrowers in Bankruptcy (June 7, 2010), *available at* http://www.ftc.gov/news-events/press-releases/2010/06/countrywide-will-pay-108-million-overcharging-struggling.

31.     JPMorgan was one of five banks that agreed to a $25 billion settlement with 49 state Attorneys General as a result of its servicing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations include servicers' deceptive practices in the offering of loan modifications and failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/ 12-ag-186.html.

10

**D.      NovaStar Mortgage, Inc.**

32.      NovaStar Mortgage, Inc. operated as a subsidiary of NovaStar Financial Inc. (together, "NovaStar").  In October 2007, Saxon Mortgage Services, Inc. and Saxon Funding Management LLC (together, "Saxon") acquired all of NovaStar's servicing rights.  Morgan Stanley acquired Saxon in December of 2006.

33.      NovaStar was the servicer for the NHEL 2005-3 and NHEL 2006-3 securitizations.

34.      In November 2011, the New York Department of Financial Services entered into an agreement with Saxon, which aimed to redress the unlawful servicing practices.  Press Release, Dep't of Fin., *Superintendent Lawsky Announces Agreements With Morgan Stanley, Saxon, AHMSI & Vericrest On Groundbreaking New Mortgage Practices* (Nov. 10, 2011), *available at* http://www.dfs.ny.gov/about/press/pr1111101.htm.  The agreement required that any force-placed insurance be reasonably priced in relation to claims incurred and prohibited force-placing insurance with an affiliated insurer.  *Id*.  In addition, the agreement required a strengthening of oversight on third party vendors and imposed new obligations to conduct reviews of foreclosure documents prepared by counsel and to terminate foreclosure attorneys whose documents practices were problematic.  *Id*.

35.      In 2012, the Federal Reserve issued a Consent Order against Morgan Stanley to address patterns of misconduct and negligence in residential mortgage loan servicing and foreclosure processing.  *In re Morgan Stanley*, Consent Order, No. 12-015-B-HC (Apr. 2, 2012), *available at* http://www.federalreserve.gov/newsevents/press/enforcement/enf20130228a16.pdf.

36.      The Consent Order maintains that Morgan Stanley filed or caused to be filed in courts in various states numerous affidavits and other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary.  *Id*.  It also

11

required Morgan Stanley to retain an independent consultant to review foreclosure proceedings. *Id*. The Consent Order was in response to allegations that Morgan Stanley engaged in robo-signing.

37.    In addition, in 2013, Morgan Stanley agreed to pay $97 million into a settlement fund and $130 million for other assistance in a settlement between ten banks and Federal regulators.  The settlement stemmed from foreclosure abuses due to robo-signing.  James O'Toole, *Goldman Sachs, Morgan Stanley in $557 Million Foreclosure Settlement*, CNN (Jan. 16, 2013), http://money.cnn.com/2013/01/16/news/companies/goldman-morgan-stanley/.

E.      **Wells Fargo Bank, N.A.**

38.     Wells Fargo Bank, N.A. and its affiliates (collectively "Wells Fargo") have engaged in widespread servicing scams that have been the subject of numerous lawsuits and investigations.

39.     Wells Fargo was the master servicer for the BSABS 2006-4, HELT 2007-FRE1, SAMI 2005-AR4, SAMI 2005-AR6, and SAMI 2006-AR3 securitizations.

40.     In April 2011, the Federal Reserve, the FDIC, the OCC and the OTS issued a report concerning foreclosure-processing reviews of 14 servicers, including Wells Fargo. Interagency Review of Foreclosure Policies and Practices (2011), *available at* http://www. federalreserve.gov/boarddocs/rptcongress/interagency/interagency.htm.  The report found that the foreclosure governance processes were underdeveloped and insufficient and that weaknesses included (i) lack of sufficient audit trails to show how information set out in servicer affidavits (including the amount of fees and penalties charged) was linked to servicers' internal records, (ii) failure to ensure accurate foreclosure documentation, including documentation pertaining to the fees assessed, and (iii) lack of sufficient oversight of default management service providers.  *Id.*

41.     On April 13, 2011, the OCC issued a Consent Order finding, in part, that Wells Fargo engaged in fraudulent or improper foreclosure practices, including by filing in state and federal courts affidavits executed by its employees concerning the fees and expenses chargeable to the borrower when, in many cases, the allegations were not based on personal knowledge or review of the relevant books and records.  *In re Wells Fargo Bank, N.A.*, Consent Order, AA-EC-11-19 (Apr. 13, 2011).

42.     Wells Fargo stipulated to the Consent Order.  *Id.*

13

43.     The Consent Order required Wells Fargo to undertake a sweeping review of their foreclosure practices, including (i) instating processes to ensure that all fees, expenses, and other charges imposed on the borrower are assessed in accordance with the terms of the underlying mortgage and in compliance with all applicable Legal Requirements and OCC supervisory guidance, and (ii) determining (a) whether a delinquent borrower's account was only charged fees and/or penalties that were permissible under the terms of the borrower's loan documents, applicable state and federal law, and were reasonable and customary and (b) whether the frequency that fees were assessed to any delinquent borrower's account was excessive under the terms of the borrower's loan documents, and applicable state and federal law.  *Id*. at 7–10.

44.     Further, Wells Fargo was one of the banks to agree to a $25 billion settlement with 49 state Attorneys General as a result of its servicing misconduct.  The agreement requires servicers to implement comprehensive new mortgage loan servicing standards to remedy violations of state and federal law.  These violations include servicers' deceptive practices in the offering of loan modifications and failures to offer non-foreclosure alternatives before foreclosing on borrowers with federally insured mortgages.  *See* Press Release, U.S. Dep't of Just., Federal Government and State Attorneys General Reach $25 Billion Agreement with Five Largest Mortgage Servicers to Address Mortgage Loan Servicing and Foreclosure Abuses (Feb. 9, 2012), *available at* http://www.justice.gov/opa/pr/2012/February/12-ag-186.html.