**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------- x

COMMERZBANK AG,

                                        Plaintiff,

               -against-

THE BANK OF NEW YORK MELLON
and THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.,

                                 Defendants.

------------------------------------------------------------------- x

Index No. 15-cv-10029-GBD

**<u>AMENDED COMPLAINT</u>**

**DEMAND FOR JURY TRIAL**

**TABLE OF CONTENTS**

**Page**

NATURE OF ACTION ........................................................................................................1

PARTIES ...........................................................................................................................8

JURISDICTION AND VENUE ........................................................................................12

FACTUAL ALLEGATIONS ............................................................................................13

I.      THE RMBS SECURITIZATION PROCESS ..........................................................13

II.     BNY MELLON'S DUTIES AND
        OBLIGATIONS AS TRUSTEE FOR THE COVERED TRUSTS.................................15

        A.      BNY Mellon's Duties Pertaining to the Delivery of Mortgage Files ....................16

        B.      BNY Mellon Had a Duty to Provide Notice of Defaults
                and Enforce Repurchase Obligations Triggered by Such Notice .........................24

        C.      BNY Mellon's Duty to Act Prudently
                Upon the Occurrence of an Event of Default..........................................................26

        D.      BNY Mellon Had a Duty to Address the
                Servicers' Failure to Meet Prudent Servicing Standards ......................................27

        E.      BNY Mellon Is Liable for Negligence in Performing Its Duties...........................29

III.    BNY MELLON BREACHED ITS CONTRACTUAL, FIDUCIARY,
        AND STATUTORY DUTIES AS TRUSTEE FOR THE COVERED TRUSTS.............30

        A.      BNY Mellon Failed to Provide Notice of the Sponsors'
                and Originators' Pervasive Representation and Warranty Breaches ....................30

                1.      The Originators' and Sponsors' Pervasive
                        Breaches of Representations and Warranties............................................39

        B.      BNY Mellon Failed to Act Prudently
                Upon the Occurrence of an Event of Default..........................................................51

                1.      Events of Default Under the PSAs Relating to
                        Document Delivery Failures in the Covered Trusts ................................52

                2.      BNY Mellon Received Written Notice of Representation and
                        Warranty Violations Which Ripened into Events of Default ...................55

i

3.    Events of Default Under the Indentures.....................................................59

4.    Events of Default Concerning False Servicer Certifications .....................61

5.    Events of Default as a Result of Ineligible Certificate Account................63

C.    BNY Mellon Failed to Address the Master
Servicers' and Servicers' Looting of Trust Assets .................................65

D.    BNY Mellon Violated the Streit Act as Trustee for the Covered Trusts ...............73

IV.    BNY MELLON BREACHED ITS DUTIES
AS TRUSTEE FOR THE MILLSTONE II CDO..............................................77

V.    BNY MELLON BREACHED THE
COVENANT OF GOOD FAITH AND FAIR DEALING.................................81

VI.    BNY MELLON SUFFERED FROM CONFLICTS OF INTEREST ...............................82

VII.    BNY MELLON'S CONDUCT INJURED COMMERZBANK ....................................84

CAUSES OF ACTION .........................................................................................................87

FIRST CAUSE OF ACTION (Violations of the TIA) ..................................................87

SECOND CAUSE OF ACTION (Breach of Contract) ..................................................89

THIRD CAUSE OF ACTION (Breach of Fiduciary Duty) .........................................90

FOURTH CAUSE OF ACTION (Negligence—
Failure to Avoid Conflict of Interest and Perform Ministerial Acts with Due Care) ....................91

FIFTH CAUSE OF ACTION (Violation of the Streit Act).........................................92

SIXTH CAUSE OF ACTION (Breach of the Covenant of Good Faith) .....................93

PRAYER FOR RELIEF ........................................................................................................94

Plaintiff Commerzbank AG ("Plaintiff" or "Commerzbank"), by and through its attorneys, brings this action against Defendants The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. (collectively "BNY Mellon", "Defendant", or the "Trustee"), and alleges as follows:

## NATURE OF ACTION

1.    This action arises out of BNY Mellon's role as trustee for 72 securitization trusts (the "Covered Trusts"), identified in Exhibit A, and its role as trustee for the Millstone II CDO pursuant to an Indenture dated as of May 25, 2006, and asserts claims against BNY Mellon for breaches of its contractual and fiduciary duties, and its duties under the federal Trust Indenture Act of 1939 (the "TIA"), 15 U.S.C. § 77aaa, *et seq.* (with respect to the Covered Trusts only), and New York's Streit Act, N.Y. Real Property Law § 124, *et seq.* (the "Streit Act") (with respect to the Covered Trusts only).

2.    The Covered Trusts were created to facilitate residential mortgage backed securities ("RMBS") transactions introduced to investors from 2005 to 2007.  Fifty-nine of the RMBS transactions were sponsored by Countrywide Home Loans, Inc. (the "Countrywide Trusts"), four were sponsored by EMC Mortgage Corporation (the "EMC Trusts"), three were sponsored by Nationstar Mortgage LLC (the "Nationstar Trusts"), two were sponsored by NovaStar Mortgage, Inc. (the "NovaStar Trusts"), one was sponsored by Centex Home Equity Company, LLC (the "Centex Trust"), one was sponsored by Chase Home Finance LLC (the "Chase Trust"), one was sponsored by Equity One, Inc. (the "Equity One Trust"), and one was sponsored by First Horizon Home Loan Corporation (the "First Horizon Trust") (Countrywide Home Loans, Inc.,  EMC Mortgage Corporation, Nationstar Mortgage LLC, NovaStar Mortgage, Inc., Centex Home Equity Company, LLC,

Chase Home Finance LLC, Equity One, Inc., and First Horizon Home Loan Corporation are referred to collectively as the "Sponsors").

3.      Commerzbank acquired RMBS certificates with a purchase value in excess of one billion dollars issued by the Covered Trusts identified in Exhibit B ("the Certificates"). Exhibit B identifies the Certificates Commerzbank still holds (the "Held Certificates") and the Certificates Commerzbank has sold (the "Sold Certificates").

4.      The Certificates represent interests in the cash flows associated with the mortgage loans deposited into the Covered Trusts by the Sponsors and their affiliates or business partners.  The certificateholders are the beneficiaries of the Covered Trusts.  The performance of the RMBS depended on the Sponsors depositing properly underwritten mortgage loans having complete documentation into the Covered Trusts.  The quality of the mortgage loans is critical, and numerous provisions of the governing agreements assure that only qualifying loans would be deposited into the Covered Trusts.  Similarly, because the securities were to be "mortgage-backed," numerous other provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the Trustee.

5.      The certificateholders, however, did not receive any loan or mortgage files that they could check to make certain that their contractual rights were being protected. Rather, such investors were dependent upon their trustee representative, BNY Mellon, to police the deal and to protect their contractual and other legal rights.

6.      As trustee for the Covered Trusts, BNY Mellon owes Commerzbank and the other certificateholders certain contractual and common law duties, as well as duties under the TIA and the Streit Act with respect to the mortgage loans owned by the Covered Trusts.

2

BNY Mellon and the relevant servicers (the "Servicers")[1] were required to provide notice of breaches of representations and warranties by the Sponsors and the parties who originated the mortgage loans underlying the Covered Trusts (the "Originators") concerning key attributes of the mortgage loans underlying the Covered Trusts, including the origination guidelines applicable to those loans and adherence to state laws regarding predatory lending. BNY Mellon had a duty to enforce the obligation of the responsible parties (typically the Sponsors, and their affiliates that served as the depositors (the "Depositors")) or the Originators to repurchase loans that breached representation and warranty provisions or were missing required documentation.  BNY Mellon was also required to address defaults by the Servicers who were required to engage in prudent loss mitigation practices.

7.      The Millstone II CDO involved the issuance of collateralized debt obligations ("CDOs") by Millstone II CDO Ltd. and Millstone II CDO LLC (collectively the "Millstone CDO Issuers").  A CDO trust is an investment vehicle that bundles a variety of revenue-generating assets (the collateral) and then sells pieces of the expected revenue to investors in the form of debt and equity securities.  The collateral for the Millstone II CDO included, among other assets, RMBS certificates involving a number of the same Sponsors, Originators and Servicers as the Certificates at issue here.  The Bank of New York Mellon Trust Company, N.A. (successor in trust to JPMorgan Chase Bank, National Association) was the trustee for the Millstone II CDO, and BNY Mellon's contractual duties are set forth in an Indenture dated as of May 25, 2006 (the "Millstone Indenture").

---

[1] Some of the Covered Trusts employ a "Master Servicer" while others refer to the lead servicing entity as a Servicer.  References herein to the Servicer include the Master Servicer to the extent applicable. Additionally, some of the Covered Trusts have Special Servicers as parties to the PSAs.  References herein to the Servicer also include the Special Servicer to the extent applicable.

8.    Commerzbank was the holder of approximately $1.3 billion of notes issued by the Millstone CDO Issuers (the "Millstone Notes") as set forth below:

| Class of Notes | ISIN | Original Principal Balance |
|---|---|---|
| Class A-1M Notes | USG61325AB58 | $1,125,000,000 |
| Class A-1Q Notes | USG61325AC32 | $209,500,000 |

9.    The ability of Commerzbank to receive its scheduled principal and interest payments on the Millstone Notes depended on the performance of the underlying assets in the Millstone II CDO.  As a result, it was critical that the collateral be protected and all rights and remedies in connection with the assets be prudently exercised.

10.    BNY Mellon acknowledged the existence of two Events of Default under the Millstone Indenture in 2008.  Under the Millstone Indenture, when an Event of Default known to BNY Mellon has occurred and is continuing, BNY Mellon, absent directions from a required percentage of the controlling class of noteholders, shall "exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent Person would exercise under the circumstances in the conduct of such Person's own affairs."

11.    Upon information and belief, BNY Mellon received no directions from controlling noteholders until at or around March 20, 2012 when it was directed to sell and liquidate the collateral backing the Millstone CDO.  Commerzbank sold the Millstone Notes (the Class A1-M Notes and the Class A1-Q Notes) on or about March 8, 2012, prior to the liquidation direction.  In connection with the sale of those notes alone, Commerzbank suffered approximately $750 million in losses, which could have largely been avoided had

4

BNY Mellon performed its duties.

12.     In the almost four years prior to receiving the liquidation direction from other parties, BNY Mellon sat idly and did nothing to exercise rights and remedies vested in it to protect the collateral backing the defaulted Millstone CDO despite, as set forth below, having knowledge of widespread mortgage fraud and breaches of representations and warranties by the parties to the RMBS certificates backing the Millstone CDO.  A prudent person who held those RMBS certificates would have investigated potential claims and remedies and prudently exercised those that had merit.  BNY Mellon was not entitled to do nothing for four years.

13.     BNY Mellon was actively involved in many aspects of the process of securitizing mortgage loans and typically had very close business relationships with the Sponsors, Originators, and Depositors.  Nevertheless, as trustee, BNY Mellon was obligated to act against the financial interest of the Sponsors when demanded by the circumstances. BNY Mellon, however, abandoned its obligations to protect the rights of investors.

14.     BNY Mellon's breaches of its contractual, fiduciary, and statutory duties give rise to six distinct legal claims.

15.     <u>Breach of Contract</u>.  BNY Mellon's contractual duties in connection with the Covered Trusts are set forth in governing agreements, generally identified as pooling and servicing agreements ("PSAs").[2]  BNY Mellon breached the PSAs by failing to: (i) provide notice of representation and warranty violations by the Sponsors and Originators; (ii)

---

[2] Four of the Covered Trusts (CWHEL 2006-I, CWHEL 2007-B, CWHEL 2007-E, and CWHL 2005-HYB9) (collectively the "CWHEL Trusts") were structured using Indentures, which are the functional equivalent of a PSA.  Any material differences between the PSAs and the Indentures, to the extent relevant, are discussed herein.  Unless expressly noted herein, when the term PSA is used, it is also referring to the aforementioned governing agreements executed in connection with those securitizations.

provide notice of the Servicers' failure to give notice of those same representation and warranty violations; (iii) cause the responsible parties to repurchase or substitute loans that were subject to a breach of representation or warranty or missing documentation required to be delivered under the PSAs; and (iv) exercise all rights and remedies available to BNY Mellon under the PSAs upon the occurrence of an Event of Default.  As set forth above, BNY Mellon's contractual duties in connection with the Millstone II CDO are set forth in the Millstone Indenture and BNY Mellon breached those duties by failing to fulfill its prudent person duties after providing notice of an Event of Default.

16.     Breach of Fiduciary Duty.  Under common law, after an "Event of Default" an indenture trustee has a duty to act as a prudent person would in the exercise of his own affairs to protect the rights of certificateholders.  This duty continues until the Event of Default is cured.  BNY Mellon failed to meet its fiduciary duties because it was aware Events of Default had occurred, but failed to take action to force the responsible parties to repurchase loans with representation and warranty violations or missing documentation and failed to address breaches by the Servicers with respect to the Covered Trusts and failed to make investigations and pursue remedies for the RMBS and other collateral as a prudent person would in connection with the Millstone II CDO.

17.     Violations of the TIA.  The TIA requires the Trustee to provide certificateholders with notice of defaults under the operative indentures within 90 days of becoming aware of such defaults and to act prudently to protect the rights of certificateholders during the period in which the default remains uncured.  BNY Mellon violated these provisions by failing to provide notice of defaults it was aware of and failing to act prudently to protect the certificateholders' interests by exercising all rights and

6

remedies available to BNY Mellon under the PSAs.

18.    Violation of the Streit Act.  The Streit Act applies to the extent a PSA is not qualified under the TIA.  Thus, to the extent the TIA is deemed to not apply to any particular "mortgage investments," the Streit Act provides a similar protection and remedy. The Streit Act provides a private remedy to any person aggrieved by the act or omission of a trustee.  BNY Mellon violated the Streit Act through its acts and omissions set forth below, including its failure to use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs to protect the rights of certificateholders during the pendency of an Event of Default under a non-qualified PSA.

19.    Negligence.  BNY Mellon had an extra-contractual duty to perform ministerial acts with due care and to avoid conflicts of interest.  In connection with the Covered Trusts, BNY Mellon negligently performed ministerial acts by failing to provide notices of the numerous defaults that it was aware of under the PSAs.  BNY Mellon violated its duty of independence in connection with both the Covered Trusts and Millstone CDO by failing to take action against the Sponsors, Originators, Depositors, and Servicers because, if BNY Mellon acted, it would have exposed systemic origination and servicing misconduct by BNY Mellon (or its servicing agents) and would have jeopardized future lucrative engagements.

20.    Breach of Covenant of Good Faith and Fair Dealing.  BNY Mellon violated the covenant of good faith and fair dealing by failing to give notice of defaults in connection with the Covered Trusts and failing to take action to cause the responsible parties to repurchase loans that violated representation and warranty provisions or were missing

7

required documentation in connection with the Covered Trusts or take action to pursue remedies against the responsible parties for the RMBS and other collateral underlying the Millstone II CDO.  BNY Mellon violated the covenant by acting to prevent the occurrence of conditions precedent that would have triggered the responsible parties to repurchase defective loans and caused Events of Default, as well as conditions that would have triggered BNY Mellon's heightened duties, stripping Commerzbank of the fruits of its contracts.

21.  By failing to perform its duties, BNY Mellon has caused Commerzbank to suffer over a billion dollars in losses in connection with the Certificates and Millstone Notes.

## PARTIES

22.  Plaintiff Commerzbank AG is an entity organized under the laws of Germany. Commerzbank AG is the legal successor to all of Dresdner Bank AG's ("Dresdner") interests by way of merger as of May 2009, effected by way of universal succession under the German Transformation Act, with Commerzbank AG as the entity resulting from such merger.  Plaintiff brings this action as a current and/or former holder of the Certificates. Commerzbank's acquisitions and other activities related to the Certificates were conducted at and through Commerzbank AG London Branch (the "London Branch").

23.  Commerzbank acquired certain of the Certificates through assignments from the following investors: (i) investor Barrington II CDO Ltd. ("Barrington 2"), which was a Cayman Islands limited company; (ii) investor Eurohypo AG New York Branch (now known as Hypothekenbank Frankfurt AG New York Branch) ("Eurohypo"), which is a wholly-owned subsidiary of Commerzbank and was the New York branch of a corporate

entity organized under the laws of Germany; and (iii) investor Palmer Square 3 Limited ("Palmer 3"), which was a private limited liability company organized under the laws of Ireland. (Barrington 2, together with Eurohypo and Palmer 3, the "Assignors"). Exhibit B indicates which Certificates were acquired through assignment from Barrington 2 (the "Barrington 2 Certificates"), Eurohypo (the "Eurohypo Certificates"), and Palmer 3 (the "Palmer 3 Certificates"). Commerzbank brings both its own claims while it was a certificateholder and the claims that were assigned to it by the Assignors.

24. The Barrington 2 Certificates were acquired as part of the collateral for Barrington 2. In May 2012, London Branch and Dynamic Credit Partners, LLC ("DCP"), in its capacity as Collateral Manager for Barrington 2, agreed to unwind Barrington 2 whereby DCP would sell the collateral assets and Commerzbank would be presented with the opportunity to purchase them. In connection with this process, London Branch acquired the Barrington Certificates between May and July 2012. On December 24, 2013, London Branch entered into an Assignment Agreement with various parties including Barrington 2 and the Bank of New York Mellon Trust Co., N.A. which provided:

> With respect to all assets of the Issuer and the Co-Issuer acquired since their respective formations (including, without limitation, any Collateral now owned or previously owned by the Issuer or Co-Issuer under the Indenture, the "Assets"), the Issuer and the Co-Issuer, effective as of the date hereof, hereby transfer and assign to Commerzbank, and the Trustee releases its lien against, any and all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Assets, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Assets, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not included in the foregoing, any contract claims, tort claims, malpractice claims,

9

fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under other contracts to which the Issuer and/or the Co-Issuer is a party (clauses (1) and (2), collectively, the "Transferred Rights") and all rights and powers necessary to invoke and enforce the Transferred Rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions.

25.     On December 11, 2013, Eurohypo and London Branch entered into a

Confirmation of Assignment with respect to the Eurohypo Certificates, which Eurohypo had

previously transferred to London Branch.  The Confirmation of Assignment provided:

> In exchange for good and valuable consideration, at the time that Eurohypo transferred the Securities to Commerzbank, it was Eurohypo's intent to transfer all litigation rights, causes of action and claims arising out of, in connection with, and/or relating to (1) the Securities, whether known or unknown, whether arising before, on or after the date of this Agreement, including, without limitation, all claims related to and/or arising out of the initial purchase of the Securities, any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims and (2) to the extent not include in the forgoing any contract claims, tort claims, malpractice claims, fraud claims (whether under common law or statutory, for aiding and abetting, fraud in the inducement, or otherwise), negligent misrepresentation claims and securities law claims arising under contracts to which Eurohypo is a party, and which concern the Securities and all rights and powers necessary to invoke and enforce the Transferred rights, including, without limitation, the right and authority to commence, prosecute and resolve any legal actions (altogether, the "Transferred Rights").

26.     On August 11, 2008, a Deed of Unwind for Palmer 3 effectuated the transfer

of all of Palmer 3's collateral assets, including the Palmer 3 Certificates, to Dresdner, acting

through its London branch.  The Palmer 3 Certificates were recorded on Dresdner's

accounts in September 2008 (interests for which Commerzbank is legal successor).  By

letter dated December 10, 2013, the liquidator of Palmer 3 provided Commerzbank a letter

10

confirmation stating:

> With regard to the [unwinding of Palmer 3], this letter confirmation further memorializes the fact that is it my understanding that it was the Company's intent to effectuate the transfer of all assets of value, as provided in the Deed of Unwind, to the Sole Noteholder [Dresdner] on the terms set forth in the Deed of Unwind, and that such assets included the [Collateral Assets], and all legal rights and claims whether in tort or otherwise associated with the Collateral Assets.
>
> It is my understanding and belief that such legal rights, and claims include, but are not limited to, the Company's interest and control over any and all legal claims sounding in tort, contract, trust, or otherwise concerning any of the Collateral Assets, whether arising before or after the date of their acquisition or the date of this confirmation.

27.     Defendant The Bank of New York Mellon is a bank organized under the laws of the State of New York, with its principal place of business located at One Wall Street, New York, New York 10286.  It serves as the trustee for the Covered Trusts.[3]

28.     Defendant The Bank of New York Mellon Trust Company, N.A. is a national banking association organized and existing under the laws of the United States with its main office in Los Angeles, California.

29.     Both Defendants are wholly owned subsidiaries of The Bank of New York Mellon Corporation.

30.     BNY Mellon's corporate trust services are delivered through a platform consisting of The Bank of New York Mellon and The Bank of New York Mellon Trust Company, N.A. Defendants describe themselves as a single platform in public documents such as their "Assertion of Compliance" filings pursuant to SEC Regulation AB, 17 C.F.R. 229.1121 for the

---

[3] The Bank of New York signed the Certificates incorporating the PSAs, as Trustee.  After a corporate merger in or about July 2007, The Bank of New York was re-named The Bank of New York Mellon.  All references herein to BNY Mellon refer to The Bank of New York Mellon pre- and post-merger.

Covered Trusts.  Defendants operate as an intertwined entity employing overlapping senior management, such as the authorized signors on their Assertions of Compliance, and the same corporate legal department located in The Bank of New York Mellon's New York City offices.

31.     For the Countrywide Trusts, BNY Mellon signed Certificates incorporating the PSAs.  For the EMC Trusts, Nationstar Trusts, NovaStar Trusts, Equity One Trust, and Millstone CDO, BNY Mellon succeeded JPMorgan Chase Bank, N.A. ("JPMorgan") as trustee after BNY Mellon acquired JPMorgan's trust business in or around October 2006.  As the trustee for the Covered Trusts, BNY Mellon owed certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the Covered Trusts, which it violated.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over the TIA claims asserted in this matter under 15 U.S.C. § 77v.  This Court has jurisdiction over the other claims asserted under 28 U.S.C. § 1367.  This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 77v as Defendants reside or transact business in this District and a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

34.     This Court has personal jurisdiction over The Bank of New York Mellon because The Bank of New York Mellon is organized under the laws of New York and maintains its principal place of business in New York and a substantial part of the administration of the Covered Trusts is performed in New York.  This Court has personal jurisdiction over The Bank of New York Mellon Trust Company, N.A. because a substantial

12

part of the administration of the Millstone II CDO was performed in New York. Additionally, the majority of the Covered Trusts and the Millstone II CDO are New York trusts, with their governing agreements governed by New York law.

**FACTUAL ALLEGATIONS**

**I.     THE RMBS SECURITIZATION PROCESS**

35.     The process through which RMBS are created and sold is known as mortgage loan securitization.  In broad terms, mortgage loans are acquired from mortgage originators and pooled together in a trust, which issues securities representing interests in the cash flows from principal and interest payments on the pool of loans after certain costs and fees are deducted.

36.     The first step in each securitization is generally the acquisition of mortgage loans by a sponsor (or "seller"), such as Countrywide Home Loans, Inc., and the sale of a large pool of such loans by the sponsor to a depositor, typically a special-purpose affiliate of the sponsor.

37.     The depositor then conveys the pool of loans to a trustee, such as BNY Mellon, pursuant to a PSA that establishes various prioritized tranches of interests in payments made by borrowers on the loans.  The trust issues certificates representing those tranches; the certificates are sold to an underwriter; and the underwriter re-sells the certificates at a profit to investors.  The sponsor (through its affiliated depositor) earns a profit on the excess of the proceeds of the sale of certificates to the underwriter over the cost of purchasing the mortgage loans.  Here, BNY Mellon acted as the trustee in connection with the relevant RMBS transactions.

38.     Pursuant to the PSAs, a servicer is appointed to manage the collection of

13

payments on the mortgage loans in return for a monthly fee.  The servicer's duties include monitoring delinquent borrowers, foreclosing on defaulted loans, monitoring compliance with representations and warranties regarding loan origination, tracking mortgage documentation, and managing and selling foreclosed properties.

39.     The trustee delivers monthly remittance reports to holders of certificates describing the performance of underlying loans and compliance with the PSA.  The contents of those reports are specified in the PSA and in Item 1121 of SEC Regulation AB.  *See* 17 C.F.R. § 229.1121.  The servicer provides data to the trustee to include in these remittance reports.

40.     Each tranche in a loan securitization has a different level of risk and reward, and its own rating issued by a nationally recognized credit-rating agency such as Standard & Poor's or Moody's.  The most senior tranches generally receive the highest ratings, AAA or AA.  Junior tranches receive lower ratings, but offer higher potential returns.  Senior tranches are generally entitled to payment in full ahead of junior tranches, and shortfalls in principal and interest payments are generally allocated first to junior tranches.  This division of cash flows and losses is referred to as the waterfall.

41.     Because the cash flow from payments made by mortgage borrowers on the underlying mortgage loans is the sole source of funds to pay holders of a mortgage-backed security, the credit quality of the security turns on the credit quality of, and the trust assets securing, the underlying loans, which often number in the thousands.

42.      BNY Mellon earned fees in connection with its role as trustee, typically an annual fee based on the percentage of principal outstanding on the loans underlying the RMBS.  BNY Mellon also received significant benefits from the interest-free deposits maintained in its

14

accounts when the servicing payments were remitted to its accounts.  BNY Mellon maintained

accounts for numerous trusts and earned significant sums from the aggregate balances on these

accounts.  The RMBS trustee engagements further deepened BNY Mellon's business

relationships with the sponsors and underwriters of the RMBS, leading to more lucrative future

engagements.  These arrangements included BNY Mellon's participation in credit facilities

extended to originators which allowed them to increase the volume of residential mortgage loans

they sold and securitized.

## II.     BNY MELLON'S DUTIES AND OBLIGATIONS AS TRUSTEE FOR THE COVERED TRUSTS

43.     BNY Mellon's duties and obligations as the trustee for the Covered Trusts are

spelled out in the PSAs and under applicable state and federal laws.  These agreements

govern the parties' respective rights and responsibilities in connection with the Covered

Trusts.  BNY Mellon entered into PSAs or Indentures with:[4]

> (A) For two of the EMC Trusts: (i) Bear Stearns Asset Backed Securities I, LLC, as depositor; (ii) Wells Fargo Bank, National Association, as master servicer and as securities administrator; and (iii) EMC Mortgage Corporation, as sponsor;
>
> (B) For two of the EMC Trusts: (i) Structured Asset Mortgage Investments II Inc., as depositor; and (ii) Wells Fargo Bank, National Association, as master servicer and securities administrator;
>
> (C) For the Chase Trust: (i) Chase Mortgage Finance Corporation, as depositor; (ii) JPMorgan Chase Bank, N.A., as custodian; and (iii) The Bank of New York Trust Company, N.A. as paying agent;
>
> (D) For fifty-five of the Countrywide Trusts: (i) CWALT, Inc., CWMBS, Inc., CWABS, Inc. or CWHEQ, Inc. as depositor; (ii) Countrywide Home Loans, Inc., as a seller; (iii) Countrywide LFT LLC, Park Granada LLC, Park Monaco Inc., and/or Park Sienna LLC, as sellers; and (iv) Countrywide Home Loans Servicing LP, as master servicer;

---

[4] The offering materials for CWHEL 2006-RES and CWL 2005-IM2 securitizations are not publicly available.

(E) For four of the Countrywide Trusts: An Indenture with the trust, as Issuer;

(F) For the Centex Trust: (i) Chec Funding LLC, as the depositor; (ii) Centex Home Equity Company, as seller and servicer; and (iii) Harwood Street Funding II, LLC, as seller;

(G) For the First Horizon Trust: (i) First Horizon Asset Securities Inc., as depositor; and (ii) First Horizon Home Loan Corporation, as master servicer;

(H) For one of the NovaStar Trusts (NHEL 2006-3): (i) NovaStar Mortgage Funding Corporation, as depositor; (ii) NovaStar Mortgage, Inc., as servicer and as sponsor; and (iii) U.S. Bank National Association, as custodian;

(I) For one of the NovaStar Trusts (NHEL 2005-3): (i) NovaStar Mortgage, Inc., as servicer and as seller; and (ii) Wachovia Bank, National Association, as custodian;

(J) For one of the Nationstar Trusts (HELT 2007-FRE1): (i) Nationstar Funding LLC, as depositor; (ii) Nationstar mortgage LLC, as the seller and as the servicer; and (iii) Wells Fargo Bank, N.A., as the master servicer and as the securities administrator;

(K) For one of the Nationstar Trusts (NSTR 2006-B): (i) Nationstar Funding LLC, as the depositor; and (ii) Nationstar Mortgage LLC, as the seller and as the servicer;

(L) For one of the Nationstar Trusts (NSTR 2007-A): (i) Nationstar Funding LLC, as the depositor; (ii) Nationstar Mortgage LLC, as a seller and as the servicer; and (iii) Auburn Funding LLC, as a seller;

(M) For the Equity One Trust: (i) Popular ABS, Inc., as depositor; (ii) Equity One, Inc., as a seller and as a servicer; and (iii) Popular Financial Services, LLC, as a seller.

(N) For the Millstone II CDO: (i) Millstone II CDO LTD., as issuer, and (ii) Millstone II CDO LLC, as co-issuer.

**A.     BNY Mellon's Duties Pertaining to the Delivery of Mortgage Files**

44.     Each PSA sets forth a process for conveying the mortgage loans to the

Covered Trusts.  Typically, the Sponsor conveyed the loans to the Depositor for the Covered

Trusts.  Then the Depositor conveyed the mortgage loans to BNY Mellon in its capacity as

16

the trustee for the Covered Trusts to hold for the benefit of the certificateholders.  This

process is set forth in Section 2.01 ("Conveyance of Mortgage Loans") of the Countrywide

PSA,[5] which provides in relevant part:

> (a) Each Seller concurrently with the execution and delivery hereof, hereby sells, transfers, assigns, sets over and otherwise conveys to the Depositor, without recourse, all its respective right, title and interest in and to the related Mortgage Loans, including all interest and principal received or receivable by such Seller, on or with respect to the Mortgage Loans after the Cut-off Date . . . On or prior to the Closing Date, Countrywide shall deliver to the Depositor or, at the Depositor's direction, to the Trustee or other designee of the Depositor, the Mortgage File for each Mortgage Loan listed in the Mortgage Loan Schedule . . .

> (b) Immediately upon the conveyance of the Mortgage Loans referred to in clause (a), the Depositor sells, transfers, assigns, sets over and otherwise conveys to the Trustee for the benefit of the Certificateholders, without recourse, all the right, title and interest of the Depositor in and to the Trust Fund together with the Depositor's right to require each Seller to cure any breach of a representation or warranty made herein by such Seller or to repurchase or substitute for any affected Mortgage Loan in accordance herewith.

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar,

and NovaStar Trusts set forth a substantially similar process.  *See* Ex. C § I.

45.    In addition, Section 2.02 of the Countrywide PSA ("Acceptance by Trustee of

the Mortgage Loans") provides that BNY Mellon is required to take physical possession of

the mortgage loans and the accompanying mortgage files for the exclusive use and benefit

of all current and future certificateholders.  It provides:

---

[5] Quotations to the Countrywide PSA herein are to the PSA executed in connection with the CWALT 2006-32CB securitization.  Fifty-five of the other Countrywide Trusts in this action were issued pursuant to PSAs with substantially similar language and any differences are immaterial to the issues addressed in this Amended Complaint.  Four of the Countrywide Trusts, the CWHEL Trusts, were issued pursuant to an indenture, servicing agreement, trust agreement and purchase agreement, which contain substantially similar language.  The relevant provisions of the CWHEL Trusts as well as the Centex, Chase, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts are set forth in Exhibit C hereto.

17

> (a) The Trustee acknowledges receipt of the documents identified in the Initial Certification in the form annexed hereto as Exhibit F-1 and declares that it holds and will hold such documents and the other documents delivered to it constituting the Mortgage Files, and that it holds or will hold such other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges that it will maintain possession of the Mortgage Notes in the State of California, unless otherwise permitted by the Rating Agencies.

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts set forth a substantially similar process. *See* Ex. C § II.

46.    Section 2.01(c) of the Countrywide PSA also specifically sets forth the operative documents that must be contained in the mortgage file for the mortgage loans.  It provides:

> (c) In connection with the transfer and assignment set forth in clause (b) above, ***the Depositor has delivered or caused to be delivered to the Trustee . . . for the benefit of the Certificateholders the following documents or instruments with respect to each Mortgage Loan so assigned***:

>> (i) (A) the ***original Mortgage Note endorsed*** by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse," ***with all intervening endorsements showing a complete chain of endorsement from the originator to the Person endorsing the Mortgage Note*** . . . or

>> (B) with respect to any Lost Mortgage Note, a lost note affidavit from Countrywide stating that the original Mortgage Note was lost or destroyed, together with a copy of such Mortgage Note;

>> (ii) except as provided below and for each Mortgage Loan that is not a MERS Mortgage Loan, ***the original recorded Mortgage or a copy of such Mortgage, with recording information, certified by Countrywide as being a true and complete copy of the Mortgage*** . . . and in the case of each MERS Mortgage Loan, the original Mortgage, or a copy of such mortgage with recording information, noting

18

the presence of the MIN of the Mortgage Loans and either language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan or if the Mortgage Loan was not a MOM Loan at origination, the original Mortgage and the assignment thereof to MERS, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded;

(iii) in the case of each Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage, or a copy of such assignment, with recording information, (which may be included in a blanket assignment or assignments), together with, except as provided below, all interim recorded assignments of such mortgage, or a copy of such assignment, with recording information, (each such assignment, when duly and validly complete, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which the assignment relates);* provided that, if the related Mortgage has not been returned from the applicable public recording office, such assignment of the Mortgage may exclude the information to be provided by the recording office . . .;

(iv) the original or copies of each assumption, modification, written assurance or substitution agreement, if any;

(v) except as provided below, *the original or duplicate original lender's title policy or a printout of the electronic equivalent and all riders thereto* . . . .

*         *         *

In addition, in connection with the assignment of any MERS Mortgage Loan, each Seller agrees that it will cause, at the Trustee's expense, the MERS ® System to indicate that the Mortgage Loans sold by such Seller to the Depositor have been assigned by that Seller to the Trustee in accordance with this Agreement . . . for the benefit of the Certificateholders by including . . . in such computer files the information required by the MERS ® System to identify the series of the Certificates issued in connection with such Mortgage Loans.

19

(Emphasis added).  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts set forth a substantially similar process.  *See* Ex. C § III.

47.    Physical possession of these documents by BNY Mellon was necessary to transfer the ownership rights to the mortgage loans from the Sponsors and Depositors to the Covered Trusts.

48.    After a designated period, BNY Mellon, or a custodian on its behalf, was required to issue a final certification and exception report that identified mortgage files that were missing documentation required under the PSA.  *See* Ex. C § XIII.  When a custodian fulfilled this role, it acted as an agent or on behalf of the Trustee.

49.    The final step in the certification process was the creation of a final certification and document exception report.  BNY Mellon's obligation to prepare these documents is spelled out in Section 2.02(a) of the Countrywide PSA, which provides:  "Not later than 90 days after the Closing Date, the Trustee shall deliver to the Depositor, the Master Servicer and Countrywide . . . a Final Certification with respect to the Mortgage Loans in the form annexed hereto as Exhibit H-1, with any applicable exceptions noted thereon."  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar requirements.  *See* Ex. C § IV.

50.    After a designated period, BNY Mellon was required to issue a Final Certification.  The final certification, called "Form of Final Certification of the Trustee," which was attached to the Countrywide PSA as Exhibit H-1, provides:

> Gentlemen:

> In accordance with Section 2.02 of the above-captioned Pooling

20

and Servicing Agreement (the "Pooling and Servicing Agreement"), *the undersigned, as Trustee, hereby certifies that as to each Initial Mortgage Loan listed in the Mortgage Loan Schedule (other than any Initial Mortgage Loan paid in full or listed on the attached Document Exception Report) it has received*:

(i) *the original Mortgage Note, endorsed by Countrywide or the originator of such Mortgage Loan*, without recourse in the following form: "Pay to the order of ___ without recourse", *with all intervening endorsements that show a complete chain of endorsement from the originator to Countrywide*, or, if the original Mortgage Note has been lost or destroyed and not replaced, an original lost note affidavit from Countrywide, stating that the original Mortgage Note was lost or destroyed, together with a copy of the related Mortgage Note;

(ii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *the original recorded Mortgage*, [and in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan, *the original Mortgage*, noting thereon the presence of the MIN of the Mortgage Loan and language indicating that the Mortgage Loan is a MOM Loan if the Mortgage Loan is a MOM Loan, with evidence of recording indicated thereon, or a copy of the Mortgage certified by the public recording office in which such Mortgage has been recorded];

(iii) in the case of each Initial Mortgage Loan that is not a MERS Mortgage Loan, *a duly executed assignment of the Mortgage to "The Bank of New York, as trustee* under the Pooling and Servicing Agreement dated as of [month] 1, 2004, without recourse", or, in the case of each Initial Mortgage Loan with respect to property located in the State of California that is not a MERS Mortgage Loan, a duly executed assignment of the Mortgage in blank (each such assignment, when duly and validly completed, to be in recordable form and sufficient to effect the assignment of and transfer to the assignee thereof, under the Mortgage to which such assignment relates);

(iv) *the original recorded assignment or assignments of the Mortgage together with all interim recorded assignments of such Mortgage* [(noting the presence of a MIN in the case of each Initial Mortgage Loan that is a MERS Mortgage Loan)];

(v) the original or copies of each assumption, modification, written assurance or substitution agreement, if any, with

21

evidence of recording thereon if recordation thereof is permissible under applicable law; and

(vi) *the original or duplicate original lender's title policy* or a printout of the electronic equivalent and all riders thereto or, in the event such original title policy has not been received from the insurer, any one of an original title binder, an original preliminary title report or an original title commitment, or a copy thereof certified by the title company, with the original policy of title insurance to be delivered within one year of the Closing Date.

In the event that in connection with any Initial Mortgage Loan that is not a MERS Mortgage Loan Countrywide cannot deliver the original recorded Mortgage or all interim recorded assignments of the Mortgage satisfying the requirements of clause (ii), (iii) or (iv), as applicable, the Trustee has received, in lieu thereof, a true and complete copy of such Mortgage and/or such assignment or assignments of the Mortgage, as applicable, each certified by Countrywide, the applicable title company, escrow agent or attorney, or the originator of such Initial Mortgage Loan, as the case may be, to be a true and complete copy of the original Mortgage or assignment of Mortgage submitted for recording.

*Based on its review and examination and only as to the foregoing documents, (i) such documents appear regular on their face and related to such Initial Mortgage Loan, and (ii) the information set forth in items (i), (iv), (v), (vi), (viii), (xi) and (xiv) of the definition of the "Mortgage Loan Schedule" in Article I of the Pooling and Servicing Agreement accurately reflects information set forth in the Mortgage File*.

The Trustee has made no independent examination of any documents contained in each Mortgage File beyond the review specifically required in the above-referenced Pooling and Servicing Agreement.  The Trustee makes no representations as to: (i) the validity, legality, sufficiency, enforceability or genuineness of any of the documents contained in each Mortgage File of any of the Initial Mortgage Loans identified on the [Mortgage Loan Schedule] [Loan Number and Borrower Identification Mortgage Loan Schedule] or (ii) the collectability, insurability, effectiveness or suitability of any such Initial Mortgage Loan.

Capitalized words and phrases used herein shall have the

22

respective meanings assigned to them in the Pooling and Servicing Agreement.

THE BANK OF NEW YORK,
as Trustee

(Emphasis added).  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain a substantially similar form of final certification.  *See* Ex. C § V.

51.    The final certification and document exception report are the two key certifications that BNY Mellon was required to prepare for the Covered Trusts.  In these documents BNY Mellon certified that: (i) there was full and complete loan documentation in accordance with the requirements of the PSAs for those loans specifically identified on the mortgage loan schedule; and (ii) BNY Mellon had not obtained complete required documentation for those loans identified on the document exception report.

52.    If there was a defect with any mortgage file, then the Servicer and BNY Mellon were obligated to demand that the Sponsor cure the defect leading to the exception within 90 days or repurchase or substitute the defective loans.  This is set forth in Section 2.02(a) of the Countrywide PSA, which provides:

> ***If, in the course of such review, the Trustee finds any document constituting a part of a Mortgage File which does not meet the requirements of Section 2.01, the Trustee shall list such as an exception in the Final Certification***; provided, however, that the Trustee shall not make any determination as to whether (i) any endorsement is sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note or (ii) any assignment is in recordable form or is sufficient to effect the assignment of and transfer to the assignee thereof under the mortgage to which the assignment relates. ***Countrywide . . . shall promptly correct or cure such defect within 90 days from the date it was so notified of such defect and, if Countrywide does not correct or cure such defect within such period, Countrywide . . . shall either (a) substitute***

23

> *for the related Mortgage Loan a Substitute Mortgage Loan, which substitution shall be accomplished in the manner and subject to the conditions set forth in Section 2.03, or (b) purchase such Mortgage Loan from the Trustee within 90 days from the date Countrywide . . . was notified of such defect in writing at the Purchase Price of such Mortgage Loan; provided, however, that in no event shall such substitution or purchase occur more than 540 days from the Closing Date.*

(Emphasis added). The PSAs for the Centex, Chase, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar requirements. *See* Ex. C § VI. Section 2.03 of the Countrywide PSA provided that the Servicer and BNY Mellon were entitled to reimbursement of any expenses incurred enforcing this repurchase obligation. The PSAs for the Centex, Equity One, and First Horizon Trusts contain substantially similar provisions. *See* Ex. C § VI.

53.     Under all the PSAs, and applicable tax laws governing REMICS, the responsible party could not cure a document defect by substitution after a specified period, typically 540 days to two years from closing. *See* Ex. C § VI. In any event, because any substituted loans must be virtually identical to the initial loan, including maturity date and other terms, substitution was not generally feasible more than a year after closing because loans of the same vintage were no longer widely available for inclusion in securitizations.

**B.      BNY Mellon Had a Duty to Provide Notice of Defaults and Enforce Repurchase Obligations Triggered by Such Notice**

54.     BNY Mellon had an obligation pursuant to the PSAs to provide notice to all parties of the Servicers', Sponsors', or Originators' breaches of representations and warranties under the PSAs or master loan purchase agreements. For example, Section 2.03(c) of the Countrywide PSA provides:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty with respect to a Mortgage Loan made

24

pursuant to Section 2.03(a) that materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties. Each Seller hereby covenants that within 90 days of the earlier of its discovery or its receipt of written notice from any party of a breach of any representation or warranty with respect to a Mortgage Loan sold by it pursuant to Section 2.03(a) which materially and adversely affects the interests of the Certificateholders in that Mortgage Loan, it shall cure such breach in all material respects, and if such breach is not so cured, shall, (i) if such 90-day period expires prior to the second anniversary of the Closing Date, remove such Mortgage Loan (a 'Deleted Mortgage Loan') from the Trust Fund and substitute in its place a Substitute Mortgage Loan, in the manner and subject to the conditions set forth in this Section; or (ii) repurchase the affected Mortgage Loan or Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below. . . . The Seller repurchasing a Mortgage Loan pursuant to this Section 2.03 (c) shall promptly reimburse the Master Servicer and the Trustee for any expenses reasonably incurred by the Master Servicer or the Trustee in respect of enforcing the remedies for such breach. With respect to the representations and warranties described in this Section which are made to the best of a Seller's knowledge, if it is discovered by either the Depositor, a Seller or the Trustee that the substance of such representation and warranty is inaccurate and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interests of the Certificateholders therein, notwithstanding that Seller's lack of knowledge with respect to the substance of such representation or warranty, such inaccuracy shall be deemed a breach of the applicable representation or warranty. Any breach of a representation set forth in clauses (45) through (63) of Schedule III-A with respect to a Mortgage Loan shall be deemed to materially and adversely affect the Certificateholders.

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar requirements. *See* Ex. C § VI.

55.     In addition, after the occurrence of an Event of Default, the Trustee assumes the same duties as a common law trustee, which includes, among other things, providing beneficiaries notice of all defaults under the operative trust documents, which include the PSAs here.

25

56.    Congress also enacted the TIA to ensure, among other things, that investors in certificates, bonds, and similar instruments, have adequate rights against, and receive adequate performance from, the responsible trustees.  15 U.S.C. § 77bbb.

57.    Under Section 315(b) of the TIA, BNY Mellon was required to give certificateholders notice of a default under the PSAs within 90 days of learning of such default.  15 U.S.C. § 77ooo(b).

58.    As set forth in Section III hereof, BNY Mellon failed to give notice of numerous defaults and breaches of representations and warranties or covenants as required under the PSAs, common law, and the TIA.

## C.    BNY Mellon's Duty to Act Prudently Upon the Occurrence of an Event of Default

59.    Under the PSAs and applicable law, BNY Mellon owed a fiduciary duty to certificateholders upon the occurrence of an Event of Default.  BNY Mellon's post-default fiduciary duty is described in Section 8.01 of the Countrywide PSA, which provides in relevant part, "[i]n case an Event of Default has occurred . . . the Trustee shall exercise such of the rights and powers vested in it by this Agreement, and use the same degree of care and skill in their exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs."  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar requirements.  *See* Ex. C § VII.

60.    In addition, Section 315(c) of the TIA provides that upon the occurrence of a "default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  15

26

U.S.C. § 77ooo(c).

61.     The Streit Act provides that upon the occurrence of an Event of Default, an indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.  Section 130-e of the Streit Act provides a private remedy to any person aggrieved by the act or omission to act of a trustee.

62.     Upon the occurrence of an Event of Default, a prudent trustee would have taken appropriate steps to ensure all mortgage loan documentation was completely and accurately transferred to the trusts.  A prudent trustee also would have ensured that the appropriate parties were receiving notification of breaches of representations and warranties from servicers and master servicers and enforced the responsible parties' obligations with respect to breaching mortgage loans.

63.     As set forth in Section III hereof, BNY Mellon failed to exercise its duties both prior to and after the occurrence of defaults and Events of Default.

**D.      BNY Mellon Had a Duty to Address the
Servicers' Failure to Meet Prudent Servicing Standards**

64.     Each PSA required the Servicers to service the loans underlying the Covered Trusts prudently.

65.     For example, Section 3.01 of the Countrywide PSA provides:  "For and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and customary and usual standards of practice of prudent mortgage loan servicers."  Section 3.01 further provides: "[T]he Master Servicer shall not take any action that is inconsistent with or prejudices the

27

interests of the Trust Fund or the Certificateholders in any Mortgage Loan or the rights and interests of the Depositor, the Trustee and the Certificateholders under this Agreement." The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar requirements. *See* Ex. C § VIII.

66. The PSAs provide that the failure to meet prudent servicing standards is an Event of Default if left uncured for a designated period of time after notice of the default. For example, Section 7.01 of the Countrywide PSA provides that an Event of Default is triggered by:

> any failure by the Master Servicer to observe or perform in any material respect any other of the covenants or agreements on the part of the Master Servicer contained in this Agreement (except with respect to a failure related to a Limited Exchange Act Reporting Obligation), which failure materially affects the rights of Certificateholders, that failure continues unremedied for a period of 60 days after the date on which written notice of such failure shall have been given to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer by the Trustee or the Depositor, or to the Master Servicer and the Trustee by the Holders of Certificates evidencing not less than 25% of the Voting Rights evidenced by the Certificates; provided, however, that the sixty-day cure period shall not apply to the initial delivery of the Mortgage File for Delay Delivery Mortgage Loans nor the failure to substitute or repurchase in lieu of delivery….

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar provisions. *See* Ex. C § IX.

67. Further, the PSAs for the Centex and Nationstar Trusts provide that the failure to follow prudent servicing standards is also an Event of Default 30 days after a servicing officer becomes aware of such breach, without regard to whether notice is provided. *See* Ex. C § IX.

68. Upon a Servicer default or Event of Default, the Trustee was obligated to act.

BNY Mellon had a duty to provide notice when it became aware of breaches of the PSAs by the Servicers.  If the defaults were not cured within the grace period, or if the Trustee failed to give notice, the Trustee was required to take action to address the defaults.  For example, the Countrywide PSA provides that once a Servicer Event of Default occurred, the Trustee had the authority and obligation to "terminate all of the rights and obligations of the Master Servicer," Countrywide PSA § 7.01 (*see also* Ex. C § IX), and "assume all of the rights and obligations of the Master Servicer."  Countrywide PSA § 3.05 (*see also* Ex. C § X).  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts impose substantially similar obligations on BNY Mellon.  *See* Ex. C § X.  More generally, BNY Mellon, as Trustee, had a duty to exercise all rights available under the PSAs to protect certificateholders' interests and do so with due care.

69.     As set forth in Section III, BNY Mellon breached its statutory, fiduciary, and contractual duties by failing to take actions to address Servicer defaults and Events of Default.

### E.     BNY Mellon Is Liable for Negligence in Performing Its Duties

70.     Section 8.01 of the Countrywide PSA provides in relevant part:

> ***No provision of this Agreement shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct***; provided, however, that:
>
> (i) unless an Event of Default known to the Trustee shall have occurred and be continuing, the duties and obligations of the Trustee shall be determined solely by the express provisions of this Agreement, the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Agreement, no implied covenants or obligations shall be read into this Agreement against the Trustee and the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any

29

> certificates or opinions furnished to the Trustee and conforming to the requirements of this Agreement which it believed in good faith to be genuine and to have been duly executed by the proper authorities respecting any matters arising hereunder;
>
> (ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Trustee, unless *it shall be finally proven that the Trustee was negligent in ascertaining the pertinent facts*.

(Emphasis added).  The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar provisions.  *See* Ex. C § VII.

71.     Every trustee also has a non-waivable duty to exercise due care in the performance of ministerial acts required to be undertaken in the course of the administration of the trust.  BNY Mellon can be held liable for its own negligence in failing to perform its requisite ministerial acts which includes, among other things, its responsibilities to: (i) give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' widespread practice of including in securitization trusts loans that breached such representations and warranties; and (ii) provide notices of servicing related breaches known to the Trustee.

72.     Every trustee—including BNY Mellon—has an absolute duty to avoid conflicts of interest and a duty of undivided loyalty to trust investors.  This duty is non-waivable and arises independently of the PSAs.

## III.     BNY MELLON BREACHED ITS CONTRACTUAL, FIDUCIARY, AND STATUTORY DUTIES AS TRUSTEE FOR THE COVERED TRUSTS

### A.     BNY Mellon Failed to Provide Notice of the Sponsors' and Originators' Pervasive Representation and Warranty Breaches

73.     BNY Mellon failed to give notice of defaults that occurred when the Sponsors or

Originators breached representation and warranty provisions providing that all loans met applicable loan origination guidelines. In reality, during the 2005 to 2007 time period, the Sponsors and Originators regularly disregarded their underwriting guidelines and the representations and warranties made to securitization trusts.

74. For example, for the Countrywide Trusts, Countrywide Home Loans represented and warranted in the Countrywide PSA that "[e]ach Mortgage Loan was underwritten in all material respects in accordance with Countrywide's underwriting guidelines." Countrywide PSA Schedule IIIA, § 36. Countrywide Home Loans further represented and warranted the following:

> (1) The information set forth on Schedule I to the Pooling and Servicing Agreement with respect to each Mortgage Loan is true and correct in all material respects as of the Closing Date.
>
> (2) As of the Cut-off Date, none of the Mortgage Loans is 30 days or more delinquent.
>
> (3) No Mortgage Loan had a Loan-to-Value Ratio at origination in excess of 100.00%.
>
> (4) Each Mortgage is a valid and enforceable first lien on the Mortgaged Property. . . .
>
> (10) Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, predatory and abusive lending laws, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby will not involve the violation of any such laws. . . .
>
> (12) A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, in an amount at least equal to the Cut-off Date Stated Principal Balance of each such Mortgage Loan or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect. . . .

31

(16) Each Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms and under applicable law.  To the best of Countrywide's knowledge, all parties to the Mortgage Note and the Mortgage had legal capacity to execute the Mortgage Note and the Mortgage and each Mortgage Note and Mortgage have been duly and properly executed by such parties. . . .

(20) Each Mortgage Note and each Mortgage is in substantially one of the forms acceptable to FNMA or FHLMC, with such riders as have been acceptable to FNMA or FHLMC, as the case may be. . . .

(22) The origination, underwriting and collection practices used by Countrywide with respect to each Mortgage Loan have been in all respects legal, prudent and customary in the mortgage lending and servicing business. . . .

(27) Each Mortgage Loan which had a Loan-to-Value Ratio at origination in excess of 80.00% is the subject of a Primary Insurance Policy that insures that portion of the principal balance equal to a specified percentage times the sum of the remaining principal balance of the related Mortgage Loan. . . .

(29) If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property. . . .

(37) Other than with respect to any Streamlined Documentation Mortgage Loan as to which the loan-to-value ratio of the related Original Mortgage Loan was less than 90% at the time of the origination of such Original Mortgage Loan, prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; such appraisal is in a form acceptable to FNMA and FHLMC. . . .

(40) The Mortgage Loans were selected from among the

32

outstanding fixed-rate one- to four-family mortgage loans in the portfolios of the Sellers at the Closing Date as to which the representations and warranties made as to the Mortgage Loans set forth in this Schedule III-A can be made.  Such selection was not made in a manner intended to adversely affect the interests of Certificateholders . . . .

(42) With respect to any Mortgage Loan as to which an affidavit has been delivered to the Trustee certifying that the original Mortgage Note is a Lost Mortgage Note, if such Mortgage Loan is subsequently in default, the enforcement of such Mortgage Loan or of the related Mortgage by or on behalf of the Trustee will not be materially adversely affected by the absence of the original Mortgage Note.  A "Lost Mortgage Note" is a Mortgage Note the original of which was permanently lost or destroyed and has not been replaced.

(43) The Mortgage Loans, individually and in the aggregate, conform in all material respects to the descriptions thereof in the Prospectus Supplement. . . .

(46) The Master Servicer has fully furnished, in accordance with the Fair Credit Reporting Act and its implementing regulations, accurate and complete information (i.e., favorable and unfavorable) on its borrower credit files related to the Mortgage Loans to Equifax, Experian and Trans Union Credit Information Company (three of the nationally recognized credit bureaus) on a monthly basis. . . .

(49) None of the Mortgage Loans are "high cost" loans as defined by applicable predatory and abusive lending laws. . . .

(55) All of the Mortgage Loans were originated in compliance with all applicable laws, including, but not limited to, all applicable anti-predatory and abusive lending laws. . . .

(61) The methodology used in underwriting the extension of credit for each Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology confirmed that at the time of origination (application/approval) the borrower had the reasonable ability to make timely payments on the mortgage loan….

33

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain substantially similar provisions.  *See* Ex. C § XI.

75.     As noted in Section II(B), each party, including the Trustee, had an obligation to provide notice of breaches of these representations and warranties and such notice triggered the Sponsors' or Originators' obligation to repurchase or substitute the defective loans.  *See also* Ex. C § VI.

76.     BNY Mellon knew that the Sponsors and Originators regularly disregarded their underwriting guidelines and representations and warranties made to securitization trusts long before certificateholders learned of such problems.

77.     BNY Mellon served as trustee for hundreds, if not thousands, of RMBS trusts from 2004 to 2007, including for many transactions involving the Sponsors and Originators.  In the course of administering these trusts, BNY Mellon learned that the Sponsors and Originators had departed from their underwriting guidelines, engaged in predatory lending, and failed to ensure mortgage loans complied with state and federal laws.

78.     For example, while serving as trustee for various RMBS trusts, BNY Mellon was presented with a large number of defaulted loans that were originated by the Sponsors and Originators here, and foreclosures were commenced often in BNY Mellon's name.

79.     Indeed, BNY Mellon commenced foreclosure actions from 2005 to present for numerous loans in which the Sponsors or Originators were at issue, including, for example, foreclosure actions in which:

> (a)     Countrywide served as Sponsor, including with respect to loans in the Countrywide Trusts. *See, e.g.*, *Bank of N.Y. v. Lariviere*, No. RE-07-243 (W. York. Dist. Ct. Jan. 16, 2008); *Bank of N.Y. v. Sigworth*, No. 2009 F 00472 (C.P. Hancock Cnty. May 29, 2009) (foreclosing on mortgage loan which was part of the CWL 2006-1 Trust);

34

(b)     Countrywide served as Originator. *See, e.g.*, *Bank of N.Y. v. Cupo*, Dkt. No. F-12104-07, 2012 WL 611849 (N.J. Super. Ct. App. Div. Feb. 28, 2012); *Bank of N.Y. v. Batad*, 204 P.3d 501 (Haw. Ct. App. 2009); *Bank of N.Y. v. Sullivan*, No. 2007-09-6810 (C.P. Summit Cnty. Sept. 28, 2007); *Bank of N.Y. v. Scott*, No. 2008-10-7076 (C.P. Summit Cnty. Oct. 9, 2008); *Bank of N.Y. v. Eatmon*, No. 2007-10-7093 (C.P. Summit Cnty. Oct. 10, 2007); *Bank of N.Y. v. Brumit*, No. 2006-12-7889 (C.P. Summit Cnty. Dec. 5, 2006);

(c)     Decision One Mortgage Company LLC served as Originator. *See, e.g.*, *Bank of N.Y. v. Mulligan*, 958 N.Y.S.2d 59 (N.Y. Sup. Ct. 2010);

(d)     Encore Credit Corporation served as Originator. *See, e.g.*, *Bank of N.Y. v. Orosco*, No. 32052/07 (N.Y. Sup. Ct. Nov. 29, 2007); *Bank of N.Y. v. Russell*, No. 2007-F-790 (C.P. Hancock Cnty. Nov. 14, 2007); *Bank of N.Y. v. Hahn*, No. CI0200708222 (C.P. Lucas Cnty. Dec. 19, 2007); and

(e)     First Horizon as Originator. *See, e.g., Bank of N.Y. v. Scillitani*, No. A-1060-13T3 (N.J. Super. App. Div. May 7, 2015).

80.     Sometimes the defaults and foreclosures occurred just months after the loan was originated or securitized.  In each foreclosure, BNY Mellon was the named plaintiff and real party in interest as it allegedly held title to the notes and mortgage as trustee for the benefit of the certificateholders.  As the real party in interest it had knowledge of the contents of the foreclosure filings.

81.     Through its review of these filings, BNY Mellon knew that the borrowers either (i) did not qualify for the loans because they did not have the ability to repay the loans; (ii) were victims of predatory lending; or (iii) were given a loan that did not comply with state or federal law.

82.     Beginning in 2009 or 2010, facts began to emerge publicly demonstrating that the Sponsors and Originators had violated the representations and warranties provided in connection with the Covered Trusts.  These facts, some of which are detailed in Exhibit F, demonstrated that the Sponsors and Originators regularly included loans in securitizations

35

that did not comply with applicable underwriting guidelines, made predatory loans, and failed to meet state and federal lending guidelines. While investors such as Commerzbank lacked the ability to determine whether the publicly reported misconduct by the Sponsors and Originators impacted specific loans backing the Covered Trusts, BNY Mellon had knowledge of specific problems with specific loans, as well as access to the mortgage loan files. At a minimum, in its role as trustee to hundreds of RMBS trusts, BNY Mellon was privy to information that would have provided the "scent" of a problem with the loans underlying the Covered Trusts. Having caught wind of the problem, BNY Mellon had statutory and common law duties requiring them to "nose to the source."

83.    BNY Mellon also received written notice of systemic, widespread Sponsor breaches from monoline insurers.

84.    Monoline insurance is a form of credit enhancement that involves purchasing insurance to cover losses from any defaults. Many RMBS trusts were insured by monoline insurers. The Sponsors of the mortgage loans made representations and warranties concerning the underwriting standards of the loans in the governing agreements for the insured RMBS. The governing agreements for the insured RMBS transactions have a repurchase procedure through which the monoline insurers must provide notice of a breach of representation and warranty to the responsible mortgage loan sponsor and the parties to the agreement, including the trustee.

85.    Monoline insurers have filed many complaints against Sponsors and Originators of the Covered Trusts for breaches of their representations and warranties in connection with other RMBS trusts. *See* Compl., *Ambac Assurance Corp. v. Countrywide Home Loans, Inc.*, No. 653979/2014 (N.Y. Sup. Ct. Dec. 30, 2014); Am. Compl., *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009); Compl., *Syncora Guarantee*

36

*Inc. v. Countrywide Home Loans, Inc.*, No. 650042/2009 (N.Y. Sup. Ct. May 6, 2010); Compl., *Assured Guaranty Corp. v. EMC Mortgage LLC*, No. 650805/2012 (N.Y. Sup. Ct. Mar. 15, 2012); Am. Compl., *Ambac Assurance Corp. v. EMC Mortgage LLC*, No. 650421/2011 (N.Y. Sup. Ct. July 18, 2011); Am. Compl., *MBIA Ins. Corp v. JPMorgan Securities LLC*, No. 64676/2012 (N.Y. Sup. Ct. Sept. 29, 2014).  BNY Mellon received notice of several of the above referenced monoline actions as it was the trustee or indenture trustee for several of the trusts, including Covered Trusts at issue here.  *See e.g., MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/2008 (N.Y. Sup. Ct. Aug. 24, 2009) (CWHEL 2007-E).

86.    Prior to filing suit against the mortgage loan sponsors, the monoline insurers were often able to obtain and carry out a forensic loan level review of the loans at issue and informed the trustee of the results.  For example, the head of the BNY Mellon team that oversaw BNY Mellon's administration of Countrywide RMBS trusts from approximately 2008 to 2011 testified in a proceeding BNY Mellon commenced under New York C.P.L.R. Article 77 to approve a settlement with Countrywide (the "BNY Mellon Article 77 Proceeding") that she recalled a monoline insurer notifying BNY Mellon of "a sizeable population" of Countrywide mortgage loans across multiple Countrywide RMBS that breached the mortgage loans representations and warranties.

87.    Because these monoline insurers' findings from loan level reviews set forth in their breach notices reflected these common mortgage loan sellers' pervasive violations of underwriting and securitization guidelines, BNY Mellon discovered or should have discovered if it was carrying out its duties that these same defective underwriting and securitization practices applied equally to the Covered Trusts containing loans originated and securitized by these same Originators and Sponsors.

37

88.     The head of the BNY Mellon team that oversaw BNY Mellon's administration of Countrywide RMBS trusts also testified in the BNY Mellon Article 77 Proceeding that she became aware of allegations of "mortgage fraud in Countrywide issued RMBS" from the media and letters received from various certificateholders.  She further testified that she was unaware of any instance where BNY Mellon took any actions to investigate these notices from certificateholders.

89.     Starting in 2009, at the latest, other investors, including Fannie Mae and Freddie Mac, provided BNY Mellon similar notices, advising BNY Mellon that Countrywide, First Horizon, and EMC, among other Sponsors and Originators, breached representation and warranty provisions for numerous mortgage loans.

90.     Apart from the multiple, highly-publicized RMBS lawsuits and the numerous government investigations on both the state and federal level and the non-public information that BNY Mellon received through its role as trustee, there are various other indications that the Covered Trusts' loan pools included large numbers of mortgage loans that materially breached the responsible party's representations and warranties.  For example, the Originators' and Sponsors' systemic abandonment of their underwriting guidelines has had a devastating effect on the performance of the Covered Trusts.  Many of the Certificates acquired by Commerzbank were triple-A or double-A rated at the time of purchase.  *See* Ex. D.  Now many are "junk" bonds that do not qualify for any investment grade rating.  *See id.*  These downgrades were prompted by the alarming rate of defaults and delinquencies of the mortgage loans backing the Covered Trusts and the information that has emerged concerning the Sponsors' and Originators' systemic abandonment of underwriting guidelines.  *See* Ex. E.  A summary of the Covered Trusts' high default and delinquency rates is attached as Exhibit E.  BNY Mellon was aware of the high level

38

of defaults and should have carefully investigated these issues, notified certificateholders, including Commerzbank, of the issues, and taken action to address these issues.

91.    If BNY Mellon had provided the required notices, it would have forced the Sponsors or Originators to repurchase, or substitute if within the period specified in the PSAs, the relevant loans, and the Sponsors would not have been able to issue additional fraudulent RMBS certificates.  BNY Mellon had a continuing duty to provide such notice but failed to do so throughout its tenure as trustee.  Indeed, BNY Mellon let the statute of limitations to bring repurchase claims lapse by failing to provide notice or take other action within six years of the closing of each Covered Trust.

### 1.    The Originators' and Sponsors' Pervasive Breaches of Representations and Warranties

92.    Either the Sponsor or Originator, and sometimes both, provided representations and warranties to the Covered Trusts.

93.    The failure of the parties to the PSAs to provide notice of breaches of representations and warranties constituted a default that would have ripened into Events of Default had BNY Mellon provided notice of the defaults.

94.    The chart below identifies each of the entities disclosed to be the Sponsors, Originators, and obligors of the loans included in the Covered Trusts.[6]

| | **Trust** | **Sponsor** | **Originator** | **Obligor** |
|---|---|---|---|---|
| 1 | BSABS 2006-4 | EMC Mortgage Corporation | Wells Fargo Bank, N.A.; Long Beach Mortgage Company; New Century | EMC Mortgage Corporation |

---

[6] Upon information and belief, Countrywide Home Loans, Inc. is the sponsor, originator, and obligor for the CWHEL 2006-RES and CWL 2005-IM2 securitizations, but the relevant offering materials are not publicly available.

|  | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
|  |  |  | Mortgage Corporation |  |
| 2 | CFLX 2007-M1 | Chase Home Finance | JPMorgan Chase Bank, N.A. | Chase Home Finance |
| 3 | CWALT 2005-24 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 4 | CWALT 2005-27 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 5 | CWALT 2005-38 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 6 | CWALT 2005-41 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 7 | CWALT 2005-44 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 8 | CWALT 2005-51 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 9 | CWALT 2005-56 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 10 | CWALT 2005-59 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 11 | CWALT 2005-69 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 12 | CWALT 2005-82 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 13 | CWALT 2005-AR1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 14 | CWALT 2005-IM1 | Countrywide Home Loans, Inc. | Impac Funding Corporation | Countrywide Home Loans, Inc. |
| 15 | CWALT 2006-32CB | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 16 | CWALT 2006-OA1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 17 | CWALT 2006-OA11 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; | Countrywide Home Loans, Inc. |

40

| | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
| | | | MortgageIT | |
| 18 | CWALT 2006-OA12 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 19 | CWALT 2006-OA2 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 20 | CWALT 2006-OA6 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; MortgageIT | Countrywide Home Loans, Inc. |
| 21 | CWALT 2006-OA9 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; MortgageIT | Countrywide Home Loans, Inc. |
| 22 | CWALT 2006-OC2 | Countrywide Home Loans, Inc. | American Home Mortgage Corporation; Decision One Mortgage Company LLC; Greenpoint Mortgage Funding Inc.; The Mortgage Store Financial Inc. | Countrywide Home Loans, Inc. |
| 23 | CWALT 2006-OC4 | Countrywide Home Loans, Inc. | Decision One Mortgage Company LLC; Greenpoint Mortgage Funding Inc.; Pinnacle Financial Corporation | Countrywide Home Loans, Inc. |
| 24 | CWALT 2007-AL1 | Countrywide Home Loans, Inc. | Alliance Bancorp | Countrywide Home Loans, Inc. |
| 25 | CWALT 2007-OA6 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 26 | CWHEL 2006-I | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 27 | CWHEL 2007-B | Countrywide Home Loans, Inc. | Countrywide Bank, FSB; Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 28 | CWHEL 2007-E | Countrywide Home Loans, Inc. | Countrywide Bank, FSB; | Countrywide Home Loans, Inc. |

41

| | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
| | | | Countrywide Home Loans, Inc. | |
| 29 | CWHL 2004-29 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Park Granada, LLC |
| 30 | CWHL 2005-HYB9 | Countrywide Home Loans, Inc | Countrywide Home Loans, Inc.; Impac Funding Corporation; Ohio Savings Bank; Sierra Pacific Mortgage Company, Inc.; AmNet Mortgage Network, Inc. | Taberna Realty Holdings Trust; Countrywide Home Loans, Inc. |
| 31 | CWL 2004-BC4 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Encore Credit Corporation; Decision One Mortgage | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 32 | CWL 2005-10 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 33 | CWL 2005-14 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 34 | CWL 2005-8 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 35 | CWL 2005-AB2 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans |

|  | **Trust** | **Sponsor** | **Originator** | **Obligor** |
|---|---|---|---|---|
|  |  |  |  | Servicing LP: CWABS, Inc. |
| 36 | CWL 2005-AB3 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 37 | CWL 2005-BC5 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 38 | CWL 2006-1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 39 | CWL 2006-10 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 40 | CWL 2006-11 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 41 | CWL 2006-12 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 42 | CWL 2006-13 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |

| | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
| 43 | CWL 2006-14 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 44 | CWL 2006-15 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 45 | CWL 2006-16 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 46 | CWL 2006-17 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 47 | CWL 2006-18 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 48 | CWL 2006-19 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 49 | CWL 2006-22 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 50 | CWL 2006-25 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide |

|   | **Trust** | **Sponsor** | **Originator** | **Obligor** |
|---|---|---|---|---|
|   |   |   |   | Home Loans Servicing LP: CWABS, Inc. |
| 51 | CWL 2006-26 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 52 | CWL 2006-3 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 53 | CWL 2006-5 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 54 | CWL 2006-7 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 55 | CWL 2006-ABC1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 56 | CWL 2006-BC4 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 57 | CWL 2006-S10 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |

45

| | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
| 58 | CWL 2007-1 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 59 | CWL 2007-2 | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc.; Countrywide Home Loans Servicing LP: CWABS, Inc. |
| 60 | CXHE 2005-C | Centex Home Equity Company, LLC; Harwood Street Funding II, LLC | Centex Home Equity Company, LLC | Centex Home Equity Company, LLC |
| 61 | FHAMS 2006-AA1 | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation |
| 62 | HELT 2007-FRE1 | Nationstar Mortgage LLC | Fremont Investment & Loan | Nationstar Mortgage LLC |
| 63 | NHEL 2005-3 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 64 | NHEL 2006-3 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. |
| 65 | NSTR 2006-B | Nationstar Mortgage LLC | Nationstar Mortgage LLC | Nationstar Mortgage LLC |
| 66 | NSTR 2007-A | Nationstar Mortgage LLC | Nationstar Mortgage LLC | Nationstar Mortgage LLC |
| 67 | POPLR 2006-C | Equity One, Inc. | Equity One, Inc.; Popular Financial Services, LLC | Equity One, Inc.; Popular Financial Services, LLC |
| 68 | SAMI 2005-AR4 | EMC Mortgage Corporation | Countrywide Home Loans, Inc. | EMC Mortgage Corporation |
| 69 | SAMI 2005-AR6 | EMC Mortgage Corporation | First Horizon Home Loan Corporation; SouthStar Funding, LLC; WinStar Mortgage Partners, Inc. | EMC Mortgage Corporation |

| | Trust | Sponsor | Originator | Obligor |
|---|---|---|---|---|
| 70 | SAMI 2006-AR3 | EMC Mortgage Corporation | Countrywide Home Loans, Inc.; Bank of America, N.A. | EMC Mortgage Corporation |

95.     By October 2009, at the absolute latest, BNY Mellon was aware that RMBS such as the Covered Trusts were essentially junk bonds, and the sponsors and originators had systemically failed to comply with represented underwriting standards.  During an interview in October of 2009, Bob Kelly, the chief executive of BNY Mellon admitted that:

> [W]e bought a lot of securities that were Triple-A rated . . . that turned out, at best, to be Triple-C in terms of quality.  Shame on us because we should have done a lot more work in understanding the fundamental cash flows and other characteristics of those securities instead of relying on rating agencies.

Mr. Kelly further acknowledged that the U.S. mortgage market "do[es] not have any underwriting standards . . . including basic stuff like mortgage brokers who are not registered and trained."  Janet Whitman, *Saturday Interview: Nova Scotia native Bob Kelly*, Financial Post, Oct. 16, 2009, http://www.financialpost.com/related/topics/2111634/story.html.

96.     Further, consistent with BNY Mellon's view that Triple-A rated RMBS are "junk", BNY Mellon took a $4.8 billion charge against earnings for its own RMBS holdings in 2009 and subsequently sold some of its lowest-quality securities.  Michael Rapoport, *'Toxic' Assets Still Lurking at Banks*, Wall St. J., Feb. 7, 2011, http://www.wsj.com/articles/SB10001424052748704570104576124701144189910.  On a conference call at the time, BNY Mellon's chief executive acknowledged BNY Mellon's desire "to sell the securities where we think there is just no value there." *Id.*

47

97.     As detailed in Exhibit F, in 2009 and 2010 additional facts began to emerge that demonstrated that the Sponsors and Originators systematically abandoned applicable underwriting guidelines and therefore breached representations and warranties in all securitizations.

98.     The Sponsors and Originators have been the subject of numerous investigations and lawsuits alleging systematic abandonment of underwriting guidelines in the pursuit of profits.  These investigations and lawsuits contain ample evidence available to BNY Mellon that mortgage loans originated and sponsored by the relevant Originators and Sponsors breached the associated representations and warranties.

99.     Not only do these investigations and lawsuits contain accounts from confidential witnesses and former employees, but many complaints contain detailed information based on forensic reviews of individual loans, including loans in the Covered Trusts.  For example, in September 2011, Massachusetts Mutual Life Ins. Co. ("Mass. Mutual"), an RMBS investor, sued Countrywide and others regarding RMBS for which Countrywide was the sponsor, including for the Covered Trusts CWALT 2005-41, CWALT 2005-56, CWALT 2005-59, CWALT 2005-IM1, CWL 2006-16, CWL 2006-17, CWALT 2006-OA6, and CWALT 2006-OA9.  Mass. Mutual conducted a forensic analysis of loans underlying several RMBS trusts including those eight Covered Trusts, which revealed that for the Covered Trusts, between 47–50 percent of the loans tested had appraisals inflated by 10 percent or more, and 37–41 percent of the loans tested had LTVs that were ten or more points more than represented.  *See* Compl., *Mass. Mutual Life Ins. Co. v. Countrywide Fin. Corp.*, No. 3:11-cv-30215 (D. Mass. Sept. 1, 2011).

100.     Additionally, in September 2011, the Federal Housing Finance Agency ("FHFA") filed an action against Countrywide and others in which FHFA performed a review of residential

48

mortgage loans originated and securitized by Countrywide, including for 26 of the Countrywide Trusts. Compl., *FHFA v. Countrywide Financial Corporation*, No. 652436/2011 (N.Y. Sup. Ct. Sept. 2, 2011). FHFA found that the offering materials had understated the actual amount of loans with LTV ratios of: (i) 80 percent or greater by 17–54 percent; and (ii) 100 percent or greater by 6–14 percent. *Id.* ¶ 136. FHFA further found that the offering materials overstated the actual percentage of owner-occupied properties by 8–13 percent, and that more than 61 percent of the sampled loans were currently in default. *Id.* ¶¶ 132, 198.

101.    Loan-level analyses conducted in connection with investigations of other Sponsors and Originators of the Covered Trusts uncovered similar results. *See e.g., Federal Deposit Insurance Corp. v. J.P. Morgan Securities LLC*, No. 12-cv-00878 (W.D. Tex. Nov. 19, 2012) (SAMI 2006-AR3 and SAMI 2005-AR4); *FHFA v. JPMorgan Chase & Co*, 11-cv-06188 (S.D.N.Y. 2012) (BSABS); *FHFA v. First Horizon*, 11-cv-6193 (S.D.N.Y. 2012) (FHAMS 2006-AA1).

102.    Further, these lawsuits and investigations demonstrate that the Originators originated mortgage loans with the goal of increasing volume, rather than evaluating the borrower's ability to repay the loan, and regularly made exceptions to underwriting guidelines in the absence of sufficient compensating factors. For example, one of the NovaStar Trusts (NHEL 2006-5) contained a loan for $900,000 that NovaStar provided to two borrowers with income of $6,866 per month and monthly debt payments of at least $9,004 (which did not include borrowers' monthly expenses for things such as taxes, utilities, groceries, health care, and transportation).

103.    These lawsuits, in conjunction with the poor performance of the underlying loans (which BNY Mellon was aware of as it issued regular reports regarding performance) and the

49

public information concerning widespread issues among Originators, were more than sufficient to provide BNY Mellon with notice that large numbers of loans originated and sponsored by the Originators and Sponsors breached the associated representations and warranties.

104.    In fact, in 2008, BNY Mellon acknowledged Countrywide's "raft of severe financial and regulatory problems," including i) investigations by the FBI and SEC into Countrywide's conduct during the mortgage crisis, and ii) lawsuits brought by four state attorneys general against Countrywide for alleged widespread deceptive mass-mortgage lending practices.  *BNYM v. Countrywide Financial Corp.*, No. 3935-VCP, p. 9-10, n. 12, 30 (Del. Ch. Aug. 18, 2008).

105.    BNY Mellon's concerns regarding Countrywide, developed as a result of its extremely close relationship with its client Countrywide, were so severe by August 2007, that it threatened to pull the plug on Countrywide's $45 billion repo book.  BNY Mellon's concerns required intervention from the president of the New York Federal Reserve in order to avoid an unprecedented event with a potentially devastating impact on the financial market.  Timothy Geithner, Stress Test: Reflections on Financial Crises, (2014).

106.    BNY Mellon was aware of these reports, investigations, and lawsuits, and it also had additional information concerning representation and warranty violations that it learned in the course of administering the Covered Trusts.  Additionally, BNY Mellon had access to non-public information regarding the Covered Trusts that would have confirmed the representation and warranty violations if it had conducted even a limited investigation.  Thus, BNY Mellon was aware of the defaults, but failed to provide the required notice and pursue repurchase claims.

**B.      BNY Mellon Failed to Act Prudently
Upon the Occurrence of an Event of Default**

107.     When BNY Mellon learned that the Servicers[7] failed to provide notice of numerous breaches of representation and warranty provisions as required under the PSAs, BNY Mellon should have acted like a prudent person would in the exercise of its own affairs and (i) taken action against the Servicers; (ii) taken steps to require the Sponsors or Originators to repurchase or substitute the loans; and (iii) notified certificateholders of the Servicers' defaults and the breaches of representation and warranty provisions.  During the period that an Event of Default was in existence, BNY Mellon had a continuing duty to enforce repurchase rights.  As such, it should have, at a minimum, reviewed all defaulted loans as they defaulted and determined whether a responsible party was required to repurchase such loans.  BNY Mellon continually failed to do so and let the statute of limitations to bring repurchase claims lapse by failing to take sufficient action within six years of the closing of each Covered Trust.

108.     Although certain Events of Default require formal notice and an opportunity to cure, the Trustee cannot escape its duty of care by failing to provide the required notice. As set forth in Section III(A), BNY Mellon was aware (or would have been aware if it had carried out its duties) that the Servicers, Depositors, Sponsors, and the Trustee itself, failed to provide notice of the Sponsors' and Originators' representation and warranty violations that occurred in the Covered Trusts.  BNY Mellon, however, did not provide notice of such breaches as it was required to do.  Because these would have seasoned into Events of

---

[7] In the PSAs for the EMC Trusts and one of the Nationstar Trusts (HELT 2007-FRE1), the Master Servicer was also the Securities Administrator or Trust Administrator and was required to provide notices of breaches by the Master Servicer and Servicers.  References to the Servicer herein also refer to the Master Servicer as Securities Administrator or Trust Administrator, where applicable.

Default if notice had been provided, BNY Mellon had a duty to act prudently to enforce repurchase provisions once it learned of such defaults.  However, as the head of BNY Mellon's team that administered Countrywide RMBS testified at the BNY Mellon Article 77 Proceeding, she was not aware of a single instance of BNY Mellon seeking to cause Countrywide or, its parent, Bank of America to repurchase a mortgage loan.

109.  As described below, additional Events of Default occurred under the terms of the PSAs.  BNY Mellon has engaged in repeated breaches of its duty to exercise due care throughout the life of the Covered Trusts.

### 1. Events of Default Under the PSAs Relating to Document Delivery Failures in the Covered Trusts

110.  As discussed above in Section II(A), BNY Mellon, or a custodian acting on its behalf,  had a duty to identify in final certifications and exception reports, mortgage files that were missing documentation required to be delivered under the PSAs, which typically include documents sufficient to prove ownership of the note and mortgage or otherwise protect title.  BNY Mellon knew of numerous instances where it did not receive: (i) the original mortgage note with all intervening endorsements showing a complete chain of endorsement from the Originator to the Sponsor or Depositor, or a lost mortgage note affidavit and a duly executed assignment of mortgage for each loan that was not a MERS loan; (ii) the original recorded mortgage for each loan that was not a MERS loan; (iii) the original mortgage for those loans that were MERS loans; or (iv) the original recorded assignment or assignment of the mortgage together with all interim recorded assignments and the original lender's title policy.

111.  When BNY Mellon prepared the final exception reports, it provided them to the Sponsors, Depositors, and Servicers indicating many of these missing documents.  When

the custodian prepared such reports, it provided them to BNY Mellon, the Sponsors, Depositors, and Servicers and the reports similarly showed many documents that were required to be delivered under the PSAs were not delivered.  BNY Mellon was aware that affected loans were not repurchased or substituted.

112.    BNY Mellon has admitted publicly that it was aware of Countrywide's pervasive failure to deliver complete mortgage files to Countrywide sponsored RMBS trusts, including the Covered Trusts.  Phillip R. Burnaman II, an expert retained by BNY Mellon in the BNY Mellon Article 77 Proceeding, issued an expert report revealing that BNY Mellon's exception reports for Countrywide securitizations (including numerous Covered Trusts) as of June 2011 showed **117,899** loans lacking complete documentation at that time.  Burnaman Expert Report at 50, *In re Bank of N.Y. Mellon*, No. 651786/2011 (N.Y. Sup. Ct. Mar. 14, 2013) (emphasis added).

113.    The head of Global Document Custody Operations at BNY Mellon likewise testified in the BNY Mellon Article 77 Proceeding concerning internal BNY Mellon records corroborating this large magnitude of documentation exceptions that were still uncured.

114.    Rather than take action to ensure the responsible parties cured such defects (during the cure period) or substituted or repurchased the affected loans, BNY Mellon stood by while the Sponsors, and Servicers of the Covered Trusts engaged in so called "robo-signing" on a widespread basis when the missing documents were needed to foreclose on properties underlying the Covered Trusts.  BNY Mellon and the Sponsors and Servicers of the Covered Trusts have been implicated in numerous governmental reports, court orders, and press reports regarding servicing misconduct and the massive cover up of the failure to deliver documentation concerning securitized mortgage loans known as the "robo-signing" scandal.  This is powerful evidence of the systemic document delivery failures and BNY

Mellon's knowledge of such failures. Section III(C) contains a chart of the relevant Sponsors and Servicers for the Covered Trusts. BNY Mellon's and the relevant Sponsors' and Servicers' involvement in the robo-signing scandal is summarized in Exhibit G.

115. Events of Default occurred shortly after the final exception reports were delivered for each of the Covered Trusts under multiple provisions of the PSAs. These Events of Default triggered a continuing duty to review defaulted loans to determine if such loans should be repurchased.

116. First, Section 7.01(ii) of the Countrywide PSA provides that an Event of Default occurs when the Servicer breaches its contractual obligations relating to the "initial delivery of the Mortgage File for Delay Delivery Mortgage Loans" and the "the failure to substitute or repurchase in lieu of delivery." As a result, when the Servicer failed to enforce the Sponsors' or Originators' obligation to substitute or repurchase loans with uncured document exceptions, an Event of Default occurred.

117. Second, each PSA provides that the Servicers' failure to adhere to prudent servicing standards ripens into an Event of Default if left uncured within a specified period after notice of such breach. For example, Section 7.01 of the Countrywide PSA provides that an Event of Default occurs if the Servicer fails to prudently service the mortgage loans and such breach is not remedied within 60 days of notice of the breach. The PSAs for the Chase, Centex, CWHEL, EMC, Equity One, First Horizon, Nationstar, and NovaStar Trusts contain similar provisions. *See* Ex. C § IX. The PSAs for the Centex, and Nationstar Trusts also provide that the Servicer's failure to perform its covenant to prudently service the mortgage loan ripens in to a Servicer Event of Default if left uncured for a specified period after a servicing officer learns of such failure.

118.    As set forth above and in Exhibit G, when borrowers defaulted and the Servicers were required to commence foreclosures, they fabricated the documents necessary to foreclose rather than cause the Sponsor, Depositor, or Originator to repurchase or substitute the affected loan.  BNY Mellon was aware of this fact as it was aware of the contents of the document exception reports and that loans with exceptions had defaulted and not been repurchased or substituted.  Both the Servicers and Trustee were aware that these loans were not put back to the Sponsors or Originators and, instead, as described in Exhibit G, the Servicers robo-signed the documentation required to foreclose.  These acts of robo-signing were breaches of the applicable prudent servicing standard, as a prudent Servicer would have insisted that the loans be repurchased.  Having failed to provide notice, BNY Mellon had an obligation to act prudently to address all defaults.

119.    These Events of Default triggered BNY Mellon's duty to act prudently to protect the interests of the certificateholders in all respects, and such duty continues to this day because the document defects were not cured within the required period and the affected loans were not repurchased.  BNY Mellon had a continuing obligation to seek repurchase of loans missing required documentation throughout its tenure as Trustee, including as loans on the final exception report defaulted.  BNY Mellon also had a duty to determine whether other defaulted loans should be put back to the responsible parties based on representation and warranty violations because an Event of Default had occurred.  BNY Mellon has repeatedly breached these duties throughout its tenure as Trustee.

### 2. BNY Mellon Received Written Notice of Representation and Warranty Violations Which Ripened into Events of Default

120.    In addition to the Events of Default discussed above, on July 21, 2011, the Association of Mortgage Investors ("AMI") notified all major RMBS trustees, (including BNY

55

Mellon) that "substantial evidence [] has emerged of abuses in the servicing and monitoring of"
RMBS.  The letter set forth in detail the publicly available evidence demonstrating that there was
widespread evidence, including some of the evidence referenced in this Amended Complaint,
that loan Originators had systemically breached representations and warranties provided to
securitization trusts, and that the parties servicing loans underlying securitization trusts had
systemically breached their obligations under applicable servicing agreements.  The letter
cautioned, "[y]ou cannot be negligent in ascertaining the pertinent facts regarding the underlying
collateral;" "[u]pon discovery of representation or warranty breaches, you have to notify the
appropriate parties;" and "you must comply with your obligations . . . to take action to remedy
the servicer Events of Default in the best interests of the certificateholders."

121.   Further, beginning in June 2010, a group of institutional investors purporting
to hold over 25% of the outstanding notes for approximately 100 Countrywide trusts for
which BNY Mellon serves as trustee provided notice of numerous defaults by the Servicer
and Countrywide under the PSAs including, *inter alia*, the following:

- Countrywide sold a material number of loans to securitization trusts that did not comply with applicable underwriting guidelines in violation of representations and warranties provided by Countrywide;

- The Servicer failed to service and administer the mortgage loans in accordance with the "customary and usual standards of practice of prudent mortgage loan servicers" as required by Section 3.01 of the Countrywide PSA by failing to maintain loan and collateral files consistently with the standards of practice of a prudent mortgage loan servicer, demand that the Sponsors of loans found to be deficient cure such deficiencies and by collecting unnecessary servicing fees;

- The Servicer failed to provide notice under Section 2.03(c) of the Countrywide PSA of each "breach of a representation or warranty with respect to a Mortgage Loan . . . that materially and adversely affects the interests of Certificateholders";

- The Servicer agreed to modify loans that included illegal predatory lending

56

terms in order to settle claims brought by state Attorneys General without requiring the Seller of such loans— its parent company— to bear the costs and expenses related to those modifications.  *See* Countrywide PSA § 2.03(c);

- The Servicer failed to use "reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments." *See* Countrywide PSA § 3.11(a).

122.    Further, on or about December 16, 2011, BNY Mellon received instructions from a group of institutional investors in hundreds of RMBS trusts asking BNY Mellon to open investigations into large numbers of ineligible mortgages in the loan pools securing those trusts and deficient servicing of those loans (the "JPMorgan Putback Initiative").  The JPMorgan Putback Initiative identified and sought to compel the repurchase of large quantities of loans originated by many of the same lenders that also originated large quantities of the loans sold to the Covered Trusts, and seeks recovery of losses relating to servicing deficiencies by many of the same major servicers of loans backing the Covered Trusts.  On October 1, 2014, BNY Mellon accepted the settlement with JPMorgan with respect to EMC Trusts, despite the fact that the settlement would reimburse the trusts for only a small fraction of the losses caused by JPMorgan's misconduct.  *See* Compl. ¶¶ 9–10, *Blackrock Allocation Target Shares v. Bank of N.Y.*, No 651866/2014 (N.Y. Sup. Ct. June 18, 2014); Dawn Kopecki & Alexis Leondis, *JP Morgan Sets Tentative $45 Billion Accord for Mortgage Bonds*, Bloomberg (Nov. 16, 2013), http://www.bloomberg.com/news/2013-11-15/jpmorgan-reaches-4-5-billion-mortgage-bond-deal-with-investors.html; List of Accepting Trusts and Loan Groups, *available at* http://www.rmbstrusteesettlement.com/docs/List_of_Accepting_Trusts_and_Loan_Groups.pdf.

123.    Under Section 7.01(ii) of the Countrywide PSA once the Servicer is provided notice of a breach of its duties under the PSA, it becomes an "Event of Default" if it is not

57

cured within sixty days. The Servicer failed to cure the defaults within sixty days and, thus, Events of Default have occurred.

124. Faced with these Events of Default, a reasonably diligent trustee would have demanded that the servicer or the relevant originator or sponsors, such as Countrywide and Bank of America, cure such defaults within the specified cure period. BNY Mellon, however, failed to make a demand.

125. Instead, with respect to certain Countrywide Trusts, BNY Mellon agreed to a settlement where it receives a substantial financial benefit in the form of an indemnity from Bank of America. The settlement is also a windfall to Bank of America and Countrywide.

126. The $8.5 billion to be paid by Bank of America pales in comparison to the value of the claims to be released. The settlement includes repurchase claims owned by 530 trusts, including many of the Covered Trusts. The aggregate amount of loans in such trusts, according to BNY Mellon, is $208 billion. Based on analyses that have been conducted by monoline insurers with access to loan files for Countrywide's defaulted loans, 75%–90% of these loans violated representation and warranty provisions and, as a result, should have been repurchased by Countrywide. Thus, the damage suffered by the 530 trusts easily exceeds $90 billion. Nevertheless, despite the clear right of the trusts to put back defective loans to Countrywide, BNY Mellon agreed to release Countrywide and Bank of America for all breaches of representations and warranties and servicing-related claims in connection with the 530 trusts for only $8.5 billion. Although $8.5 billion is a large sum of money in the abstract, it is only a small fraction of the $90+ billion in damage caused by Countrywide's breaches.

127. Although the appellate court in the BNY Article 77 Proceeding held that BNY

58

Mellon did not abuse its discretion in other respects in agreeing to the settlement, the Article 77 court did not decide (i) whether any uncured Events of Default existed triggering BNY Mellon's affirmative duty to exercise remedies on behalf of certificateholders and to act prudently in doing so or (ii) whether BNY Mellon acted in accordance with those duties.[8]  As discussed further herein, there were uncured Events of Defaults with respect to each Countrywide Trust and, following such Events of Default, BNY Mellon failed to exercise due care.

128.    Moreover, BNY Mellon has had notice of Countrywide's defaults for years but failed to take any steps to protect certificateholder rights.  If it had, it would have forced Countrywide to repurchase or substitute the loans that ultimately caused massive losses for certificateholders at a time when Countrywide itself had ample assets.

129.    Further, BNY Mellon created conflicts of interest, rather than avoid them. BNY Mellon agreed to the proposed settlement of Countrywide's repurchase obligations only after Bank of America agreed to indemnify BNY Mellon for liabilities under the PSAs and the settlement agreement.

### 3.    Events of Default under the Indentures

130.    As noted, four of the Covered Trusts were documented using an Indenture, rather than a PSA.  While the same type of Events of Default occurred under the Indenture as described in Sections III herein, the relevant provisions are slightly different in that the Issuer's (*i.e.*, the trust's) breach of the Indenture gives rise to an Event of Default rather than the Master Servicer's  or Servicer's breaches.

131.    Each Indenture requires the Issuer to protect the collateral of the trust.  For

---

[8] In the BNY Article 77 Proceeding, the New York Supreme Court found that BNY Mellon abused its discretion in entering into the settlement by releasing potential claims against Bank of America and Countrywide for the repurchase of modified loans without performing an appropriate investigation of the released claims.

example, Section 3.05 of the CWHEL 2006-I Indenture provides in relevant part, "[t]he Issuer will . . . take any other action appropriate to: . . . (iv) enforce any rights with respect to any of the Collateral; [or] (v) preserve and defend title to the Collateral and the rights of the Indenture Trustee, the Credit Enhancer, and the Noteholders in the Collateral against all adverse claims." The Indentures for CWHEL 2007-B, CWHEL 2007-E, and CWHL 2005-HYB9 contain substantially similar provisions.

132.    The failure to do so is an Event of Default. For example, Section 5.01 of the Indenture for CWHEL 2006-I provides that an Event of Default occurs when the Issuer fails in:

> the performance of any obligation of the Issuer under this Indenture (other than an obligation specifically dealt with elsewhere in this Section), or any representation or warranty of the Issuer made in this Indenture or in any certificate or other writing delivered in connection with this Indenture proves to have been materially incorrect as of the time when it was made, and the default or the circumstance making the representation or warranty incorrect has not been cured with 60 days after notice to the Issuer by the Indenture Trustee or to the Issuer and the Indenture Trustee by the Credit Enhancer (or, if a Credit Enhancer Default exists, by the Holders of at least 25% of the Outstanding Amount of all Classes of Notes) by registered or certified mail specifying the default or incorrect representation or warranty and requiring it to be remedied and stating that the notice is a notice of default under this Indenture.

The Indentures for CWHEL 2007-B, CWHEL 2007-E, and CWHL 2005-HYB9 contain substantially similar provisions.

133.    As discussed above, the Trustee provided written notice that the mortgage files were incomplete. The Issuers under the Indentures failed to protect the trust assets, a fact the Trustee was well aware of. As a result, an Event of Default occurred under the Indentures in the first year of the existence of CWHEL 2006-I, CWHEL 2007-B, CWHEL

2007-E, and CWHL 2005-HYB9.

134.   In addition, the Indentures provide that the Issuer must give notice to BNY Mellon and the Credit Enhancer of any defaults, called "Incipient Defaults," that could give rise to an Event of Default within five days of their occurrence.  For example, Section 5.01 of the Indenture for CWHEL 2006-I provides in relevant part, "[t]he Issuer shall deliver to the Indenture Trustee and the Credit Enhancer, within five days after its occurrence, notice in the form of an Officer's Certificate of any Incipient Default under clause (iii), its status, and what action the Issuer is taking or proposes to take with respect to the event."  The Indentures for CWHEL 2007-B, CWHEL 2007-E, and CWHL 2005-HYB9 contain similar provisions.  The Issuers were aware of Incipient Defaults, such as the failure to protect the trust assets by ensuring that the mortgages were properly transferred to the trusts, but did not give the required notice. BNY Mellon was fully aware of this omission as it provided the mortgage file exception reports and was a party that should have received notice of any Incipient Default. An Event of Default occurred under this provision as well, and BNY Mellon failed to act prudently after their occurrence.

135.   As detailed in Section III(A) and III (B)(2), the Trustee became aware of public information indicating that the Issuer failed to protect the trust assets by enforcing the Sponsors' or Originators' repurchase obligations triggered by representation and warranty violations.  Events of Default occurred as a result.  This triggered a continuing obligation to act prudently to protect the interests of certificateholders that BNY Mellon breached throughout its tenure as Trustee.

### 4.   Events of Default Concerning False Servicer Certifications

136.   Each PSA obligated the Servicer to certify annually that it met its obligations

61

under the PSAs and applicable federal regulations.  For example, Section 3.16(a) of the

Countrywide PSA requires the Servicer to certify, among other things, that:

> (i)    a review of the activities of the Servicer during the preceding calendar year (or applicable portion thereof) and of the performance of the Servicer under this Agreement has been made under such officer's supervision and
>
> (ii)   to the best of such officer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement in all material respects throughout such year (or applicable portion thereof), or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officer and the nature and status thereof.

The PSAs for the Centex, Chase, CWHEL, EMC, Equity One, First Horizon, Nationstar,

and NovaStar Trusts contain substantially similar requirements.  *See* Ex. C § XII.

137.    The failure to provide a conforming certification is an Event of Default under

each of the PSAs.  *See* Ex. C §§ VIII, IX.  Under the PSAs for the Centex, and Nationstar

Trusts, the Event of Default is triggered by the breach without regard to whether notice is

provided.  Under the remaining PSAs, BNY Mellon was not entitled to rely on certifications

that it knew to be false and, thus, BNY Mellon's failure to provide notices of breaches

relating to false Servicer certifications triggered its post-Event of Default duties.

138.    BNY Mellon received certifications that it knew to be false because the

Servicers were not in fact meeting their obligations under the PSAs and failed to disclose

numerous representation and warranty violations.  As discussed in Sections III(B)(1) and

III(C), the Servicers breached the PSAs in many ways including by attempting to foreclose

on defective loans rather than tendering loans for repurchase or substitution and by looting

trust assets through multiple servicing scams.  As discussed in Section III(A), BNY Mellon

was aware of numerous representation and warranty violations that were not disclosed in the

required servicing certifications.  BNY Mellon was aware of these breaches, and therefore, knew the required servicer certifications did not conform because they were false.  The PSAs only allowed the Trustee to rely upon the certifications if it had a good faith basis to believe the certifications were true.  Events of Default were triggered as a result and BNY Mellon had a continuing duty to act prudently to protect the certificateholders' interests.

139.    In addition, under the PSAs for the Centex, Countrywide, CWHEL, EMC, Equity One, First Horizon, and Nationstar Trusts, the Servicers provided a representation and warranty that all reports provided under the PSA, including servicing compliance certifications, were accurate and complete.  For example, Section 2.08 of the Countrywide PSA provides: "[N]o written information, certificate of an officer, statement furnished in writing or written report delivered to the Depositor, any affiliate of the Depositor or the Trustee and prepared by the Servicer pursuant to this Agreement will contain any untrue statement of a material fact or omit to state a material fact necessary to make such information, certificate, statement or report not misleading."  All parties to the PSA had a duty to provide notice of breach of this representation and warranty.  The Servicers' failure to provide such notice resulted in Events of Default triggering BNY Mellon's post-Event of Default duties.

### 5.    Events of Default as a Result of Ineligible Certificate Account

140.    Each of the Countrywide PSAs requires the Master Service to establish and maintain an account in which the Master Service will deposit the payments received under the PSA ("Certificate Account").  *See, e.g.*, Section 3.05(b) of the Countrywide PSA.  The PSAs provided requirements to ensure the viability of the financial institution in which the Certificate Accounts were held.  Following a short cure period, any failure by the Servicer regarding the Certificate Accounts ripens into Events of Default.  For example, Section 7.01

63

(i) of the Countrywide PSA provides an Event of Default upon:

> [A]ny failure by the Master Servicer to deposit in the Certificate Account or remit to the Trustee any payment required to be made under the terms of this Agreement, which failure shall continue unremedied for five days after the date upon which written notice of such failure shall have been given to the Master Servicer. . .

141. The eligibility requirements and short cure period for Events of Default relating to the Certificate Account were intended to protect the payments received under the PSAs from failures of a financial institution that held, or may have held, the Certificate Accounts.

142. Upon information and belief, with respect to some of the Countrywide Trusts, the Servicers maintained the Certificate Account at Countrywide's affiliate, Countrywide Bank.

143. At various points between March 2005 and August 2007, Countrywide Bank was rated below the requisite threshold required under the PSAs for the Countrywide Trusts. Beginning in August 2007, the rating agencies downgraded Countrywide below this eligibility threshold. *See Rating Action: Moody's Lowers Countrywide debt to Baa3 from A3; rating remain on review down*, August 16, 2007, *available at* https://www.moodys.com/research/Moodys-lowers-Countrywide-debt-to-Baa3-from-A3-ratings-remain--PR_139423.

144. To the extent that any Certificate Accounts were held at Countrywide Bank during periods where the Bank was either not rated or were rated below the required level, the Servicer failed to maintain an eligible Certificate Account. BNY Mellon's failure to enforce the Servicers' requirements relating to the Certificate Account ripened into Events of Default.

C.    **BNY Mellon Failed to Address the Master
Servicers' and Servicers' Looting of Trust Assets**

145.    In addition to the servicing related defaults and Events of Default described above, the Servicers have engaged in a variety of schemes to overcharge borrowers in default.  These scams have dramatically increased loss severities on defaulted mortgages and, as a result, dramatically increased Commerzbank's losses.

146.    The chart below identifies each of the entities disclosed to be the Sponsors, Servicers, and Master Servicers of the loans included in the Covered Trusts.

|   | **Trust** | **Sponsor** | **Servicer** | **Master Servicer** |
|---|---|---|---|---|
| 1 | BSABS 2006-4 | EMC Mortgage Corporation | EMC Mortgage Corporation; Wells Fargo Bank, N.A. | Wells Fargo Bank, N.A. |
| 2 | CFLX 2007-M1 | Chase Home Finance | JPMorgan Chase Bank, N.A. | JPMorgan Chase Bank, N.A. |
| 3 | CWALT 2005-24 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 4 | CWALT 2005-27 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 5 | CWALT 2005-38 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 6 | CWALT 2005-41 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 7 | CWALT 2005-44 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; | Countrywide Home Loans Servicing LP |

65

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| | | | Countrywide Home Loans, Inc. | |
| 8 | CWALT 2005-51 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 9 | CWALT 2005-56 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 10 | CWALT 2005-59 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 11 | CWALT 2005-69 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 12 | CWALT 2005-82 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 13 | CWALT 2005-AR1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 14 | CWALT 2005-IM1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 15 | CWALT 2006-32CB | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 16 | CWALT 2006-OA1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 17 | CWALT 2006-OA11 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 18 | CWALT 2006-OA12 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 19 | CWALT 2006-OA2 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 20 | CWALT 2006-OA6 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 21 | CWALT 2006-OA9 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 22 | CWALT 2006-OC2 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 23 | CWALT 2006-OC4 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 24 | CWALT 2007-AL1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 25 | CWALT 2007-OA6 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP |
| 26 | CWHEL 2006-I | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 27 | CWHEL 2007-B | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 28 | CWHEL 2007-E | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. | Countrywide Home Loans, Inc. |
| 29 | CWHL 2004-29 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 30 | CWHL 2005-HYB9 | Countrywide Home Loans, Inc | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 31 | CWL 2004-BC4 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 32 | CWL 2005-10 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 33 | CWL 2005-14 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 34 | CWL 2005-8 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 35 | CWL 2005-AB2 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 36 | CWL 2005-AB3 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 37 | CWL 2005-BC5 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 38 | CWL 2006-1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP; Litton Loan Servicing LP | Countrywide Home Loans Servicing LP |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 39 | CWL 2006-10 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 40 | CWL 2006-11 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 41 | CWL 2006-12 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 42 | CWL 2006-13 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 43 | CWL 2006-14 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 44 | CWL 2006-15 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 45 | CWL 2006-16 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 46 | CWL 2006-17 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 47 | CWL 2006-18 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 48 | CWL 2006-19 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 49 | CWL 2006-22 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 50 | CWL 2006-25 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 51 | CWL 2006-26 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 52 | CWL 2006-3 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 53 | CWL 2006-5 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 54 | CWL 2006-7 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 55 | CWL 2006-ABC1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 56 | CWL 2006-BC4 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 57 | CWL 2006-S10 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 58 | CWL 2007-1 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 59 | CWL 2007-2 | Countrywide Home Loans, Inc. | Countrywide Home Loans Servicing LP | Countrywide Home Loans Servicing LP |
| 60 | CXHE 2005-C | Centex Home Equity Company, LLC; Harwood Street Funding II, LLC | Centex Home Equity Company, LLC | |
| 61 | FHAMS 2006-AA1 | First Horizon Home Loan Corporation | First Horizon Home Loan Corporation; First Tennessee Mortgage Services, Inc. | First Horizon Home Loan Corporation |
| 62 | HELT 2007-FRE1 | Nationstar Mortgage LLC | Nationstar Mortgage LLC | Wells Fargo Bank, N.A. |
| 63 | NHEL 2005-3 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | |
| 64 | NHEL 2006-3 | NovaStar Mortgage, Inc. | NovaStar Mortgage, Inc. | |
| 65 | NSTR 2006-B | Nationstar Mortgage LLC | Nationstar Mortgage LLC | |
| 66 | NSTR 2007-A | Nationstar Mortgage LLC | Nationstar Mortgage LLC | |
| 67 | POPLR 2006-C | Equity One, Inc. | Equity One, Inc.; Popular Mortgage Servicing, Inc. | |

| | Trust | Sponsor | Servicer | Master Servicer |
|---|---|---|---|---|
| 68 | SAMI 2005-AR4 | EMC Mortgage Corporation | Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 69 | SAMI 2005-AR6 | EMC Mortgage Corporation | EverHome Mortgage Company; EMC Mortgage Corporation; Countrywide Home Loans Servicing LP | Wells Fargo Bank, N.A. |
| 70 | SAMI 2006-AR3 | EMC Mortgage Corporation | EMC Mortgage Corporation; Countrywide Home Loans Servicing LP; Bank of America, N.A. | Wells Fargo Bank, N.A. |

147. Many of the Countrywide PSAs provide that the Servicer may not modify a loan unless Countrywide, the Sponsor, repurchases the loan. *See e.g.,* Section 3.11(b) of the CWALT 2006-32CB, CWALT 2006-OA1, CWALT 2007-AL1, and CWL 2006-3 PSAs. Nevertheless, the Servicers allowed loans to be modified without requiring the Sponsors or Originators to repurchase the modified loans.

148. To the extent that the PSAs permitted modifications without repurchase, the Servicers have also systemically refused to modify loans when it was in the Covered Trusts' interest to do so rather than foreclose and to engage in otherwise prudent loss mitigation practices. The Servicers have done so because they have engaged in a variety of scams to overcharge borrowers (and ultimately the Covered Trusts) for default-related services.

149. From 2005 until today, the Servicers have cheated borrowers and the Covered Trusts after default by, *inter alia*, charging improper and excessive fees (including, without limitation, fees for property maintenance prior to foreclosure), failing to properly oversee third-party vendors, failing to adhere to industry benchmarks for foreclosure proceedings,

71

and procuring insurance policies for properties that were already insured.

150.   In fact, BNY Mellon, in its role as trustee, filed a claim in a bankruptcy action acknowledging the existence of many of these exact servicer and master servicer actions. *See* Notice of Cure Claim of The Bank of New York Mellon Trust Company N.A., as trustee, *In re Residential Capital, LLC*, No. 12-12020 (Bankr. S.D.N.Y. Apr. 16, 2013), ECF No. 3456.  Among others, BNY Mellon gave notice of claims for damages arising out of the servicer's failures to give timely notice, and failure to enforce breaches, of the representations and warranties.  *Id.* ¶ 20.  BNY Mellon's additional claims further highlight the systemic, widespread servicing problems that existed in the mortgage industry.  *See e.g., id.* ¶¶ 28, 33.

151.   When a defaulting borrower's home is foreclosed upon and sold, the Servicer deducts its fees (which defaulting borrowers are in no position to pay themselves) and any servicing advances from sale proceeds before any funds are transferred to the securitization trust that purportedly owned the mortgage loan and thus was entitled to the net sale proceeds.

152.   These overcharges are unlawful and resulted in breaches under the PSAs because they do not meet the prudent servicing standard and were not disclosed in annual certifications provided by the Servicers.  As noted in Sections III(B)(1) and III(B)(3), servicing related defaults known to the Trustee triggered the Trustee's duty to act prudently. BNY Mellon was aware of these servicing scams, which have been the subject of high profile government investigations, lawsuits, and press coverage, including articles in banking industry publications like the *American Banker*.

153.   Exhibit H summarizes servicing misconduct involving the relevant Servicers.

72

**D.      BNY Mellon Violated the Streit Act as Trustee for the Covered Trusts**

154.     BNY Mellon violated its statutory duties under the Streit Act with respect to the Covered Trusts for which the Trust Indenture Act does not apply.

155.     The Streit Act's preamble, entitled "Purpose and application of article," provides: "It is the purpose of the legislature, in enacting this article, to provide for the regulation and supervision of the appointment, creation, agreements, acts, conduct, practices and proceedings of trustees . . . ." N.Y. Real Prop. Law § 124. Section 130-h of the Act further states: "This article shall be construed liberally to effectuate its purpose." *Id*. § 130-h.  Section 130-e of the Act provides for broad relief in the form of the removal of the trustee to any person aggrieved by any act or omission to act of a trustee.  Section 126 governs both the terms of an indenture (or PSA) and how a trustee must act, specifying minimum trustee powers and duties, including, as this Court has held, the obligation to exercise prudent-person duties post-Event of Default. [9]

156.     The Streit Act was enacted in the 1930s. The United States experienced a real estate boom in the 1920s.  N.Y. Leg. Doc. (1936) No. 66 at 14. The real estate boom was financed through mortgage-backed securities ("MBS"). *Id*. The MBS market in the 1920s consisted of both commercial MBS and residential MBS, known in the 1920s as "guaranteed mortgage participation certificates." Goetzmann & Newman, "Securitization in the 1920's," Dec. 11, 2009 at 4-5.

157.     There was little regulation of such MBS in the 1920s. Beginning in late-1926, the New York Attorney General conducted an investigation into MBS practices and sought to reform the industry, including mandating the appointment of truly independent trustees. "Asks More

---

[9] To the extent that BNY Mellon contends that the Streit Act only requires that the PSAs include provisions specified in Section 126 of the Streit Act, then, in the alternative, BNY Mellon violated the Streit Act because the PSAs do not include all of the provisions set forth in Section 126.

Reform in Realty Bonds," *New York Times*, Feb. 8, 1927. Meanwhile, the American

Construction Council, chaired by Franklin D. Roosevelt, called a national conference to discuss

State supervision of bond houses, uniformity in appraisal procedure, and other problems in the

MBS market. "Realty Bond Houses Adopt New Rules," *New York Times*, Feb. 7, 1927 at 1. The

*New York Times* article reporting on this national conference noted that "[t]he practice of having

the issuing house act as its own trustee, or provide a trustee which is not a bank or trust

company, has been criticized as setting up a 'straw man' as trustee for the funds of the investor."

*Id.* at 2.

158.    These initial attempts to regulate the MBS market, however, did not prevent the

market from suffering a "catastrophic decline beginning in late 1928," as "[t]he market fell from

a peak in May 1928 of 100.10, a premium versus par, to a low of just 24.75 cents on the dollar in

April 1933." Goetzmann & Newman, "Securitization in the 1920's," Dec. 11, 2009 at 16. "By

nearly every measure, real estate securities were as toxic in the 1930s as they are now." *Id*. at 18.

The New York Moreland Act Commissioner appointed in 1934 to investigate mortgage

insurance in connection with MBS called the collapse of MBS "one of the greatest disasters

which has fallen upon our investing community in the history of our state." Report of the

Moreland Commission, Oct. 5, 1934 at 1-2.

159.    The loans underlying MBS in the 1920s suffered from many of the same

problems as the loans backing RMBS issued in recent years. For example, according to the

Moreland Act Commissioner's report, loans underlying MBS consisted of loans on vacant or

foreclosed properties, loans with inflated appraisals, loans in default, and poorly performing

loans initially included or later substituted into the trusts. *Id.* at 93-95, 112-14, 118-19.

160.    There was a substantial public uproar regarding the abuses in MBS. For example,

74

during a 1934 grand jury investigation into irregularities in mortgage companies, more than 200 individual MBS investors stormed the New York County Criminal Court building demanding to be heard by the grand jury. "Mortgage Inquiry Stormed by Crowd," *New York Times*, Aug. 9, 1934.

161.     Amidst the public uproar, in the summer of 1934, Governor Herbert Lehman urged the New York Legislature to pass legislation to bring relief to MBS investors, noting that "it would be unconscionable for the Legislature to continue to neglect the plight and the needs of the certificate holders and to disregard the benefits that legislation could bring to them." "Text of Lehman's Radio Mortgage Appeal," *New York Times*, Aug. 16, 1934. A "Joint Legislative Committee to Investigate Bondholders' Committees, Stockholders' Committees, Creditors' Committees, Certificate Holders' Committees, Corporations, Trustees and Fiduciaries" chaired by Saul S. Streit (the "Streit Committee") was created pursuant to an April 16, 1935 resolution of the Legislature. N.Y. Leg. Doc. (1936) No. 66 at 3.

162.     The Streit Committee found that as a result of massive MBS defaults, "a fertile field was created for unscrupulous underwriters who sold the bonds . . . the enrichment of trustees and of managing companies, many of whom under the pretense of protecting the unsuspecting victim of a defaulted bond profited at the expense of the bewildered bondholder." N.Y. Leg. Doc. (1936) No. 66 at 15.

163.     Regarding trustees specifically, the Streit Committee concluded that "[m]any trustees were generally negligent and remiss in their duty to bondholders." *Id*. at 10. The Committee observed: "After a default, however, with the scattered ownership of the bonds, the trustee's duties ought to be for the protection of the bondholders' interest. Yet there is no responsibility imposed upon the trustee." *Id*. at 19.  For example, the Streit Committee found that

75

the Continental Bank and Trust Company, the trustee for 126 MBS, engaged in "revolting" conduct and that the bank "was remiss in its duty as trustee, overcharged the bondholders, was dilatory in presenting plans for reorganization and indulged management companies in committing waste and extravagance." *Id*. at 41. When Edward Weinfield, then chief counsel for the Streit Committee, questioned trustee witnesses, they admitted that they did "nothing" for their fees and permitted companies servicing the properties underlying MBS to engage in vast waste. "Vast Waste Seen on Straus Bonds," *New York Times*, Nov. 27, 1935.

164.   Indeed, the Streit Committee found that the "general attitude of the trustees and their attorneys who appeared before this committee was that a trustee because of the claimed inadequacy of compensation prior to default could not be expected to assume active trust duties." N.Y. Leg. Doc. (1936) No. 66 at 20. An attorney for a trustee for over 100 MBS testified to the Committee: "It (the trustee) was relieved from practically every duty by an exculpatory clause – the trustee under this indenture could sit down and do nothing." *Id*. at 19. The same attorney stated: "I think in a sense it was fraud on the investors, because, I think, the ordinary man who buys a bond with a trust company as trustee imagines that the company has some duties to perform in looking after the security whereas in point of fact the trust indenture reads that the trustee can 'sit still and fold his hands if he chooses.'" *Id*. at 20.

165.   In May 1936, the New York Legislature passed the Streit Act. According to a subsequent Streit Committee report, the Act was "intended to afford genuine and not feigned protection to bondholders where issues were in default and imposing active duties upon a trustee under trust indentures." N.Y. Leg. Doc. (1937) No. 94 at 7. "These statutes looked toward adequate control of issues and sought to prevent continued waste in the administration of properties. They also sought to provide full protection to bondholders with respect to the

operation and management of properties secured by mortgages, participations of which in various forms had been sold and distributed to the public at large." *Id.*

166.   As set forth above, BNY Mellon has engaged in the same conduct and aggrieved Commerzbank in the same ways as the Depression-era trustees whose conduct the Streit Act was passed to remedy.  Like its predecessor MBS trustees, BNY Mellon has sat on its hands and done nothing in response to widespread breaches and defaults in the Covered Trusts and catastrophic losses suffered by certificateholders such as Commerzbank. Instead of exercising its powers to protect certificateholders such as Commerzbank, BNY Mellon sat idly and permitted servicers to loot the trust assets.  And BNY Mellon failed to act prudently post-Events of Default as set forth above.  BNY Mellon's action and failures to act—precisely the type of misconduct the Streit Act was enacted to remedy—violated the Streit Act.

## IV.   BNY MELLON BREACHED ITS DUTIES AS TRUSTEE FOR THE MILLSTONE II CDO

167.   The Millstone Indenture is dated as of May 25, 2006.  BNY Mellon (successor in trust to JPMorgan Chase Bank, National Association) was the trustee for the Millstone II CDO.  It succeeded JPMorgan Chase Bank, National Association, which was the original trustee under the Millstone Indenture.  Commerzbank as a noteholder was an express third-party beneficiary under the Millstone Indenture.

168.   Article VI of the Indenture sets forth certain of BNY Mellon's duties and responsibilities as trustee.  Section 6.1(b) provides:

> In case an Event of Default known to the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Holders of at least 66 2/3% in Aggregate Principal Amount of the Notes of the Controlling Class, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent Person would exercise or use under the

77

circumstances in the conduct of such Person's own affairs.

169.   Section 5.13(ii) of the Millstone Indenture reiterates:  "during the continuance of an Event of Default that has not been cured, the Trustee shall, prior to the receipt of directions, if any, from the Holders of at least 66 2/3% in Aggregate Principal Amount of the Notes of the Controlling Class and any other relevant Noteholders, exercise such of the rights and powers expressly vested in it by this Indenture and use the same degree of care and skill in its exercise, with respect to such Event of Default, as is required by Section 6.1(b)."

170.   BNY Mellon has numerous rights and powers under the Millstone Indenture, including, but not limited to:  (1) making any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document as it may see fit (Millstone Indenture, Section 6.3(f)); (2) instituting proceedings with respect to the underlying collateral (*id*. at Section 5.4(a)(iii)); (3) taking any appropriate action to protect and enforce the rights and remedies or noteholders (*id*. at Section 5.4(a)(iv)); and (4) exercising any other rights and remedies that may be available at law or equity (*id*. at Section 5.4(a)(v)).

171.   While BNY Mellon shall exercise remedies pursuant to directions from the requisite percentage of holders of the controlling notes, it has the right and power to exercise the rights vested in it without direction.  Section 5.13(b)(ii) of the Millstone Indenture makes clear that, even after receiving direction, BNY Mellon may still take any other action deemed proper by BNY Mellon which is not inconsistent with such directions. And, as set forth above, in the case of an Event of Default, absent receipt of any direction, BNY Mellon shall exercise all of its rights and powers vested in it by the Indenture with the same degree

78

of care and skill as a prudent person would exercise in the conduct of such person's own affairs.

172.    Pursuant to Section 6.15 of the Millstone Indenture, BNY Mellon is deemed a "Fiduciary for Noteholders," including Commerzbank, with respect to the delivery of any Pledged Obligation (i.e., the collateral) to BNY Mellon.  Therefore, BNY Mellon had fiduciary obligations to Commerzbank with respect to the collateral backing the Millstone II CDO.

173.    Pursuant to Section 6.1(c) of the Millstone Indenture, "[n]o provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct . . . ."

174.    On July 24, 2008, BNY Mellon issued a Notice of Event of Default under Section 5.1(h) of the Millstone Indenture because the Class A Principal Coverage ratio was below 100% (a ratio of collateral amount to principal amount outstanding on Class A notes). The Event of Default triggered BNY Mellon's prudent person duties under the Millstone Indenture.

175.    On August 21, 2008, BNY Mellon provided a Notice of Acceleration wherein it provided notice that a requisite amount of holders from the controlling class directed BNY Mellon to declare the principal and any accrued and unpaid interest on the notes to be immediately due and payable and terminate the Reinvestment Period.

176.    As acknowledged in writing by BNY Mellon, as a result of the acceleration of the notes, a further Event of Default under Section 5.1(a) of the Indenture occurred.  BNY Mellon further provided notice that the Event of Default was continuing until at least March 20, 2012—almost four years after it occurred.  Therefore, BNY Mellon's prudent person

duties under the Indenture were triggered for almost four years.

177.    On information and belief, BNY Mellon never received any directions from the requisite percentage of the controlling class of noteholders after the second Event of Default until the requisite percentage of noteholders directed BNY Mellon at or around March 20, 2012 to sell and liquidate all of the collateral pursuant to Section 5.4(a)(ii) of the Millstone Indenture.

178.    At the time of the direction to liquidate, Commerzbank had disposed of all of the Millstone Notes and therefore did not provide BNY Mellon the direction to liquidate.

179.    For the almost four years between the Events of Default in 2008 and BNY Mellon's receipt of the notice to liquidate, BNY Mellon breached its contractual, common law and fiduciary duties to Commerzbank.

180.    The collateral underlying the Millstone II CDO included RMBS certificates issued by the same sponsors as the Certificates detailed above for which BNY Mellon served as trustee, including, for example, certificates issued by Bear Stearns, Countrywide and Structured Asset Mortgage Investors (SAMI).  As set forth above, BNY Mellon had extensive knowledge and notice of widespread breaches by the sponsors, originators and servicers such as those involved in Bear Stearns, Countrywide and SAMI RMBS.

181.    Despite the occurrence and continuance of an Event of Default for almost four years, and BNY Mellon's knowledge of systematic breaches by the parties involved in many of the RMBS underlying the Millstone CDO, BNY Mellon exercise none of the rights and powers vested in BNY Mellon under the Millstone Indenture.

182.    A prudent person would have exercised the rights and powers vested it in by the Indenture to investigate the existence of potential claims and remedies to recover losses

caused by other parties' breaches in connection with the underlying collateral and then exercised remedies to recover the losses caused by those parties. BNY Mellon's failure to do so (or to do anything prudent for that matter) constituted a breach of its contractual duties, fiduciary duties and negligence.

## V.    BNY MELLON BREACHED THE COVENANT OF GOOD FAITH AND FAIR DEALING

183.    BNY Mellon's actions set forth above have had the effect of destroying and injuring the right of Commerzbank to receive the fruits of the contracts in connection with the Covered Trusts and the Millstone II CDO. BNY Mellon has engaged in an elaborate charade whereby it assumed all rights to enforce remedies on behalf of investors, such as Commerzbank, in the Covered Trusts and the Millstone II CDO, but abdicated all responsibility to enforce such rights.

184.    For example, as set forth above, upon discovery or notice of breaches of representations and warranties for loans underlying the Covered Trusts, BNY Mellon was obligated to provide notice to the other parties to the PSAs, which would lead to enforcement of the loan sellers' obligation to repurchase the defective loans. BNY Mellon also had the duty to provide notice when it became aware of loan servicers' breaches of the PSAs, which triggered Events of Default and, in turn, BNY Mellon's heightened duties to protect certificateholders such as Commerzbank.

185.    While BNY Mellon discovered or received notice of such breaches, BNY Mellon, as a result of conflicts of interest described below, actively sought to preclude or hinder the occurrence of those conditions precedent because it did not want to shed light on its own participation in the same type of breaches or jeopardize lucrative client relationships. BNY Mellon's actions deprived Commerzbank of the fruits of its contracts in violation of the covenant

81

of good faith and fair dealing.

## VI.   BNY MELLON SUFFERED FROM CONFLICTS OF INTEREST

186.   BNY Mellon failed and unreasonably refused to take action to protect the Covered Trusts and the certificateholders and the Millstone CDO II noteholders against Originator breaches and Servicer violations because it would reveal that BNY Mellon was an active participant in various servicing related misconduct and imperiled lucrative business relationships with the Originators and Servicers.

187.   With respect to the Millstone II CDO, one of the remedies that a prudent holder of the RMBS collateral would have analyzed and pursued were claims against the trustees for the underlying RMBS for failure to fulfill their contractual and fiduciary duties to, among other things, put back defective loans and protect the trusts from servicer misconduct.  However, BNY Mellon was conflicted because if it pursued those remedies against the RMBS trustees for Millstone II CDO collateral, BNY Mellon would have exposed its own breaches that are at issue in this Amended Complaint with respect to the Covered Trusts.

188.   If BNY Mellon had met its obligations, it would have revealed that BNY Mellon was the named plaintiff in proceedings in which forged, perjured, or other improper evidence was introduced by its attorneys on its behalf.  Thus, BNY Mellon had a powerful incentive to keep secret the Sponsors' and Originators' malfeasance.

189.   Moreover, as stated above, BNY Mellon earned substantial fees in its capacity as trustee typically based on the percentage of principal outstanding on the loans underlying the RMBS.  BNY Mellon was Countrywide's trustee of choice for over 530 RMBS trusts.

190.   BNY Mellon provided "a one-stop service from the initial funding of

mortgage loans through to their eventual securitizations" for Countrywide's mortgage business.  The Bank of New York 2006 Annual Report, p. 19, *available at* https://www.bnymellon.com/_global-assets/pdf/investor-relations/archive/bankofnewyork/annual-report-2006-the-bank-of-new-york-company-inc.pdf.

191.    These trustee engagements deepened BNY Mellon's business relationships with the sponsors and underwriters of the RMBS, including Countrywide, leading to more lucrative future engagements.  For example, according to BNY Mellon, as Countrywide grew "in both sophistication and global reach, [the BNY Mellon and Countrywide] relationship has expanded accordingly, and now includes securities clearing and tri-party repo collateral management for both Countrywide and its broker-dealer, Countrywide Securities." *Id.*

192.    Exemplifying the close relationship between BNY Mellon and Countrywide/Bank of America, following Bank of America's acquisition of Countrywide, Bank of America negotiated with BNY Mellon's CEO to become its CEO.  *See* Katie Benner & Shawn Tully, *Robert Kelly: Inside the fall of a superstar banker*, Fortune, Nov. 21, 2011, http://archive.fortune.com/2011/11/18/news/companies/robert_kelly_bank_new_york.fortune/index.htm.

193.    Further, BNY Mellon agreed to the proposed settlement of Countrywide's repurchase obligations only after Bank of America agreed to indemnify BNY Mellon for liabilities under the PSAs and the settlement agreement.

## VII.   BNY MELLON'S CONDUCT INJURED COMMERZBANK

194.    BNY Mellon's breaches of its contractual, statutory, and fiduciary duties have caused Commerzbank over one billion dollars in losses.

195.    If BNY Mellon had performed its duties as trustee for the Covered Trusts, it would have enforced the obligations of the Sponsors and Originators and caused them to buy back, or replace with non-defective loans, the vast majority, if not all, of the loans that ultimately defaulted and caused Commerzbank's losses.  And if BNY Mellon had enforced these repurchase or substitution obligations, as it was required to do, the Certificates would have retained their market value, as highly rated bonds with similar coupon rates are now trading at a very significant premium.

196.    Similarly, if BNY Mellon had performed its duties as trustee for the Millstone II CDO, it would have pursued remedies against parties, such as the sponsors, underwriters and trustees that breached their duties in connection with the underlying RMBS and other collateral. And if BNY Mellon had pursued remedies against such parties, as it was required to do, it could have obtained recoveries for the Millstone II CDO noteholders, including Commerzbank, and the Millstone Notes would have retained their market value.

197.    Further, BNY Mellon's failure to address the Servicers' failure to adhere to prudent servicing practices also increased the loss severities (*i.e.*, the amount of principal loss caused by defaults) on defaulted loans dramatically.  The extended foreclosure timelines that resulted from document delivery failures and the robo-signing scandal resulted in increased servicing fees, increased property taxes and utility expenditures, which were borne by the Covered Trusts, a decline in value of the underlying properties, and ultimately less sale proceeds for the Covered Trusts and certificateholders.  The

84

overcharging for default related services and forced-placed insurance further increased loss severities as those overcharges were collected by the Servicer from foreclosure sale proceeds.

198.    If BNY Mellon had met its contractual, statutory, and fiduciary duties as trustee for the Covered Trusts to accept delivery of notes and mortgage loan files, inspect them, give notice as required, and issue accurate certifications, it would have caused the Sponsors or Originators to substitute or repurchase all loans where the Servicers, Sponsors, Depositors, and Originators failed to deliver required documentation to the Trustee or breached representations and warranties regarding the mortgage loans.  This would have included numerous loans that had already defaulted or would ultimately default.  Moreover, BNY Mellon's failure to take delivery of complete note and mortgage files or adequately inspect them has placed a cloud over title and has limited the Covered Trusts' ability to efficiently foreclose on properties underlying the Covered Trusts, which has ultimately impacted the market value of the Certificates.  Additionally BNY Mellon's failure to commence damages actions against the Servicers caused further losses and emboldened these parties to continue their lucrative servicing scams.

199.    BNY Mellon's breaches with respect to the Sold Certificates and the Millstone Notes significantly reduced the sale price Commerzbank ultimately received when it divested itself of the certificates and the Millstone Notes.  When the sales were made it was apparent that BNY Mellon had breached its duties and would not take steps to remedy its failures.  The sales of the Sold Certificates and the Millstone Notes were made by London Branch and the economic loss from those sales were experienced in Commerzbank in England where London Branch is located and/or in Germany where Commerzbank is

85

located.  The sale of the Sold Certificates did not include the assignment of any of Commerzbank's legal claims and therefore Commerzbank has retained all its legal claims against BNY Mellon.

200.    BNY Mellon's failure to meet its contractual, fiduciary, statutory, and common law duties once it became aware of defaults relating to the numerous representation and warranty breaches by the Sponsors or Originators further caused harm.  If BNY Mellon had provided notice of representation and warranty violations and defaults and acted with due care as it was required to do upon the occurrence of a default or Event of Default, it would have caused the Sponsors or Originators to repurchase loans and required the Servicers to replace the assets they have looted from the Covered Trusts.

201.    Many, if not all, of the repurchase or substitution claims concerning the Covered Trusts and claims against many of the breaching parties, such as the sponsors and underwriters, in connection with the collateral backing the Millstone II CDO described above have lapsed due to BNY Mellon's inaction.  Specifically, courts have held that the underlying representation and warranty claims that BNY Mellon failed to pursue accrued for statute of limitations purposes on the date of the closing of the relevant securitizations.

202.    BNY Mellon's breach of its duties further damaged Commerzbank because it was reasonably foreseeable that BNY Mellon's cloaking of mortgage origination and servicing abuses infecting the RMBS shelves from which the Covered Trusts were issued, such as the Countrywide shelves, would perpetuate fraudulently assembled RMBS proximately causing repeat bond purchasers, such as Commerzbank, to continually acquire RMBS from those shelves and suffer massive losses.

86

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**(Violations of the TIA)[10]**
**(with respect to the Certificates)**

203.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

204.    The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is an "indenture trustee" under the TIA.  15 U.S.C. § 77aaa(7), (10).

205.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the TIA.

206.    The TIA applies to the PSAs and the related Certificates. 15 U.S.C. § 77ddd(a)(1).

207.    BNY Mellon violated the TIA in at least three ways.

208.    First, TIA Section 315(b) provides that the indenture trustee must notify certificateholders of "all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. § 77ooo(b) (citing 15 U.S.C. § 77mmm(c)).  As set forth above, BNY Mellon failed to carefully investigate serious, known issues with the loans in the Covered Trusts, or to notify certificateholders of numerous defaults, including the failure of the responsible parties to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of representations and warranties.

209.    Second, in the case of defaults (as that term is defined in the indenture), the TIA requires that the trustee exercise its rights and powers under the governing agreement as a

---

[10] Commerzbank acknowledges that the United States Court of Appeals for the Second Circuit has held that the TIA does not apply to RMBS similar to certain of the RMBS at issue here.  Plaintiff includes a claim under the TIA with respect to those RMBS to the extent there are any further developments in the law and for purposes of preserving any rights on appeal.

87

"prudent man would exercise or use [them] under the circumstances in the conduct of his own affairs." 15 U.S.C. § 77ooo(c).  Here, as set forth above, BNY Mellon did not act prudently after learning of numerous serious issues related to material breaches of representations and warranties, servicer defaults, and Events of Default.  A prudent person would have taken action to investigate these issues carefully, pursue repurchase remedies, and cure defective mortgage loans.  In addition, a prudent person would have taken action against the responsible parties for the failure to properly execute and deliver mortgage file documents.

210.   Finally, the TIA states that "[n]otwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security . . . shall not be impaired or affected without the consent of such holder." 15 U.S.C. § 77ppp(b).  BNY Mellon has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment in connection with defective mortgage loans for which it failed to take action to correct.  In addition, BNY Mellon has impaired the ability of the Covered Trusts, and consequently the certificateholders, to receive payment by failing to enforce the repurchase remedy.

211.   These breaches materially and adversely affected the interests of the certificateholders, including Commerzbank, because they resulted in the Covered Trusts being burdened with large numbers of defective loans that should have been put back to the responsible parties.

212.   BNY Mellon is liable to Commerzbank for damages incurred as a result of its violations of the TIA in an amount to be determined at trial.

## **SECOND CAUSE OF ACTION**
### **(Breach of Contract)**
### **(with respect to the Certificates and Millstone Notes)**

213.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

214.    The PSAs are valid and binding contracts entered into between BNY Mellon, each Covered Trust, the Sponsors, the Servicers, and the Depositors, and the Millstone Indenture is a valid and binding contract entered into between BNY Mellon and the Millstone CDO Issuers.

215.    The PSAs provide, among other things, the terms under which BNY Mellon acts as trustee for the Covered Trusts, and the Millstone Indenture provides, among other things, the terms under which BNY Mellon acts as trustee for the Millstone II CDO.

216.    As current holders and/or former holder of Certificates or Notes issued by each Covered Trust and the Millstone II CDO, Commerzbank is or was an express, intended third-party beneficiary under the PSAs and the Millstone Indenture entitled to enforce the performance of the Trustee.

217.    BNY Mellon breached several obligations that it undertook on behalf of Commerzbank as certificateholder in the Covered Trusts and noteholder in the Millstone II CDO including, without limitation, to:

> (a)    take steps to cause the Sponsors or Originators to repurchase loans eligible for repurchase and to pursue remedies against parties that breached their duties in connection with the collateral backing the Millstone II CDO;

> (b)    investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

89

(c)    make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

(d)    provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

(e)    enforce the repurchase obligations of the Sponsors and/or Originators.

218.    The specific provisions of the PSAs and the Millstone Indenture breached by BNY Mellon are further detailed herein and in the attached Exhibits hereto.

219.    BNY Mellon's breach of its duties set forth in the PSAs and the Millstone Indenture, as described above, caused Commerzbank's losses on its Certificates and the Millstone Notes and diminished their value.

220.     Commerzbank has performed its obligations under the PSAs and the Millstone Indenture.

221.     BNY Mellon is liable to Commerzbank for the losses it suffered as a direct result of BNY Mellon's failure to perform its contractual obligations under the PSAs and the Millstone Indenture.

### THIRD CAUSE OF ACTION
**(Breach of Fiduciary Duty)**
**(with respect to the Certificates and Millstone Notes)**

222.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

223.    As set forth in detail above, BNY Mellon owed certificateholders and noteholders, including Commerzbank, a duty to exercise all powers under the PSAs and the Millstone Indenture to act prudently to protect certificateholders' and noteholders' rights once an Event of Default occurred or payments to certificateholders or noteholders became

90

impaired.  This included, without limitation, duties to protect the interests of the beneficiaries of the Covered Trusts and Millstone II CDO, make prudent decisions concerning the exercise of appropriate remedies following Events of Default, and enforce the repurchase obligations of the Sponsors and/or Originators.

224.    As set forth in detail above, BNY Mellon breached its fiduciary obligations by failing to perform these obligations and by failing to exercise due care and avoid conflicts of interest.

225.    The violations by BNY Mellon of its fiduciary obligations impaired certificateholders' and noteholders' ability to fully collect the principal and interest due on their certificates and notes and caused losses in the value of Commerzbank's Certificates and Millstone Notes.

## FOURTH CAUSE OF ACTION
### (Negligence—Failure to Avoid Conflicts of Interest and Perform Ministerial Acts with Due Care) (with respect to the Certificates and Millstone Notes)

226.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

227.    BNY Mellon owed certificateholders and noteholders, including Commerzbank, extra-contractual duties to perform ministerial acts with due care and avoid conflicts of interests.  As described above, BNY Mellon performed or failed to perform its responsibilities in a grossly inadequate and negligent manner.

228.    BNY Mellon's negligence and gross negligence impaired certificateholders' and noteholders' ability to fully collect the principal and interest due on their certificates and notes and caused losses in the value of Commerzbank's Certificates and Millstone Notes.

91

**FIFTH CAUSE OF ACTION**
**(Violation of the Streit Act)**
**(with respect to the Certificates)**

229.    Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

230.    As a certificateholder, Commerzbank is a trust beneficiary entitled to the protections afforded under the Streit Act.  The Streit Act was enacted to provide for the proper administration of mortgage trusts and requires that the trustee must exercise due care in performing its obligations.  N.Y. Real Prop. Law § 124.

231.    The Certificates are "mortgage investments" subject to the Streit Act.  N.Y. Real Prop. Law § 125(1).

232.    The PSAs underlying and establishing the Covered Trusts are "indentures," and BNY Mellon is a "trustee" under the Streit Act.  N.Y. Real Prop. Law § 125(3).

233.    Section 126(1) of the Streit Act provides that upon an "event of default" the indenture trustee must exercise such of the rights and powers vested in it by the indenture, and must use the same degree of care and skill in its exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

234.    Section 130-e of the Streit Act provides that "[a] trustee, committee or any member thereof and a depositary may be removed by the court *for cause shown upon the application of any person aggrieved by the act or omission to act of such trustee*, committee, member or depository after such notice and opportunity to be heard in his or her defense as the court shall direct."

235.    As set forth above, BNY Mellon failed to exercise its rights under the PSAs after becoming aware of "events of default" by failing to:

      (a)     protect the interests of the beneficiaries of the Covered Trusts;

      (b)     take steps to cause the Sponsors or Originators to repurchase loans lacking adequate documentation;

      (c)     investigate and give notice to all parties to the PSAs of the breach of representations and warranties relating to the mortgage loans once it discovered the Sponsors' and Originators' widespread practice of including in securitization trusts loans which breached such representations and warranties;

      (d)     make prudent decisions concerning the exercise of appropriate remedies following Events of Default;

      (e)     provide notice of and take steps to remedy the Servicers' failure to adhere to prudent servicing standards and otherwise perform their obligations under the PSAs; and

      (f)     enforce the repurchase obligations of the Sponsors and/or Originators.

236. BNY Mellon is liable to Commerzbank for damages incurred as a result of its violations of the Streit Act.

## SIXTH CAUSE OF ACTION
### (Breach of the Covenant of Good Faith)
### (with respect to the Certificates and Millstone Notes)

237. Commerzbank repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

238. At all relevant times, BNY Mellon owed Commerzbank, as an express, intended third-party beneficiary under the PSAs and the Millstone Indenture, a duty of good faith and fair dealing pursuant to the PSAs that required BNY Mellon to ensure that it did not, by act or omission, injure the rights of Commerzbank to receive the benefits and protections provided for under the PSAs and the Millstone Indenture.

239. As set forth above, BNY Mellon deprived Commerzbank of the fruits of its contracts by, for example, acting to prevent conditions precedents from occurring that would

have triggered benefits for Commerzbank and duties for BNY Mellon.

240.    By the conduct described above, BNY Mellon breached its duty of good faith and fair dealing under the PSAs and the Millstone Indenture.

241.    BNY Mellon's breaches are material.

242.    As a result of these breaches, Commerzbank has suffered damages and will continue to suffer damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Commerzbank prays for relief and judgment, as follows:

A.    Awarding compensatory damages and/or equitable relief in favor of Commerzbank against BNY Mellon for breaches of its statutory, contractual and fiduciary duties, its gross negligence, ordinary negligence and negligent misrepresentations, in an amount to be proven at trial, including interest thereon;

B.    Requiring BNY Mellon to take corrective actions, including taking all necessary actions to reform and improve its internal policies and procedures to comply with its trustee obligations under the PSAs and applicable laws, to cease breaching its duties under the PSAs and applicable laws, and to protect certificateholders, including Plaintiff, in the Covered Trusts from a repeat of the damaging events described herein;

C.    Awarding Commerzbank its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Commerzbank hereby demands a trial by jury on all issues triable by jury.

94

Dated: April 8, 2016

Respectfully submitted,

/s/ *David H. Wollmuth*

David H. Wollmuth
Steven S. Fitzgerald
Ryan A. Kane
Robert T. Franciscovich
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
Phone: (212) 382-3300
Fax: (212) 382-0050
dwollmuth@wmd-law.com
sfitzgerald@wmd-law.com
rkane@wmd-law.com
rfranciscovich@wmd-law.com

*Attorneys for Plaintiff*